IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

JANE DOE,                                    )          Case No. 8:17-cv-265
                                             )
              Plaintiff,                     )
                                             )
     vs.                                     )     **BRIEF SUPPORTING PLAINTIFF'S**
                                             )     **MOTION TO QUASH, FOR PROTECTIVE**
BOARD OF TRUSTEES OF THE                     )     **ORDER AND FOR REASONABLE**
NEBRASKA STATE COLLEGES,                     )     **ATTORNEY'S FEES**
a Political Subdivision of the State         )
of Nebraska,                                 )
                                             )
              Defendant.                     )

"The harassing practice of deposing opposing counsel (unless that counsel's testimony is crucial and unique) appears to be an adversary trial tactic that does nothing for the administration of justice, but rather prolongs and increases the costs of litigation, demeans the profession, and constitutes an abuse of the discovery process."

-- *Shelton v. American Motors Corp.*, 805 F.2d 1323, 1330 (8th Cir. 1986) (reversing default judgment entered as sanction for defense counsel's refusal to answer deposition questions).

# TABLE OF CONTENTS

Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Timeline for This Dispute . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    Introduction: the *Shelton* Rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.    IF ALL DEFENDANT SEEKS IS AUTHENTICATION/FOUNDATION FOR CORRESPONDENCE, OTHER MEANS EXIST TO OBTAIN THE INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    II.    "ANY STATEMENT MS. CHALOUPKA MIGHT MAKE IN HER OPENING AND CLOSING STATEMENT, OR WHILE QUESTIONING WITNESSES (INCLUDING HER OWN CLIENT)" CONSTITUTES WORK PRODUCT . . . . . . . . . . . . . . . . . . . 15

    III.    DEFENDANT'S CHARACTERIZATIONS OF PRE-FILING COMMUNICATIONS, AND THE UNDERSIGNED'S RESPONSE TO ITS OWN PRE-FILING TACTICS, ARE NOT "RELEVANT EVIDENCE" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    IV.    THE INFORMATION SOUGHT IS NOT CRUCIAL TO THE PREPARATION OF DEFENDANT'S CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    V.    DEFENDANT'S TACTIC CREATES THE RISK OF DENYING DOE HER CHOICE OF COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    VI.    IF DEFENDANT DEPOSES THE UNDERSIGNED, THE "GOOSE/GANDER" RULE APPLIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

    VII.    THIS COURT SHOULD ORDER DEFENDANT TO PAY ATTORNEY'S FEES ASSOCIATED WITH THE COST OF LITIGATING THIS MOTION

           . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

UNITED STATES SUPREME COURT
*Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

UNITED STATES CIRCUIT COURTS OF APPEAL
*Dove v. Atlantic Capital Corp.*, 963 F.2d 15 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Flury v. Daimler Chrysler Corp.*, 427 F.3d 939(11th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 23

*Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726 (8th Cir. 2002). . . . . . . . . . . . . . . . . . . . . 8, 9

*Shelton v. American Motors Corp.*, 805 F.2d 1323 (8th Cir. 1986). . . . . . . . . . . . . . . . . . . *passim*

*United States v. Brazel*, 102 F.3d 1120 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

UNITED STATES DISTRICT COURTS
*Ackermann v. New York City Dept. of Information Technology & Telecommunications*, 2010 WL 1172625 at *1 (E.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . 5

*AMW Materials Testing, Inc. v. Town of Babylon*, 215 F.R.D. 67 (E.D.N.Y. 2003) . . . . . . . . 4

*Bostick v. Atlantic Mut. Ins. Co.*, 2008 WL 11338091 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . 25

*Corsentino v. Hub Int'l Ins. Servs., Inc.*, 2018 WL 1182403 (D. Colo. 2018) . . . . . . . . . . . 9-13

*Cobb v. City of Roswell*, 2011 WL 13262054(N.D. Ga. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . 14

*D-4 Men, Inc. v. Allstate Ins. Co.*, 2010 WL 11512205 (N.D. Ga. 2010) . . . . . . . . . . . . . . . . 19

*Ditech Fin. LLC v. SFR Investments Pool 1, LLC*, 2016 WL 4370034 (D. Nev. 2016) . . . . . 23

*Dong-Youi v. Pacific Indem. Co.*, 2018 WL 3043679 (D.N.J. 2018) . . . . . . . . . . . . . . . . . . . . 12

*Ganan v. Martinez Mfg., Inc.*, 2003 WL 21938604 (N.D. Ill. 2003) . . . . . . . . . . . . . . . . . . 31-32

*GSI Technology, Inc. v. United Memories, Inc.*, 2015 WL 12942202 (N.D. Cal. 2015) . . . . . . 25

*Ille v. American Family Mut. Ins. Co.*, 2004 WL 741843 (D. Minn. 2004) . . . . . . . . . . . . . . . 26

*Johnson v. Couturier*, 261 F.R.D. 188 (E.D. Cal. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 31

*K.B. v. Methodist Healthcare-Memphis Hosps.*, 2017 WL 4979131 (W.D. Tenn. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28

*K.R. v. Clarity Child Guidance Ctr.*, 4 F. Supp.3d 856 (W.D. Tex. 2010) . . . . . . . . . . . . 34-35

*Keen v. Bovie Med. Corp.*, 2013 WL 3832382 (M.D. Fla. 2013). . . . . . . . . . . . . . . . . . . . . . . . 23

*Kimbrough v. City of Cocoa*, 2006 WL 3500873 (M.D. Fla. 2006) . . . . . . . . . . . . . . . . . . 23, 24

*Marco Island Partners v. Oak Development Corp.*, 117 F.R.D. 418 (N.D. Ill. 1987) . . . . . 19-20

*Pigott v. Sanibel Dev., LLC*, 2007 WL 2713188 (S.D. Ala. 2007) . . . . . . . . . . . . . . . . . . . . . . 16

*Scourtes v. Fred W. Albrecht Grocery Co.*, 15 F.R.D. 55 (N.D. Ohio 1953) . . . . . . . . . . . 30-31

*Secure Energy, Inc. v. Coal Synthetics*, 2010 WL 199953 (E.D. Mo. 2010) . . . . . . . . . . . . . . 22

*Securities & Exchange Comm'n v. Johnson*, 2007 WL 9702653 (D.D.C. 2007) . . . . . . . . . 21-22

*Strategic Forecasting, Inc. v. Scottsdale Indem. Co.*, 2013 WL 12183361 (W.D. Tex. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Warzon v. Drew*, 155 F.R.D. 183 (E.D. Wis. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Williams v. Wellston City Sch. Dist.*, 2010 WL 4513818 (S.D. Ohio 2010) . . . . . . . . . . . . . . 16

STATE APPELLATE COURTS
*Surf Drugs, Inc. v. Vermette*, 236 So. 2d 108 (Fla. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Jane Doe, Plaintiff in the above-captioned matter, by and through her counsel of record, submits this Brief Supporting Plaintiff's Motion to Quash and for Protective Order and for Reasonable Attorney's Fees:

## BACKGROUND

This is a Title IX case.  DOE challenges Defendant's actions and inactions after she reported on September 19, 2016 that a student named Anthony Ige had sexually assaulted her.  On September 29, 2016, Defendant's then-interim Title IX Coordinator, Anne DeMersseman, issued a finding that Ige had sexually assaulted DOE in May and September 2016.  This case does not challenge whether Defendant could have prevented Ige from raping DOE.  The focus is on whether Defendant's allowance of Ige to remain in his dormitory at DOE's expense, and whether the lenient "discipline" Defendant selected for Ige at DOE's expense, were deliberately indifferent to DOE's right to equal access to Chadron State College's resources and opportunities.

On September 19, 2016, DOE reported to Chadron State College that she had been raped by another student.  Title IX Coordinator DeMersseman initially told DOE that the perpetrator would be removed from the dormitory complex where DOE worked, but that was changed without advising DOE.  On September 29, 2016, DeMersseman issued a finding that "sexual acts occurred both in May and in September which [DOE] did not consent to."  Defendant's Vice President for Student Affairs, Jon Hansen, approved this finding, and the perpetrator did not contest the finding. On October 25, 2016, Mr. Hansen advised DOE of his decision regarding the discipline he would impose on the perpetrator.

Between October 31 and November 14, 2016, DOE engaged in an email dialogue with Mr.

1

Hansen, explaining why Mr. Hansen's lenient choice of discipline was compromising her ability to obtain equal access to CSC's resources and opportunities. DOE's last email to Mr. Hansen was on November 14, 2016.[1]

Beginning on November 15, 2016, the undersigned drafted and mailed the letters that are now at issue, which were her first communications with CSC:

    \*      a November 15, 2016 letter to CSC Health Services, requesting DOE's health and counseling records; and

    \*      a November 18, 2016 letter to Mr. Hansen and then-CSC Title IX Coordinator Anne DeMersseman, asking that they preserve evidence, send records and cease direct contact with DOE.[2]

Defendant's System Director of Title IX, Taylor Sinclair, sent a letter to the undersigned on November 22; the undersigned sent a November 23, 2016 letter to Ms. Sinclair (and also copied to Mr. Hansen). Defendant's in-house counsel, Kristin Peterson, sent the undersigned a letter on November 30, 2016.[3]

DOE graduated from Chadron State College (though she did not attend the graduation ceremony) on or about December 15, 2016.[4]

### TIMELINE FOR THIS DISPUTE

September 11, 2017      In ¶ 27 of its Answer, Defendant alleges that "CSC repeatedly requested of both DOE and her legal

---

[1] *Affidavit of Maren Lynn Chaloupka*, Exhibits S, T, U, V and W.

[2] *Affidavit of Maren Lynn Chaloupka*, Exhibit A (attachments to email from defense counsel).

[3] *Id.*

[4] *Affidavit of Maren Lynn Chaloupka* at ¶ 6.

2

|  | counsel that they inform CSC of any further concerns or necessary accommodations. Neither DOE nor her legal counsel ever told CSC that DOE was concerned about encountering Respondent in the Counseling Center, or that DOE may need alternate counseling locations or times.") |
|---|---|
| December 4, 2017 | Defendant lists the undersigned as a person likely to have discoverable information in its Rule 26 disclosures, writing that "Ms. Chaloupka may have knowledge regarding communications with CSC on Plaintiff's behalf regarding CSC's response to Plaintiff's allegations of sexual assault."[5] |
| September 10, 2018 | Defendant's first articulation of its position that the undersigned is a "necessary witness," and its intent to depose the undersigned, during a telephonic hearing with this Court. The undersigned objected. There was no further communication from defense counsel on this issue after September 10, 2018, until November 20, 2018.[6] |
| September 17, 2018 | Deadline for completion of written discovery passes without any effort by Defendant to pursue obtaining admissions regarding the authenticity of the undersigned's correspondence to CSC or completeness of the undersigned's communications with CSC.[7] |
| November 14-16, 2018 | The undersigned deposes eight current and former employees of Chadron State College. Attorney Tom Johnson appears for Defendant, accompanied by paralegal Kim Brown. Defense counsel does not raise the issue of deposing the undersigned at any point during these depositions. During the depositions, evidence is developed that supports the allegations in |

---

[5] *Affidavit of Maren Lynn Chaloupka* at ¶ 8.

[6] *Id.* at ¶ 2.

[7] *Id.* at ¶ 7.

3

DOE's Complaint.[8]

November 20, 2018     For the first time in the two months and ten days since the September 10, 2018 telephonic hearing, Defendant renews its position (via email to the undersigned) that the undersigned is a "necessary witness" whom Defendant is allegedly entitled to depose.[9]

# ARGUMENT

## STANDARD OF REVIEW

Parties are protected from abuse in the liberal discovery system by FED. R. CIV. P. 26(c).[10]

Rule 26(c)(1) states that:

> A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending ... The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense ...

If the movant establishes good cause for protection, the court may balance the countervailing interests to determine whether, in the exercise of its discretion, to grant the order.[11] Courts may also

---

[8]*Id.* at ¶ 3.

[9]*Id.* at ¶ 2.

[10]*See AMW Materials Testing, Inc. v. Town of Babylon*, 215 F.R.D. 67, 72 (E.D.N.Y. 2003) ("While the Federal Rules mandate a liberal standard, district courts are empowered to issue protective orders to temper the scope of discovery under [Rule 26(c) ]"); *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984) ("Because of the liberality of pretrial discovery permitted by Rule 26(b)(1), it is necessary for the trial court to have the authority to issue protective orders conferred by Rule 26(c)").

[11]*Dove v. Atlantic Capital Corp.,* 963 F.2d 15, 19 (2d Cir. 1992) ("The grant and nature of protection is singularly within the discretion of the district court and may be reversed only on a

act within their discretion to quash, or not quash, a notice of deposition or deposition subpoena.[12]

INTRODUCTION: THE <i>SHELTON</i> RULE

***Shelton v. American Motors Corp.***[13] was a product liability case arising from the death of a child.   Discovery was contentious, and eventually led to the plaintiff noticing the deposition of the defendant's in-house counsel.   The defense moved to quash the depositions and requested a protective order.   The magistrate granted the protective order in part, but denied the motion to quash; and when the plaintiffs deposed the in-house counsel, she refused to answer questions based on work product and attorney-client privilege.   The questions at issue "primarily concern the existence or non-existence of various documents" regarding the product in question.[14]

The magistrate ordered the defendant to bring its in-house counsel to court, to give her deposition before the magistrate so that the magistrate could rule in real time on privilege-based objections.   The in-house counsel again refused to answer, again asserted privilege and, when the magistrate ordered her to respond, she refused to answer.   The magistrate then sustained the plaintiffs' motion for default judgment on the issue of liability as a sanction.[15]   The court had held that "neither objection can properly bar inquiry into [the in-house counsel's] mere knowledge of the

---

clear showing of abuse of discretion ..." (internal citations and quotation marks omitted)).

[12]***Ackermann v. New York City Dept. of Information Technology & Telecommunications***, 2010 WL 1172625 at *1 (E.D.N.Y. 2010).

[13]***Shelton v. American Motors Corp.***, 805 F.2d 1323 (8th Cir. 1986).

[14]***Id.*** at 1325.

[15]***Id.*** at 1326.

5

existence of the documents."[16]  The defendant appealed.

The United States Court of Appeals for the Eighth Circuit framed the issue as

whether a deponent's mere acknowledgment of the existence of corporate documents is protected by the work product doctrine or the attorney-client privilege.[17]

It found that

where, as here, the deponent is opposing counsel and has engaged in a selective process of compiling documents from among voluminous files in preparation for litigation, the mere acknowledgment of the existence of those documents would reveal counsel's mental impressions, which are protected as work product.

Thereupon, the Circuit reversed the order granting default judgment.

At the outset of its analysis, the **Shelton** court observed that

[i[n recent years[18], the boundaries of discovery have steadily expanded, and it appears that the practice of taking the deposition of opposing counsel has become an increasingly popular vehicle of discovery.  To be sure, the Federal Rules of Civil Procedure do not specifically prohibit the taking of opposing counsel's deposition.  We view the increasing practice of taking opposing counsel's deposition as a negative development in the area of litigation, and one that should be employed only in limited circumstances.[19]

The court acknowledged that trial preparation would be much easier if a lawyer "could dispense with

interrogatories, document requests and depositions of laypersons, and simply depose opposing counsel

in an attempt to identify the information that opposing counsel has decided is relevant and important

---

[16]***Id.***

[17]***Id.***

[18]***Shelton*** is a 1986 opinion.  The 2015 amendments to the Federal Rules of Discovery reinforced proportionality analysis, moving that provision to part (b)(2)(C) of the Rule dealing with a court's power to limit discovery, ***i.e.***, Rule 26.

[19]***Shelton***, 805 F.2d at 1327.

to his legal theories and strategy."[20]  But the downside of allowing this practice was obvious: "Taking the deposition of opposing counsel not only disrupts the adversarial system and lowers the standards of the profession[.]"[21]

Further, allowing the deposition of counsel would add to the costs of litigation, which are already consequential.[22]  The *Shelton* court noted that this practice precipitates additional delays to resolve work-product and attorney-client objections.  The court also predicted delays to resolve collateral issues raised by the attorney's testimony.

Finally, the Eighth Circuit observed,

> the practice of deposing opposing counsel detracts from the quality of client representation.  Counsel should be free to devote his or her time and efforts to preparing the client's case without fear of being interrogated by his or her opponent.  Moreover, the "chilling effect" that such practice will have on the truthful communication from the client to the attorney is obvious.[23]

The Eighth Circuit stopped short of finding that opposing trial counsel is absolutely immune from being deposed.  It cautioned, however, that this should take place only where the party seeking the take the deposition "has shown that (1) no other means exist to obtain the information than to depose opposing counsel, (2) the information sought is relevant and non-privileged, and (3) the information is crucial to the preparation of the case."[24]  And it clarified that the burden is on the

---

[20]*Id.* at 1327.

[21]*Id.*

[22]And which, in a case like this, are accompanied by a significant disparity in resources. Defendant, its multiple in-house counsel and its two law firms of record may be compared to DOE, a young African immigrant, and her only-one attorney.

[23]*Id.*

[24]*Id.* at 1327.

party seeking the deposition to satisfy these criteria.[25]

The plaintiffs of *Shelton* failed this test.  The court found that the information sought could be obtained by other means.  The defense had actually suggested that the plaintiffs depose its corporate officials who were not attorneys, a suggestion that the plaintiffs had ignored.

As to the second component, the Circuit found that "in-house counsel's knowledge of the existence of the documents in these circumstances is protected by the work product doctrine."[26]  The issue was not whether the documents themselves constituted work product; but whether the in-house counsel's acknowledgment of the existence of particular documents would reflect her judgment as an attorney in identifying, examining and selecting from the defendant's files those documents on which she would rely in preparing the defense.  The *Shelton* court agreed that requiring her to testify of her awareness that documents exist a certain issue was "tantamount to requiring her to reveal her legal theories and opinions concerning this issue."[27]

The Eighth Circuit later clarified the *Shelton* rule, stating that *Shelton* "was not intended to provide heightened protection to attorneys who represented a client in a completed case and then also happened to represent that same client in a pending case where the information known only by the attorneys regarding the prior concluded case was crucial."[28]  This case does not fall outside of *Shelton* as so clarified.  Defendant seeks to depose the undersigned relative to her representation of DOE in this case, which is still pending.

---

[25]*Id.*

[26]*Id.* at 1328.

[27]*Id.*

[28]*Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 730 (8th Cir. 2002).

8

A more recent application of **Shelton**, which applies to an effort to depose trial counsel, can be found in the insurance bad faith case of **Corsentino v. Hub Int'l Ins. Servs., Inc.**[29]  **Corsentino** arose from a car crash, wherein the policyholder caused a car crash with the plaintiff-intervenor, rendering the plaintiff-intervenor a tetraplegic.  The policyholder's insurer refused coverage.  The plaintiff-intervenor then sued the policyholder (which the insurer refused to defend) and obtained a large judgment against the policyholder.  The policyholder then sued her insurer, alleging bad faith refusal to defend and indemnify.

When the policyholder served Rule 26 disclosures in the bad faith case, she identified, as individuals with knowledge of facts relevant to her claims, two attorneys who represented the plaintiff-intervenor in the underlying lawsuit and trial, and who continued to represent the plaintiff-intervenor in the ongoing bad faith case.  The insurer thus noticed the deposition of those attorneys.  The plaintiff-intervenor moved for a protective order.  In the briefing on that motion, the policyholder maintained that she believed that the plaintiff-intervenor's attorneys could be witnesses, although she took no position on whether they should be deposed.[30]

Citing **Pamida**, the insurer argued that **Shelton** did not apply, because it wanted to depose the plaintiff-intervenor's attorneys with regard to the prior, underlying litigation between the plaintiff-intervenor and the policyholder and not with regard to those attorneys' involvement in the pending bad faith case.  The insurer identified three areas of testimony it wished to explore through the proposed depositions of the plaintiff-intervenor's attorneys.  The United States District Court

---

[29]**Corsentino v. Hub Int'l Ins. Servs., Inc.**, 2018 WL 1182403 (D. Colo. 2018).

[30]**Id.** at *2.

for the District of Colorado – after finding that *Shelton* did apply, given the plaintiff-intervenor's attorneys' involvement in the pending bad faith case – addressed each argument in turn.

First, the insurer contended that the plaintiff-invervenors' attorneys had information relating to the insurer's affirmative defense that the policyholder may have failed to take reasonable steps under the circumstances to mitigate damages.[31]  The insurer contended that the policyholder's trial counsel in the underlying lawsuit had communicated with the plaintiff-intervenor's attorneys "concerning the direction of the defense and possible collusion."  The insurer suggested that the policyholder had deliberately failed to vigorously defend the underlying lawsuit, and that her lawyer had colluded with the plaintiff-intervenor's attorneys to assure a large verdict that could then be pursued in the bad faith case.[32]

The court assumed only for the sake of argument that the insurer may challenge the reasonableness of the underlying verdict, including by asserting fraud or collusion.  It then observed that the insurer actually had deposed the attorney for the policyholder in the underlying car crash case, but had not explored the topics with him that it now wished to include in its proposed deposition of the plaintiff-intervenor's attorneys.  The insurer could only make a generalized argument that "recollections and interpretations of communications can vary," and that it believed it was "entitled to every man's evidence to discover this case and to mount its defense."  The court responded that

[s]uch generalized arguments ... are completely at odds with the *Shelton* factor

---

[31]*Id.* at *4.

[32]As if a large verdict, in a case arising from a car crash that left the victim tetraplegic, could not happen in any way except through lawyer skullduggery.

10

> requiring the Court to consider whether other means exist to obtain the information sought. [The insurer's] argument would justify the deposition of an opposing party's counsel in every case.[33]

The court's review of emails between the policyholder's trial counsel and the plaintiff-intervenor's lawyers revealed nothing unethical, improper or illegal.

Potentially germane to this case, the insurer complained that it wanted more information about why the plaintiff-intervenor's attorneys did not respond to correspondence from the insurer. The court responded that even if that information was relevant (and the court made no finding that it was),

> that information is protected by the work product doctrine and potentially also by the attorney-client privilege to the extent the decision not to respond was based upon a directive from [the plaintiff-intervenor] to their attorneys.[34]

Thus the court rejected this argument for deposing the plaintiff-intervenor's attorneys.

Next, the insurer contended that the plaintiff-intervenor's attorneys may have discoverable information regarding the insurer's affirmative defense based on the statute of limitations. It contended that communications between the policyholder's lawyer in the underlying case and the plaintiff-intervenor's attorneys were relevant to when the policyholder knew or should have known of her potential exposure and damage resulting from the insurer's refusal to defend and indemnify. The court's analysis of this argument began with the observation that "several of the proposed topics ... do not appear to be relevant to any statute of limitations defense."[35] Communications regarding

---

[33]*Id.* at *5.

[34]*Id.* at *6.

[35]*Id.* at *7.

11

the plaintiff-intervenor's intent to bring claims against the policyholder might have been relevant, but the insurer offered no explanation for why it had failed to explore these topics during its deposition of the policyholder's lawyer.

The court thereupon rejected this basis for deposing the plaintiff-intervenor's attorneys. It also rejected the insurer's argument that it "needs to ask questions, to see if privilege will be asserted and the information withheld."[36] The insurer cited no authority supporting that proposition; and the court observed that "it is contrary to the *Shelton* factor requiring the Court to consider whether the information sought is privileged." Explaining further, the court wrote that "if a party were permitted to depose its adversary's counsel merely to confirm that a privilege would be asserted, depositions of opposing counsel would be permitted in every case."[37]

Finally – also sort of germane to this case, as Defendant has made the undersigned into a character in this story in its Answer, and has identified the undersigned as a person with knowledge in its Rule 26 disclosures – the insurer complained that the policyholder had identified the plaintiff-intervenor's attorneys as witnesses in her Rule 26 disclosures.[38] The court noted that the insurer had provided no legal authority for its position that it must be allowed to depose all individuals listed on an opposing party's Rule 26(a)(1) disclosures.[39] The court also noted that in the briefing on the

---

[36]*Id.* at *6 n. 6.

[37]*Id.*

[38]*Id.* at *8.

[39]*See also Dong-Youi v. Pacific Indem. Co.*, 2018 WL 3043679 (D.N.J. 2018) (observing "no authority to suggest that an individual listed in a party's initial disclosures should be considered a witness for trial and stricken at this stage of the litigation"). We imagine that there is even less authority for the proposition that a party may force the opposing party's attorney to become a witness by tactically listing her as a witness in that party's Rule 26 disclosures.

motion for protective order, the plaintiff-intervenor had challenged the appropriateness of all of the areas of testimony upon which the policyholder claimed that the attorneys could be called upon to testify at trial, and predicted that the plaintiff-intervenor would move to strike the attorneys from the witness list at the appropriate time.  The court allowed that if the policyholder persisted in listing the plaintiff-intervenor's attorneys as witnesses on her trial witness list, then the insurer could renew its request to depose the attorneys; but this argument would not support forcing their depositions now.[40]  Having disposed of each of the insurer's arguments, the **Corsentino** court granted the motion for protective order.

The **Shelton** framework remains relevant and current, having been cited by this Court as recently as August 2018.[41]  That framework provides the right structure for the review of Defendant's tactic.

## I.

### IF ALL DEFENDANT SEEKS IS AUTHENTICATION/FOUNDATION FOR CORRESPONDENCE, OTHER MEANS EXIST TO OBTAIN THE INFORMATION

Each letter to and from the undersigned was a communication involving another person who can provide testimony to the effect of "I received this letter from Miss Chaloupka" or "I sent this letter to Miss Chaloupka."[42]  Taylor Sinclair, Jon Hansen and Kristin Peterson can provide this

---

[40]**Id.** at *9.

[41]**See, e.g., United States v. Stabl, Inc.**, 2018 WL 3758204 (D. Neb. 2018).

[42]This is assuming only for the sake of argument, and not conceding, that pre-filing communications after DOE's unsuccessful email dialogue with Jon Hansen are relevant to prove any fact legitimately presented by the claims and defenses herein.

13

testimony (subject to cross-examination about their own communications and any tactics underlying them).[43]  And, although Defendant did not explore the issues it now contends are important enough to warrant deposing DOE's trial counsel through any form of written discovery before the conclusion of written discovery on September 17, 2018, the undersigned did offer to the defense that if all the defense needed was authentication and foundation for the letters in question, then Defendant could serve requests for admission out of time and the undersigned would waive the timeliness objection that Defendant has raised against her.[44]

The defense rejected and/or ignored these suggestions.  That fact suggests that this is about more than Defendant's originally-stated concern that "parties to litigation can differ as to the facts, allege additional conversations, or dispute the authenticity of correspondence."[45]  There was a tactic in Defendant's employees' response to the undersigned's November 15 request for records, evidence preservation and cessation of contact with DOE; a tactic in making the undersigned a character in the story of the case in ¶ 27 of Defendant's Answer; and a tactic in naming the undersigned in Defendant's Rule 26 Disclosures – a tactic unrelated to the issue of Defendant's choice to give Anthony Ige near-complete run of the CSC campus, a choice Jon Hansen had committed to before the undersigned sent her letter of representation.

If, as Defendant asserts, it needs to depose the undersigned to be "prepared for any statement

---

[43]***See, e.g., Cobb v. City of Roswell***, 2011 WL 13262054 at *2 (N.D. Ga. 2011) (finding that attorney was not a necessary fact witness regarding conversation with defendant's employees, because those employees "were all present during that conversation and can testify to what transpired").

[44]***Affidavit of Maren Lynn Chaloupka***, ¶ 9 and Exhibit F.

[45]***Affidavit of Maren Lynn Chaloupka***, Exhibit C.

Ms. Chaloupka might make in her opening and closing statement, or while questioning witnesses (including her own client) about Ms. Chaloupka's relevant communications with CSC while DOE was still a student there," we offer another option: *read the deposition transcripts*. While Defendant was represented by a different counsel at the November 14, 15 and 16, 2018 from the counsel that emailed this Court, any counsel of record for Defendant may read the deposition transcripts and familiarize themselves with the questions, answers and exhibits. For example, counsel may review the transcript of the depositions of Anne DeMersseman and Jon Hansen determine whether the undersigned asked either witness about her correspondence to them.[46] Counsel may even ask her co-counsel who represented Defendant at the depositions, "did Miss Chaloupka ask any witness about her correspondence to them?" and presumably her co-counsel will answer that question.[47]

The bottom line is that to the extent that Defendant really just wishes to establish authentication and foundation for the undersigned's letters, it cannot satisfy the first element of *Shelton*. That information can be obtained by other means. If Defendant has other plans for this tactic, the propriety of its tactic triggers the second and third elements of *Shelton*, as discussed below.

## II.

### "ANY STATEMENT MS. CHALOUPKA MIGHT MAKE IN HER OPENING AND CLOSING STATEMENT, OR WHILE QUESTIONING WITNESSES (INCLUDING HER OWN CLIENT)" CONSTITUTES WORK PRODUCT

In its December 3, 2018 email to this Court, the defense claimed that it "must be prepared

---

[46]While the transcripts have not yet been received from the court reporter, the undersigned's recollection from reviewing her outlines is that she did not.

[47]Again, to the best of the undersigned's recollection, the answer should be "no."

15

for any statement Ms. Chaloupka might make in her opening and closing statement, or while questioning witnesses (including her own client) about Ms. Chaloupka's relevant communications with CSC while Doe was still a student there."[48]  But trial counsel's plans for content of opening statement, closing argument and witness examination are subject to work product protection.[49]

It is actually difficult to find authority for a proposition like "drafts of or plans for opening statements *in the pending case* constitute work product," because that proposition is sufficiently obvious that, apparently, ver few attorneys have challenged it.  But The Florida Supreme Court has explained that

> [p]ersonal views of the attorneys as to how and when to present evidence, his evaluation of its relative importance, his knowledge of which witness will give certain testimony, personal notes and records as to witnesses, jurors, legal citations, proposed arguments, jury instructions, diagrams and charts he may refer to at trial for his convenience, but not to be used as evidence, come within the general category of work product.[50]

The "product of [an attorney's] investigation of a case in preparation for trial, in his [or her] capacity as attorney representing a client,"[51] is work product – and it is not subject to discovery absent the requisite showing of substantial need and inability to obtain from other sources without undue hardship.

Defendant was represented at the November 14, 15 and 16, 2018 depositions.  The

---

[48]***Affidavit of Maren Lynn Chaloupka***, Exhibit Q (Email from defense counsel to this Court dated December 3, 2018).

[49]And if they aren't, then the undersigned should be given leave to depose defense trial counsel about their plans for their opening statement, final argument, voir dire, witness examinations, presentation of witnesses and other components of their trial strategy.

[50]***Surf Drugs, Inc. v. Vermette***, 236 So. 2d 108, 112 (Fla. 1970).

[51]***Scourtes v. Fred W. Albrecht Grocery Co.***, 15 F.R.D. 55, 58 (N.D. Ohio 1953).

16

undersigned more than likely telegraphed a theory of the case over the course of three days of depositions.  Review of those transcripts should give Defendant sufficient information about what exhibits and testimony may be addressed in opening statements, without the need to depose the undersigned about her trial plans.

### III.

### DEFENDANT'S CHARACTERIZATIONS OF PRE-FILING COMMUNICATIONS, AND THE UNDERSIGNED'S RESPONSE TO ITS OWN PRE-FILING TACTICS, ARE NOT "RELEVANT EVIDENCE"

Evidence is relevant if it has any tendency to make a fat more or less probable than it would be without the evidence, and if the fact is of consequence in determining the action.[52]  In **Shelton**, the Eighth Circuit specified that the deposition of counsel must seek "relevant evidence" – as opposed to, and as distinguished from, the broader "reasonably calculated to lead to the discovery of admissible evidence" contained in Rule 26.  The reason is because of the risk that the party pushing to depose trial counsel may hold something short of pure intent.

In the environmental tort case of **United States v. Stabl, Inc.**[53], defense counsel[54] had sought to take 30(b)(6) depositions of agency counsel.  Reviewing the notice of deposition, this Court observed that

> the majority of Defendants' noticed topics directly implicate the attorney-client and work product privilege.  For example, topic 5 requesting information regarding "the decision ... to file the Complaint in this matter and when to file that complaint" is

---

[52]FED. R. EVID. 401.

[53]**United States v. Stabl, Inc.**, 2018 WL 3758204 (D. Neb. 2018) (Nelson, M.J.).

[54]Notably, the effort to invade privilege at issue in **Stabl, Inc.**, earlier this year was made by the same law firm as defense counsel herein.

17

clearly work product.  Topic 7, requesting "communications ... and decisions with regard to filing of the Complaint in this matter" clearly implicate both attorney-client and work product privileges.  Defendants request that the governmental plaintiffs produce a witness to testify as to how the government interpreted and applied the law and government policies, which necessarily includes the governmental plaintiffs' legal theories and positions.  Defendants also ask the plaintiffs to disclose facts their attorneys believe apply to their position and how counsel intend to apply those facts to support the plaintiffs' positions. Depositions, including 30(b)(6) depositions, are designed to discover facts, not contentions or legal theories, which, to the extent discoverable at all prior to trial, must be discovered by other means.

This Court entered a protective order, and wrote that it

> will admonish Defendants to re-notice the depositions and limit their topics of inquiry to *factual* issues relevant to these cases ... Defendants clearly cannot inquire into topics or conversations protected by attorney-client or work-product privileges.  This includes, but is not limited to, inquiries into "communications ... and decisions with regard to filing of the Complaint in this matter," and any other of the plaintiffs' internal decisionmaking process regarding why either plaintiff decided to commence litigation in this case or the underlying case, and any opinions, strategies, mental impressions, or evaluation of their cases regarding the same ...

That decision of this Court was dated August 18, 2018.

The United States District Court for the Southern District of Ohio recognized another serious risk of this type of deposition, which is that it is a tactical move by a party toward disqualifying its opposing counsel:

> [q]uestioning the attorney on the other side of a case implicates the attorney-client relationship, threatens to intrude on the attorney-client privilege, jeopardizes the attorney's work product, and raises the question of whether the attorney must withdraw or be disqualified from further representation because he or she has become a material witness.  The potential to use such a request for improper purposes is also great.[55]

---

[55]***Williams v. Wellston City Sch. Dist.***, 2010 WL 4513818, at *3 (S.D. Ohio 2010).

18

Other courts have observed that "parties often move for disqualification for tactical reasons"[56], and that is a valid concern in this case.

*Marco Island Partners v. Oak Development Corp.*[57] arose from a spat over a purchase agreement.  The plaintiffs alleged that the defendants made material misrepresentations in order to induce them to buy the hotel, and then breached their management agreement with the plaintiffs. During discovery, the defense subpoenaed an attorney who represented the plaintiffs during the contract negotiations:  that attorney was not trial counsel, but belonged to the same law firm as trial counsel, and had assisted in trial preparation.[58]  The defense asserted that it should be permitted to depose the attorney because he had firsthand knowledge of facts crucial to the litigation.[59]  The plaintiffs moved to quash the deposition subpoena.

The United States District Court for the Northern District of Illinois granted the motion. Observing that the Federal Rules give courts discretion to limit pretrial discovery if the discovery sought is "unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome or less expensive"[60], the court wrote that

> it seems particularly appropriate to exercise this discretion when a party seeks to depose its opponent's attorney.  Such a deposition provides a unique opportunity for harassment; it disrupts the opposing attorney's preparation for trial, and could

---

[56]*D-4 Men, Inc. v. Allstate Ins. Co.*, 2010 WL 11512205 at *3 (N.D. Ga. 2010); and *Pigott v. Sanibel Dev., LLC*, 2007 WL 2713188, at *2 (S.D. Ala. 2007) (noting trend of "manipulation of the ethical rules by adverse litigants to secure tactical advantages").

[57]*Marco Island Partners v. Oak Development Corp.*, 117 F.R.D. 418 (N.D. Ill. 1987).

[58]*Id.* at 420.

[59]*Id.* at 419.

[60]*Id.* (citing FED. R. CIV. P. 26(b)(1)).

ultimately lead to disqualification of opposing counsel if the attorney is called as a trial witness.[61]

The court observed that if the defense did decide to call that attorney as a trial witness, "his law partners may have to discontinue their representation of plaintiff."[62]  It quashed the subpoena, noting that "it seems likely that this deposition would prove more disruptive than revealing."[63]

*So what is the allegedly "relevant evidence" that Defendant can allegedly obtain only by deposing the undersigned?*  The answer may be that Defendant believes its counsel can force the undersigned to agree to some sort of careful phrasing that Defendant would thereafter attempt to use as an admission.

For example, Defendant's proposed Stipulation asks for more than the undersigned's agreement to the dates her two letters to CSC.  It asks that she agree that she "acted as an agent for DOE," and thus as a character in the story of these events.  And its concluding paragraph, that "the foregoing documents constitute the only communications between Ms. Chaloupka and Chadron State College from Nov. 16, 2016 to the date of DOE's graduation," carry the implication that if the undersigned elected to not engage with Defendant's in-house lawyers (Taylor Sinclair and Kristin Peterson) in the subjects those lawyers raised in their responsive correspondence, then that must have been some sort of concession that Defendant can now use as evidence.

Is the implication that Sinclair's and Peterson's letters to the undersigned constituted settlement offers, and that Defendant is waiving the protections of FED. R. EVID. 408 that would

---

[61]*Id.* at 420.

[62]*Id.*

[63]*Id.*

otherwise support a defense motion *in limine?* If that is its argument for the relevance of the pre-filing communications between the undersigned and its employees, that still inevitably leads to deposition questions about the undersigned's interpretation of Sinclair's and Peterson's letters, the undersigned's understanding of Sinclair's and Peterson's intent and the undersigned's intent in her responses. And that, too, invades privilege.

*Strategic Forecasting, Inc. v. Scottsdale Indem. Co.*[64], was a dispute over business insurance coverage. Underlying that case was a class action filed against the insured, which was resolved via a written settlement agreement; in that settlement, the insured agreed to sue its insurer and pay any proceeds to the class members. The insurer noticed the deposition of the insured's lawyer from the underlying class action, and the insured moved to quash the notice.[65]

The insurer intended to question the lawyer on his participation in the settlement negotiations, and about earlier drafts of the settlement agreement that had envisioned an assignment that would have terminated insurance coverage. The United States District Court for the Western District of Texas noted that the information sought by the insurer, "namely the intent of the parties in entering into the settlement agreement as to an assignment of the insurance proceeds," sought privileged information.[66] The court wrote:

> As [the insurer] admits, the information sought from [the lawyer] goes to his intentions and legal understanding regarding the meaning of the settlement agreements' terms. As such, the testimony sought would clearly invade the mental

---

[64]*Strategic Forecasting, Inc. v. Scottsdale Indem. Co.*, 2013 WL 12183361 (W.D. Tex. 2013).

[65]*Id.* at *1.

[66]*Id.* at *4.

21

impressions, conclusions, opinions or legal theories of [the lawyer].[67]
The court quashed the subpoena and granted the lawyer a protective order – the same result that should inure here, for the same reasons.[68]

Even if the Court were to assume that Defendant does seek only "facts," the likelihood is that "it would be impossible to tailor the deposition to maintain such a distinction. The deposition inevitably would involve intrusion into the thoughts, perceptions, strategy and conclusions of counsel."[69]   That would result in the undersigned's invocation of privilege, and probably further motion practice – but for what?  What is the best-case scenario for the usability of any legitimately relevant and non-privileged evidence that Defendant would seek to obtain from the undersigned?

By the date of the undersigned's first communication, Defendant had already made its decision regarding Ige's discipline; DOE had already quit counseling because of it; and when DOE challenged Jon Hansen about his decision, Hansen dug in his heels.[70]  Defendant has produced zero documents that would suggest it was willing to change its mind, and Hansen gave no indication in his deposition that he would change his mind.  Hansen has testified that Defendant's in-house counsel, Kristin Peterson, helped him draft his response to DOE, fundamentally telling her to go away.[71]  The intent, understanding and response of the undersigned to Sinclair's and Peterson's

---

[67]***Id.*** at *4.

[68]Unless, that is, Defendant wants its employees to submit to questions about their understanding, their intent and their tactics in their communications to the undersigned.  ***See*** Sec. VI *infra*.

[69]***Securities & Exchange Comm'n v. Johnson***, 2007 WL 9702653, at *2 (D.D.C. 2007).

[70]***Affidavit of Maren Lynn Chaloupka***, Exhibits S, T, U, V and W.

[71]***Affidavit of Maren Lynn Chaloupka***, ¶ 7.

communications, after Hansen's "go away" response to DOE, is privileged and is not relevant.

## IV.

### THE INFORMATION SOUGHT IS NOT CRUCIAL TO THE PREPARATION OF DEFENDANT'S CASE

The terms "relevant" and "crucial" are not synonymous. "To hold otherwise would be to render the third *Shelton* factor redundant."[72] For information to be crucial, it must have some greater importance to the action than merely being allegedly relevant. Evidence is not crucial if the claim or defense to which it relates is adequately supported by alternate evidence.[73] Thus, for example, if Defendant's policies or procedures require DOE and her lawyer to engage with Defendant on Defendant's in-house counsel's terms in advance of filing, such policies and procedures would be an example of such alternate evidence.

"Evidence has been found to be crucial when it goes to the heart of a party's ability to prove its claim or defense."[74] For example, in *Flury v. Daimler Chrysler Corp.*,[75] a court found that an automobile alleged to have a manufacturing defect, which was destroyed by plaintiff's insurer, was "crucial" to the defense of a crashworthiness case. In criminal cases, while a district court generally has broad discretion in ruling upon the admissibility of evidence, discretion "does not extend to the

---

[72]***Ditech Fin. LLC v. SFR Investments Pool 1, LLC***, 2016 WL 4370034, at *3 (D. Nev. 2016) *(citing and quoting **Shelton*** (requiring a party to show that the information is "relevant" *and* "crucial").

[73]***Keen v. Bovie Med. Corp.***, 2013 WL 3832382, at *3 (M.D. Fla. 2013).

[74]***Kimbrough v. City of Cocoa***, 2006 WL 3500873, at *5 (M.D. Fla. 2006).

[75]***Flury v. Daimler Chrysler Corp.***, 427 F.3d 939 at 941, 943 (11th Cir. 2005).

23

exclusion of crucial relevant evidence necessary to establish a valid defense."[76]   The summation would be that the courts distinguish between what is *relevant* and what is *crucial* – and what Defendants seek from deposing the undersigned does not "go[] to the heart of [Defendant's] ability to prove its ... defense."[77]

The information Defendant originally claimed it was seeking[78] – authentication of correspondence, or completeness of communications – is not "crucial," relative to the claims or defenses presented by the Complaint.  Nor is the information Defendant may hope to obtain by digging into work product crucial to any of the claims or defenses presented by the Complaint. This case is about Defendant's choice to allow a rapist nearly complete access to his college campus after his admission to the findings that he committed non-consensual sexual intercourse on multiple occasions, and Defendant's choice to tell DOE that she is the one whose educational experience must be compromised.

Those are the events involved in the claims and defenses at issue.  Defendant made those choices, and committed to those choices in Jon Hansen's response to DOE's emails, **_before_** the first communication from the undersigned.  Nothing in the undersigned's communications to Defendant is crucial to those claims and defenses.  If it were, Defendant would not have waited two years and four months after this case was filed, nearly a year after listing the undersigned as a person "likely to have discoverable information," and two months and ten days after the undersigned's objection to

---

[76]***United States v. Brazel***, 102 F.3d 1120, 1145 (11th Cir. 1997).

[77]***See, e.g., Kimbrough, supra*** at *5.

[78]***Affidavit of Maren Lynn Chaloupka***, Exhibit C.

24

her deposition to further pursue her deposition.[79]

Examining what counts as "crucial" for purposes of *Shelton* analysis, the United States District Court for the Central District of California wrote that

> [w]hat a witness told plaintiff's counsel; what plaintiff's counsel directed his photographer to capture on film; counsel's knowledge and/or opinion of a policy limits demand; and the time frame for responding to the demand or for conducting discovery, are not central to the issues to be resolved herein. Simply put, plaintiff's counsel's opinions in these areas are not the critical concern when examining whether <u>defendant's</u> refusal to accept the policy limits demand was reasonable.

While the defendant could present evidence that the plaintiff's refusal to allow additional time to evaluate the demand and to conduct discovery caused it to make a hasty decision, the *GSI* court held, "the reasons why more time was not given are simply not relevant."[80]

The *Shelton* court itself delineated "crucial" from "not crucial" by writing that the attorney whose deposition was sought "had nothing to do with this lawsuit except to represent her client. She did not design the jeep or have any duties in relation to the design of the jeep; nor, of course, was she a witness to the accident."[81] That guidance bears on Defendant's interpretation of "crucial" herein: the undersigned did not renege on CSC's promise to DOE to remove Ige from her longtime workplace; the undersigned did not participate in Jon Hansen's "discipline" decision for DOE, and (unlike Kristin Peterson[82]) the undersigned did not assist Hansen in responding to DOE's emails.

---

[79] *See, e.g., GSI Technology, Inc. v. United Memories, Inc.*, 2015 WL 12942202 at *1 (N.D. Cal. 2015) (finding information sought from counsel was "not crucial" in part based on defense's failure to timely pursue counsel's deposition after counsel objected).

[80] *Bostick v. Atlantic Mut. Ins. Co.*, 2008 WL 11338091 at *3 (C.D. Cal. 2008) (emphasis in original).

[81] *Shelton*, *supra*, 805 F.2d at 1330.

[82] *Affidavit of Maren Lynn Chaloupka* at ¶ 7.

25

The undersigned "has had nothing to do with this lawsuit except to represent her client."[83]

Whether an attorney shared facts with his client is not "crucial."[84]  The dictionary definition of "crucial" is "marked by final determination of a doubtful issue," and "important or essential as resolving a crisis."[85]  Unless Defendant is prepared to present Jon Hansen, Taylor Sinclair or Kristin Peterson to testify that some hypothetical magic response from the undersigned would definitely have caused them to reverse the position  Mr. Hansen maintained in his correspondence to DOE[86], the undersigned's letters are not "crucial" to  the resolution of the case (and still may not be "crucial" even if Defendant does present such testimony at this late hour).

In the bad faith insurance case of ***Ille v. American Family Mut. Ins. Co.***[87], the United States District Court for the District of Minnesota reviewed its magistrate judge's order quashing the defense's subpoenas *duces tecum* to the plaintiffs' attorneys, seeking to depose the plaintiffs' attorneys and demanding their documents.  The plaintiffs' attorneys had represented the plaintiffs in an underlying wrongful death action, and continued to represent them as the assignees of the tortfeasor's bad faith claim against its insurer.  The defense described the information sought through their subpoenas and depositions as "regarding [plaintiffs' attorneys' firsthand knowledge of the failed settlement negotiations and the facts bearing on liability on the underlying action."  The defense

---

[83]***See, e.g., Shelton***, 805 F.2d at 1330.

[84]***Johnson v. Couturier***, 261 F.R.D. 188, 192 (E.D. Cal. 2009).

[85]This is the definition that appears in the Merriam-Webster Dictionary.

[86]***Affidavit of Maren Lynn Chaloupka***, Exhibits U (which the undersigned recalls that Mr. Hansen testified Kristen Peterson helped him draft) and W.

[87]***Ille v. American Family Mut. Ins. Co.***, 2004 WL 741843 (D. Minn. 2004).

26

insisted that it was not seeking privileged information.[88]

The magistrate, and then the Article III judge, found that the relevant conduct involved the insurer's actions, and not the actions of plaintiffs' counsel:

> There is no dispute that plaintiffs' counsel demanded that [the insurer] pay the policy limit, and there is no dispute that [the insurer] refused. The opinions of plaintiffs' counsel are arguably relevant, but only to the extent that anyone familiar with the underlying facts would have an opinion about the reasonableness of the settlement demand. However, the Magistrate Judge did not clearly err when she found that the opinions are not centrally relevant, and are certainly not crucial, to the instant litigation.[89]

On that finding, the court approved the order of its magistrate judge, and maintained the protective order entered by the magistrate judge.

The plaintiffs of **K.B. v. Methodist Healthcare-Memphis Hosps.**[90] alleged that they and their insurers were overbilled for medical care. Their lead trial counsel elected to serve a series of personal affidavits to aid his clients' case. His affidavit testimony included:

> \*   His statement that the plaintiff hired him to represent her child in a personal injury case, that the tortfeasor's liability insurance carrier paid him settlement funds, and that he then provided some of those funds to the defendant hospital;
>
> \*   That during settlement negotiations for the instant case, the hospital contacted him about the balance owed on the plaintiff's account and demanded payment from the plaintiff's settlement proceeds;
>
> \*   Relative to a subsequently-withdrawn motion for sanctions, that he was supposed to depose the defendant but no one appeared for the deposition;

---

[88] **Id.** at \*2.

[89] **Id.**

[90] **K.B. v. Methodist Healthcare-Memphis Hosps.**, 2017 WL 4979131 (W.D. Tenn. 2017).

and

* Relative to a subsequently-withdrawn motion for partial summary judgment, he listed examples of poor treatment that he and his clients had received from the defendant hospital, to include billing inaccuracies, collection demands, and "misrepresentations" about the amounts of money that his clients owed.[91]

In light of the testimony in the plaintiff's lawyer's affidavits as well as the defendant's belief that the plaintiff's lawyer "orchestrat[ed] the circumstances giving rise" to the instant case, the defendant moved to compel the plaintiff's lawyer's deposition.

Specifically germane to Defendant's intent to depose the undersigned herein, the purported subjects on which the defendant intended to depose the plaintiff's lawyer included the plaintiff's lawyer's pre-filing communications with the hospital.[92] The defense wanted to "learn the details of the communications" that the plaintiff's lawyer had claimed, in his affidavits, to have received from the hospital. It wanted to inquire about the identities of hospital employees with whom the plaintiff's counsel had spoken. And, it wished to ask about the plaintiff's lawyer's affidavit testimony that the hospital had prolonged the billing process for his clients.[93]

The United States District Court for the Western District of Tennessee noted that the hospital could learn all of that information through document requests, or from its own records, or from questioning its own employees. And it observed that

part of this information, such as whether [the hospital] has "caused confusion in difficulty in resolving [plaintiff's counsel's] clients' personal injury claims," is not

---

[91] *Id.* at *1.

[92] *Id.* at *2.

[93] *Id.* at *3.

crucial to [the defense's] preparation of the case.[94]

That failure of proof of cruciality supported the court's denial of the defendant's motion to compel – and just so, how Defendant's in-house lawyers tactically responded to the undersigned's request for records and cessation of conduct is also not crucial to the defense's preparation of its case.

## V.

### DEFENDANT'S TACTIC CREATES THE RISK OF DENYING DOE HER CHOICE OF COUNSEL

It is not difficult to imagine how Defendant's tactic will play out as this matter progresses – in one of two scenarios. Scenario One shows the potential outcome if the undersigned asserts privilege:

Q:      You received this letter from Taylor Sinclair/Kristen Peterson.

A:      Correct.

Q:      In it, she said [X, Y and Z]?

A:      Correct.

Q:      In your response, you didn't engage with her on [X, Y and Z]?[95]

A:      Correct.

Q:      Why not?

---

[94]*Id.*

[95]*See* Defendant's Answer at ¶ 27 ("CSC repeatedly requested of both DOE and her legal counsel that they inform CSC of any further concerns or necessary accommodations. Neither DOE nor her legal counsel ever told CSC that DOE was concerned about encountering Respondent in the Counseling Center, or that DOE may need alternate counseling locations or times."). Again, we do not agree that a party may transform its opposing counsel into a witness, and seek her disqualification, by unilaterally declaring her as such in its court filings.

A:      I'm not going to answer that, as to do so would reveal my work product.

Scenario One ends with Defendant's chosen characterization of why the undersigned did not engage with Sinclair/Peterson, to which the undersigned cannot respond; and Defendant's concluding argument of "*therefore, Defendant 'wins'!*"

Scenario Two shows the potential outcome if DOE agrees to waive privilege so that the undersigned would respond:

Q:      You received this letter from Taylor Sinclair/Kristen Peterson.

A:      Correct.

Q:      In it, she said [X, Y and Z]?

A:      Correct.

Q:      In your response, you didn't engage with her on [X, Y and Z]?

A:      Correct.

Q:      Why not?

A:      [Explanation of litigation strategy, mental impressions, opinions]

Q:      [Further questions, which the undersigned would then have to answer.]

The next step in Scenario Two is disqualification of the undersigned as DOE's counsel (and maybe a disciplinary complaint and a malpractice claim).

*And for what?*  Nothing written by the undersigned, or its own counsel, after November 14, 2016 changes or reverses the decisions already made by Jon Hansen and Anne DeMersseman in the dates leading up to October 25, when Hansen advised DOE of his chosen "discipline" for Anthony Ige.  So what is the real goal of creating this evidence?

The United States District Court for the Eastern District of California expressed this concern

30

about the tactic of declaring one's opposing counsel a witness who must be deposed:

> [D]espite the perhaps equivocal protests of defendant's counsel that he does not seek to disqualify plaintiff's counsel at this time, the court senses otherwise. Once counsel would be deposed as to facts, the assertion that the attorney was an important witness for the defense would soon be forthcoming. Then, disqualification of a subpoenaed testifying attorney is nearly mandatory. To disrupt the client relationship between plaintiff and his lead attorney, and to start from scratch at this point, would create a manifest injustice.[96]

That applies here. By attempting to force DOE's counsel to either accede to Defendant's characterization of her communications or else reveal work product, Defendant has at best created a distraction from legitimate areas for discovery and, at worst, engineered a path to deny DOE not only her choice of counsel but also her trust in the confidentiality of attorney-client communications. The present risk substantially outweighs the likelihood of Defendant developing relevant, much less crucial, evidence from making the undersigned into its witness.

In the commercial dispute of ***Secure Energy, Inc. v. Coal Synthetics***[97], the United States District Court for the Eastern District of Missouri reviewed an effort by the defense to depose plaintiff's counsel regarding statements he had made on behalf of the plaintiff in other litigation. The defense claimed that plaintiff's counsel's other statements were "directly contrary" to the plaintiff's claims in the instant case. The defense claimed that the plaintiff's attorney should be required to testify regarding discrepancies between the plaintiff's pleadings in that case and his statements from a year before in another case. The defense indicated its intent to call plaintiff's counsel as a witness

---

[96]***Johnson v. Couturier***, 261 F.R.D. 188, 193-94 (E.D. Cal. 2009).

[97]***Secure Energy, Inc. v. Coal Synthetics***, 2010 WL 199953 (E.D. Mo. 2010).

31

and to move for his disqualification.[98]

The trial court found that this effort did not pass the *Shelton* test.  The information sought could be, and in some instances had been already, obtained by means other than plaintiff's counsel.[99]  The information sought was privileged, as the lawyer had gained his knowledge of the matters in his statements from his client: while the statements may well have been made in open court, the underlying communications "remain protected by privilege."[100]  The lawyer's mental impressions were not crucial to the present action or central to the plaintiff's claims.

The defense complained that the lawyer's statements were admissions by a party-opponent pursuant to FED. R. EVID. 801(d)(2)(C)-(D).  In response, the court found:

> Even if the Court considers [the lawyer's] statement to be an admission by a party opponent, the Court does not find this to be a sufficient basis for deposing [the lawyer].  As stated, [the lawyer] would not be able to explain his statement without revealing client confidences protected by the attorney-client and/or work product privileges.  Defendants, however, can question [the lawyer's] clients regarding the statements made by their attorney.  The Court finds an insufficient basis for allowing deposition of [the lawyer], particularly when it would result in disqualification of plaintiff's choice of counsel.[101]

On that finding, the court denied the defense's motion to compel.

The United States District Court of the Northern District of Illinois identified those concerns in the sexual harassment/wrongful termination case of *Ganan v. Martinez Mfg., Inc.*[102]  The defense

---

[98] *Id.* at *1.

[99] *Id.* at *2.

[100] *Id.*

[101] *Id.* at *3.

[102] *Ganan v. Martinez Mfg., Inc.*, 2003 WL 21938604 (N.D. Ill. 2003).

32

had moved to compel the deposition of the plaintiff's lawyer, based on the fact that the plaintiff's lawyer had represented the plaintiffs in a similar lawsuit in another case in which the parties' alignment was reversed, which had settled. "Bizarrely, Defendant's position is [the plaintiff's lawyer] may have knowledge regarding the 'conduct and motivation Defendant had for bringing the [previous case]": the defense sought information on discussions the plaintiff's lawyer had had with anyone about the prior case, and the plaintiff's lawyer's knowledge of potential witnesses, and information on the circumstances surrounding the settlement of the prior action.[103]

Finding that all of the information the defense wanted could be obtained by other means, the court wrote that

> [the plaintiff's lawyer's] deposition would only disrupt his ability to prepare his client's case for trial and possibly lead to the disqualification of [the plaintiff's lawyer], thereby delaying this Court. While this Court does not decide whether defendant must first show that no other means exist to obtain the information, this Court does find that defendant has many other less burdensome sources that will not harass or disrupt [the plaintiff's lawyer's] attempt to prosecute his client's case.

The court denied the defense's motion to compel, adding that "the defendant is warned any further motions as ridiculous as this one will result in sanctions."[104]

Defendant's position endorses the idea that if a party's attorney communicates with an adverse party before filing suit, that attorney is *ipso facto* now a witness who must testify regarding those communications, and who is subject to disqualification. There is no rule known to the undersigned in the ethical codes governing Nebraska lawyers. It is hard to imagine that adoption of such a rule would make anything in the civil justice system *better*: litigants would have to hire two

---

[103] *Id.* at *1.

[104] *Id.* at *3.

lawyers, one for pre-filing communications who would presumably discontinue representation before suit is filed (who would then be a witness), and another one to take over from there.

Defendant's position was considered, and rejected, by the United States District Court for the Western District of Texas in the case of **K.R. v. Clarity Child Guidance Ctr.**[105], in which the defendant had moved to disqualify the plaintiff's lawyer from serving as co-counsel in the case. The plaintiff's lawyer was the supervising attorney with Disability Rights Texas, and had represented the plaintiff in the pre-litigation phase of the dispute; this included exchanging written correspondence with the executive director of the defendant corporation, requesting records and policies and discussing accommodations for the plaintiff. The lawyer also attended a meeting with the defendant corporation's representatives to express concerns about the child's care, treatment and requested accommodations. After suit was filed, the lawyer continued to serve as counsel for the plaintiff.[106] she then continued her representation when suit was filed.

The defense claimed that the lawyer's role as attorney in the pre-litigation phase made her a fact witness, and that she should be disqualified from representing the plaintiff. The plaintiff responded that her lawyer had no personal knowledge that would make her a fact witness, and that she was acting as the plaintiff's retained counsel at all times during the pre-litigation phase of the dispute.[107] The record showed that the lawyer's "limited, second-hand knowledge of the facts" is based on communications with her client, communications with the defendant, review of the records

---

[105]**K.R. v. Clarity Child Guidance Ctr.**, 4 F. Supp.3d 856 (W.D. Tex. 2010).

[106]**Id.** at 857.

[107]**Id.**

and policies and "her minimal observation of the [defendant's] facility at the time she attended a meeting on her client's behalf." The court found that the knowledge that the lawyer gained from communications with her client are privileged and do not make her a witness subject to deposition; and that any mental impressions, opinions or conclusions that [the lawyer] may have formed when reviewing the records and meeting with defendant's representatives would not be discoverable.[108]

> The court then found that

> [the lawyer], whose only pre-litigation involvement was advocating on behalf of her client, is not a necessary witness in this lawsuit. If called as a witness, most information would be privileged and the remaining information would be cumulative of the testimony of other witnesses who have personal, firsthand knowledge of the essential facts. As such, her testimony is not necessary at all, much less necessary to establish an essential fact on behalf of her client.[109]

Looking ahead at the implications of the defense's tactic, the court concluded:

> Not only has defendant failed to carry its burden to show why disqualification is warranted, but it also advocates a position that would have a chilling effect on pre-litigation negotiations. Countless lawsuits are filed in this Court after the parties have attempted to resolve their disputes with the assistance of counsel. The public interest in resolving disputes prior to litigation *and allowing litigants to maintain their relationships with counsel that they retained prior to filing suit* weighs heavily in this case.[110]

On that holding, the court denied the defense's motion for disqualification.

The ***K.R.*** court nailed it: a party should not lose her choice of counsel because her counsel sent pre-filing communications to the adverse party. The record for this Motion shows that the undersigned sent a letter of representation, asking for records, evidence preservation and cessation

---

[108]*Id.* at 858.

[109]*Id.* at 858-59.

[110]*Id.* at 859 (emphasis added).

of contact with DOE.  Defendant chose a tactical response; thereafter, Defendant declared DOE's counsel to be a character in this troubling story in ¶ 27 of its Answer.  It should be more difficult than that for a defendant to rid itself of a plaintiff's chosen counsel.

**VI.**

### IF DEFENDANT DEPOSES THE UNDERSIGNED, THE "GOOSE/GANDER" RULE APPLIES

As noted above, the concluding paragraph of Defendant's proposed Stipulation – that "the foregoing documents constitute the only communications between Ms. Chaloupka and Chadron State College from Nov. 16, 2016 to the date of DOE's graduation" – carries the implication that if the undersigned elected to not engage with Defendant's in-house lawyers (Taylor Sinclair and Kristin Peterson) in the subjects those lawyers raised in their responsive correspondence, then that must have been some sort of concession that Defendant can now use as evidence.  That is the implication in Defendant's Answer: "CSC repeatedly requested of both DOE and her legal counsel that they inform CSC of any further concerns or necessary accommodations.  Neither DOE nor her legal counsel ever told CSC that DOE was concerned about encountering Respondent in the Counseling Center, or that DOE may need alternate counseling locations or times."[111]

The development of this evidence, if allowed, should concomitantly allow the undersigned to take depositions *duces tecum* – with no privileges available – of Taylor Sinclair and Kristin Peterson.  The witnesses would need to bring:

* All documentation of their communications with each other, Jon Hansen, Anne DeMersseman and other agents and employees of Defendant that show their input into Hansen's chosen discipline of Ige;

---

[111]Answer at ¶ 27.

36

\* All documentation of communications amongst themselves relating to the undersigned's November 16, 2016 letter (which asked them to preserve evidence and refrain from further direct communication with DOE), and relating to how Sinclair/Peterson should respond;

\* All documentation of communications amongst themselves relating to the undersigned's November 23, 2016 letter (which asked them to preserve evidence and refrain from further direct communication with DOE), and relating to how Sinclair/Peterson should respond;

\* Any and all documentation of communications amongst them (or with anyone else) demonstrating that, if the undersigned said the "right thing" in response, the positions Hansen staked out in his November 14 and November 16 correspondence would have changed.[112]

Attorneys Sinclair and Peterson would need to be ready to discuss, without assertion of privilege, their tactical decisions to "repeatedly request[] of both DOE and her legal counsel that they inform CSC of any further concerns or necessary accommodations" – and to provide any evidence that their "requests" were made in good faith.

Put otherwise, this is not a one-way street. It may result in the development of evidence supportive of the allegations of the Complaint.

## VII.

### THIS COURT SHOULD ORDER DEFENDANT TO PAY ATTORNEY'S FEES ASSOCIATED WITH THE COST OF LITIGATING THIS MOTION

If this Court wants to dissuade further attempts like this one, the way to do it is to let litigants (or counsel) know that he, she or it does not get to precipitate distraction, delay and waste of time for free. The way to do that is to order Defendant or its counsel to compensate the undersigned for

---

[112]Defendant has not yet produced such documents, or even identified such documents in Defendant's Rule 26 disclosures. If there are emails, notes of conversations, or other such documentation, presumably supplementation of previous document production will be forthcoming.

the time lost, from an already-busy schedule, in resisting an improper effort to obtain privileged information on a far-from-crucial issue of the case.

In th wrongful termination case of ***Warzon v. Drew***[113], the plaintiff served deposition subpoenas on the governor of the state, the secretary of the department of administration and a newspaper reporter. None of those witnesses was a party to the case. The plaintiff asserted that those depositions would help her to determine whether there was an agreement between the defendant and the governor's administration to remain neutral in an upcoming gubernatorial election; she claimed that if there was such an agreement, that would tend to support her allegation that she was fired for certain public remarks on a policy issue.[114] The United States District Court for the Eastern District of Wisconsin quashed the deposition subpoenas and granted the witnesses' motions for a protective order.

The court then observed that pursuant to FED. R. CIV. P. 26(c) and 37(a)(4), in motions such as those decided herein, the losing party may be required to pay the other side's expenses:

> In my opinion, [the plaintiff] was not substantially justified in her insistence that the governor and the secretary be deposed. No other circumstances appear which make an award of expenses unjust.[115]

Accordingly, the court ordered that the plaintiff was responsible to pay the reasonable attorney's fees and costs incurred by the governor and the secretary in seeking a protective order to quash their subpoenas.

---

[113]***Warzon v. Drew***, 155 F.R.D. 183 (E.D. Wis. 1994).

[114]***Id.*** at 185.

[115]***Id.*** at 187-88.

38

The *Warzon* court did not order the plaintiff to pay the attorney's fees of the journalist, given the "lack of clear and controlling precedent on the issue of a journalist's entitlement to assert a First Amendment right as a basis for resisting compelled disclosure in a civil proceeding."[116]  But in this case, the undersigned has found no decisional authority that supports forcing trial counsel to submit to a deposition about her strategy in pre-filing communications with the opposing party.  There are cases that allow depositions of counsel, but under facts that do not exist here.  The undersigned is not an "in-house counsel" who is not actively involved in the litigation and who has not entered an appearance as counsel of record; she is trial counsel.  Nor is there an affirmative defense that actions were taken on advice of counsel, thereby putting counsel's advice into evidentiary play.  The communications at issue are not statements made by the undersigned in some previous and concluded case; they were made in representation of DOE in advance of filing this case, and are about this case.  If Defendant had decisional authority to force this deposition, its counsel should have provided it, as a showing of good faith, in the eight days of email discussions with the undersigned preceding the first contact to this Court.

Beyond that, the undersigned has found zero decisional authority that supports deposing trial counsel to learn what statements trial counsel may make in opening statement, closing argument or witness examinations, which is what Defendant expressed as its intent in its email to this Court of December 3, 2018.[117]  There is no decisional authority because it is unusual for a party to attempt to take depositions of opposing counsel for such purposes.  Defendant knows this – and yet, here we

---

[116]*Id.* at 188.

[117]*See Affidavit of Maren Lynn Chaloupka*, Exhibit Q (email from defense counsel to this Court dated December 3, 2018).

are.

This dispute has consumed substantial time for the undersigned, and it will consume substantial time for this Court. Time is a scarce resource. The undersigned obtained a briefing deadline extension in another case in anticipation of the need to brief this case.[118] This Court will no doubt have to put aside other matters, meaning the litigants in those cases will experience delays in disposition of their motions so that this Court can decide whether a party may unilaterally name its opposing counsel as a character in the story of a case based on a pre-filing letter of representation, and thereafter depose that opposing counsel about plans for her opening statement and maybe seek her disqualification. An order to pay attorney's fees is appropriate.

## CONCLUSION

For these reasons, DOE asks this Court to quash the Notice of Deposition of Maren Lynn Chaloupka, enter a protective order prohibiting Defendant from deposing the undersigned, and order Defendant or its counsel to pay attorney's fees associated with the cost of litigating this dispute. In the alternative, DOE asks this Court for leave to depose Taylor Sinclair and Kristin Peterson *duces tecum* as set forth *infra*.

JANE DOE, Plaintiff,

By: _/s/ Maren Lynn Chaloupka_
        Maren Lynn Chaloupka – NSBA # 20864
Chaloupka Holyoke Snyder Chaloupka & Longoria, P.C., L.L.O.
1714 2nd Avenue
P.O. Box 2424
Scottsbluff, NE  69363-2424

---

[118] *Affidavit of Maren Lynn Chaloupka* at ¶ 18.

Telephone:  (308) 635-5000
Facsimile: (308) 635-8000
mlc@chhsclaw.net

### CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing instrument has
been sent via CM/ECF on this 11th day of December 2018, to the following:

| | |
|---|---|
| George E. Martin, III | Thomas E. Johnson |
| Leigh Campbell Joyce | Johnson & Tabor |
| Baird Holm, LLP | 11932 Arbor Street, Suite 101 |
| 1700 Farnam Street, Suite 1500 | Omaha, NE  68144 |
| Omaha, NE  68102 | tjohnson@johnsontabor.com |
| gmartin@bairdholm.com | |
| lcampbell@bairdholm.com | |

_/s/ Maren Lynn Chaloupka_

41