IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JANE DOE, | ) | Case No. 8:17-cv-265 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **BRIEF OPPOSING DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| BOARD OF TRUSTEES OF THE | ) | |
| NEBRASKA STATE COLLEGES, | ) | |
| a Political Subdivision of the State | ) | |
| of Nebraska, | ) | |
| | ) | |
| Defendant. | ) | |

A woman's polite endurance and devotion is her greatest beauty.

--  African proverb

In Mali, there's a saying in Bambara called "Mounyouli."  They talk about it in songs. It's our culture.  Women are raised like that.  They teach women to endure just about everything.  To endure their husbands cheating on them, to endure their husband beating them, to endure their family, their brothers, their cousins beating them.  To endure getting raped.  It's that culture where they think that women should just endure it and just put it aside and hide it.

--  Jane Doe

**But there comes a time when the cup of endurance runs over.**

–  Martin Luther King,
*Letter from the Birmingham City Jail*

# TABLE OF CONTENTS

AN INTRODUCTORY NOTE ON RELITIGATING CSC'S FINDING OF
SEXUAL ASSAULT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CAST OF CHARACTERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.   Chadron State College - enrollment and facilities . . . . . . . . . . . . . . . . . . . . . . . . . 5

B.   How seriously did CSC take its Title IX responsibilities? . . . . . . . . . . . . . . . . . . . 8

    1)   Serial interim Title IX coordinators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    2)   Students who confess to sexual assault, or whom the Title IX coordinator
        found to have committed sexual assault, were allowed to remain on campus
        as students . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

    3)   Victims and perpetrators are treated as equal contributors to sexual violence
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C.   JANE DOE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    1)   DOE's life in Mali . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    2)   The effects of rape trauma on DOE in Mali . . . . . . . . . . . . . . . . . . . . . . . . . 29

    3)   DOE comes to the United States, and to Chadron State College . . . . . . . . . . . . . . . 30

D.   DOE begins counseling with CSC counselor Robin Bila . . . . . . . . . . . . . . . . . . . . . 33

E.   CSC's delay in banning Everton Holder from campus . . . . . . . . . . . . . . . . . . . . . . 37

F.   The first rape . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

G.   The second rape . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

H.   The Title IX investigation begins . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

I.   CSC seeks to modify DOE's work, instead of modifying Ige's housing . . . . . . . . . . . . 52

i

J.      DeMersseman's first interview of DOE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

K.      DeMersseman interviews Ige  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

L.      CSC contracts its safety plan and does not warn DOE  . . . . . . . . . . . . . . . . . . . . 64

M.      DeMersseman officially finds that Ige sexually assaulted DOE (twice)  . . . . . . . . . . . 77

N.      CSC moves DOE's work assignment to Brooks Hall  . . . . . . . . . . . . . . . . . . . . . . . 79

O.      CSC loses track of where it has banned Ige from  . . . . . . . . . . . . . . . . . . . . . . . . . 81

P.      CSC decides that Ige's rape of DOE is a rape, but not a serious rape  . . . . . . . . . . . . 85

Q.      Ige admits to DOE's allegations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

S.      Hansen determines Ige's sanction  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

        1)      No contact order and restriction to Brooks  . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

        2)      Generalized counseling, without a plan, for an admitted sexual perpetrator
                . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

        3)      "Behavioral probation" – a meaningless term, unless the meaning is "we'll
                do something if you rape anyone else"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

        4)      Reading a book and writing in a journal as discipline for two rapes  . . . . . . . . . . . 101

        5)      Taking an already-required online class  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

T.      **The cup of endurance runs over**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

U.      DOE loses her counseling relationship  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

V.      DOE reaches out to Hansen and Beu  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

W.      CSC ignores DOE's request to attend class and/or insists she asked to not attend class
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

X.      Hansen consults with BOARD counsel, then tells DOE she is wrong  . . . . . . . . . . . 120

Y.      DOE tries again  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 127

Z.    DOE realizes the futility of her efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129

AA.   CSC's offers to "help" after DOE seeks counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . 134

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

      STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 137

      GENUINE ISSUES OF FACT EXIST AS TO WHETHER DEFENDANT'S ACTIONS
      EFFECTIVELY REMEDIED THE DISCRIMINATION AND RESTORED DOE'S EQUAL
      ACCESS TO EDUCATIONAL OPPORTUNITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 139

      A.    It is not enough to pick remedies from OCR's list of remedies in unrelated
            cases: the interim measures and final remedies must be effective . . . . . . . . . . 140

      B.    CSC was deliberately indifferent in prioritizing Ige's access to educational
            opportunities over DOE's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 147

      C.    This case is not about a "dissatisfied"[1] woman; it is about denying a rape
            victim equal access so she could attend school without fear. . . . . . . . . . . . . . 156

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 160

---

[1]To use Defendant's verbiage at p. 32 of its Brief.

# TABLE OF AUTHORITIES

UNITED STATES SUPREME COURT

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 138-139

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999) . . . . . . . . . . . . . 140, 141, 145, 147

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 139

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . . . . . 138, 139


UNITED STATES CIRCUIT COURTS OF APPEAL

*Gallo v. Prudential Residential Servs.*, 22 F.3d 1219 (2d Cir. 1994) . . . . . . . . . . . . . . . . . . . . 138

*Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9 (2d Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . 139

*Murrell v. School Dist. No. 1*, 186 F.3d 1238 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 151

*Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100 (2d Cir.2001) . . . . . . . . . . . . . . . 138

*Rodriguez v. City of New York*, 72 F.3d 1051 (2d Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 138

*Vance v. Spencer Cty. Pub. Sch. Dist.*, 231 F.3d 253 (6th Cir. 2000) . . . . . . . . . 141, 147, 150-51

*Wills v. Brown Univ.*, 184 F.3d 20 (1st Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151


UNITED STATES DISTRICT COURTS

*Doe ex rel. Doe v. Derby Bd. of Educ.*, 451 F. Supp.2d 438 (D. Conn. 2006) . . . . . . . . . 141, 146

*Doe v. School Admin. Dist. No. 19*, 66 F. Supp.2d 57 (D. Me. 1999) . . . . . . . . . . . . . . . . . . . 151

*Kelly v. Yale Univ.*, 2003 WL 1563424 (D. Conn. 2003) . . . . . . . . . . . . . . . . . . . . . . . 140, 141


STATE APPELLATE COURTS

*S.S. v. P.L. et al*, 177 P.3d 724 (Wash. App. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 141, 142-146

MISCELLANEOUS AUTHORITY
*Know your Rights: Title IX Prohibits Sexual Harassment and Sexual Violence*
*Where You Go to School, Office of Civil Rights, U.S. Office of Education* . . . . . . . . . . . . . . . 140, 147

## AN INTRODUCTORY NOTE ON RELITIGATING
## CSC'S FINDING OF SEXUAL ASSAULT

It is undisputed that Chadron State College Title IX Coordinator Anne DeMersseman made

a finding that sexual acts – specifically, vaginal sex and anal sex – occurred in May and September

2016 involving Anthony Ige and Jane Doe, which DOE did not consent to.[2]  DeMersseman reached

those findings after a full investigation[3] which included:

  *   Two interviews of DOE and one interview of Ige;

  *   Review of the same video evidence that Defendant submits in support of this
      Motion;

  *   Review of Chadron Police Department reports, which included CPD's
      separate interview of Ige;

  *   Review of text and Facebook messages between Ige and DOE; and

  *   An opportunity to consult with BOARD counsel Kristin Petersen.[4]

If there were any evidence at all that suggested that either the May or September sexual acts were

consensual, DeMersseman agrees that she did not include such evidence in her findings.[5]

Vice President of Enrollment Management, Marketing & Student Services Jon Hansen

---

[2]*Depo. exhibit 1*; *DeMersseman depo.* 131:19.

[3]*DeMersseman depo.* 151:22.  Not that DeMersseman deserves bonus points for doing her job – she reviewed the evidence made available to her, as would be expected of her.

[4]*DeMersseman depo.* 137:18.

[5]*DeMersseman depo.* 132:19.

1

accepted DeMersseman's findings.[6]  Ige did not contest DeMersseman's findings[7].  DeMersseman's findings have never been withdrawn or amended in any manner.  CSC, in its compliance with the federal Clery Act requirement that it disclose sexual assaults on its campus, identified one forcible sex crime for 2016[8], which matches the number of Title IX investigations in 2016 wherein there was a finding of sexual assault[9] – one, which was DOE's case.

But after Hansen imposed a sanction that punished DOE and gave Ige leave to roam nearly all of the CSC campus, DOE pushed back – and Defendant's theme since then has been, "well, it wasn't really 'rape-rape,'" or maybe "it wasn't a rape, DOE lied."  For example[10]:

**REQUEST FOR ADMISSION NO. 1**:  Admit that Anthony Ige sexually assaulted DOE.

**RESPONSE:** Defendant admits that then-Title IX Coordinator Anne DeMersseman found by a preponderance of the evidence that Ige engaged in non-consensual sexual contact constituting sexual assault under Board Policy 3020. Defendant further admits that Ige admitted to engaging in sexual assault or sexual violence, as defined by Board Policy 3020.  However, Ige declined a formal disciplinary hearing, and thus Defendant is without sufficient information to admit or deny whether Ige did, in fact, sexually assault Plaintiff.

In depositions, CSC's administrators finally admitted to what DeMersseman already found.[11]

DOE's expert witness, Dr. Charol Shakeshaft, addressed the propriety of Defendant's

---

[6]*Hansen depo.* 122:22; *Depo. exhibit 2*.

[7]*Hansen depo.* 137:21.

[8]*Depo. exhibit 6* at 26.

[9]*Depo. exhibit 61*.

[10]*Depo. exhibit 83*.

[11]*See, e.g., Hansen depo.* 132:132:04-16; *DeMersseman depo.* 168:18.

insinuated defense that "maybe this wasn't even really a rape-rape" in her deposition, explaining:

Q:      You were asked if you had watched the video showing footage in the basement of Andrews Hall on the night of the second rape, and you had not seen it.  Is it your understanding that the Title IX coordinator, however, did watch this video?

A:      I thought she did.

Q:      And that after watching that video and doing the rest of her investigation, she made a determination that sexual assault did occur in both May and September; is that correct?

A:      That's correct.  That's my understanding.

Q:      Nothing in that video evidently prevented her from making that finding; correct?

A:      I would say not.

Q:      Relating to that, you were asked whether you were crediting or discrediting either Anna or Mr. Ige in their description of the rapes.  Again, the Title IX coordinator heard these descriptions in person both from Mr. Ige and from Anna; is that correct?

A:      That's my understanding.

Q:      And found that sexual assault occurred in both May and September; correct?

A:      Yes.

Q:      What are your thoughts on the question of whether to relitigate now whether sexual assault occurred after the Title IX coordinator made her determination that it did occur?

A:      Well, I'm not sure I understand that.  I don't understand how you would relitigate.  Mr. Ige admitted that he did these things, and there was a Title IX decision.  So that seems to me to be the end of it.[12]

That should, in fact, "be the end of it," but apparently Defendant is undeterred in this defense.

---

[12] *Shakeshaft depo.* 49:19.

3

It is inappropriate for Defendant to suggest that DOE "asked for it," or lied to DeMersseman. That DOE did not cry out, and tried to go on as normal after each rape, makes her not only consistent with her African cultural experience,[13] but frankly with American women's experience as well.  If a rape victim does not feel safe, she tries to not put herself in more danger.  DOE was finally encouraged to trust that CSC would help her – and this is where that trust got her.

## CAST OF CHARACTERS

| | |
|---|---|
| **Jane Doe** | DOE is now 24 years old.  She is a black woman, born in the African nation of Mali, who came to the United States to attend Chadron State College.  DOE now lives in the Denver area. |
| **Anthony Ige** | Ige is still a student at Chadron State College.[14]  He is believed to have been born in the United States, of Nigerian descent.[15] |
| **Jon Hansen** | Hansen is a white man and is the Vice-President of Enrollment Management, Marketing & Student Services at CSC. |
| **Anne DeMersseman** | DeMersseman is a white woman, and is the Vice-President for Human Resources at CSC.  At the times relevant to this case, she served as the Title IX Coordinator for CSC.  Whether she was an *interim* Title IX Coordinator, versus whether that role was always part of her job, is unclear. |
| **Pat Beu** | Beu is a white man, and is the Senior Director of Student Affairs at CSC. |
| **Sherri Simons** | Simons, a now-retired white woman, was at all |

---

[13]**DOE depo.** 223:02.

[14]**Hansen depo.** 92:19, 200:10.

[15]**DOE depo.** 104:24.

4

|  |  |
|---|---|
| | relevant times CSC's Director of Student Housing & Residence Life. |
| **Don Keiper** | Keiper, a white man, is the security supervisor at CSC. |
| **Robin Bila, M.A.** | Bila, a white woman, is one of two counselors providing mental health counseling in the CSC Counseling Center. |
| **Michael Bogner, J.D.** | Professor Bogner, together with his partner Lisette Leesch, oversees the Justice Studies Department, and was one of DOE's professors at the relevant times. He is a white man. |
| **Lisette Leesch, J.D.** | Professor Leesch, a white woman, was also one of DOE's professors, and is the person who suggested that DOE seek counsel in this matter.[16] |
| **Taylor Sinclair** | Sinclair is the Nebraska State College System Director for Title IX. She had multiple discussions with the above-mentioned CSC employees relative to DOE's Title IX complaint. She did not engage with DOE, but did engage with the undersigned after DOE obtained counsel. She is believed to be a white woman. |
| **Kristin Petersen** | Petersen is an in-house attorney for Defendant. She had multiple discussions with the above-mentioned CSC employees relative to DOE's Title IX complaint. She assisted Hansen in formulating written decisions and responses relative to DOE's Title IX complaint. She did not engage with DOE, but did engage with the undersigned after DOE obtained counsel. She is believed to be a white woman. |

## FACTUAL BACKGROUND

A.   Chadron State College - enrollment and facilities

---

[16]**DOE depo.** 174:10.

Chadron State College, one of four colleges in the Nebraska State College system, is located in the north Nebraska panhandle town of Chadron.  In 2016, the year of the events in this case, CSC had between 2800 and 2900 enrolled students.[17]  As an "open enrollment" state institution, CSC measures its graduation rate for first-time students on the six-year, rather than the four-year, metric; in other words, it reviews what percentage of its students graduate within six years.  That rate is now between 40-46%.  The four-year graduation rate is somewhere in the mid- to high twenties.[18]

The campus is 281 acres in size.[19]  A map of the campus appears at *Deposition exhibit 82*. Freshmen are required to live on-campus unless they live with their parents[20]; upperclassmen may live off-campus.  The residence halls at CSC include:

* Eagle Ridge, a newer housing facility that is open to all students;

* Edna Work Hall and Edna Work Wing, two connected dormitories that are considered one facility.[21]  The students who live in Edna Work Wing are predominantly freshmen; the students who live in Edna Work Hall are primarily upperclassmen.

* Brooks Hall, a dormitory that houses a mixture of freshmen and upperclassmen. Former Director of Student Housing & Residence Life Sherri Simons explained that Brooks Hall is quieter, as fewer students live there.

All of these dormitories are coed facilities.

And then there is the Kent/High Rise/Andrews dormitory complex.  Kent, High Rise and

---

[17]*Hansen depo.* 09:04.

[18]*Hansen depo.* 10:02.

[19]*Hansen depo.* 09:04.

[20]*Simons depo.* 16:20.

[21]*Simons depo.* 12:23.

Andrews are connected to each other by corridors. Kent houses only freshmen, and is known to be a rather social dorm.[22] High Rise and Andrews both house upperclassmen. High Rise has a 24-hour computer lab.[23] It also has an exercise room and a laundry room in its basement, a game room on the first floor, and a convenience store that stays open late into the night. All three of these dormitories are coed facilities.

Of the three dormitories in the Kent/High Rise/Andrews complex, Kent is the closest to the rest of the campus, including the classroom buildings. Thus students who have been in the classroom buildings or the Student Center tend to enter Kent and cross through Kent to get to Andrews and/or High Rise, whatever their final destination may be.[24] As Sherri Simons observes, a student might just hang around if they see someone they want to socialize with.[25] The "hub" of the Kent/High Rise/Andrews complex is a social place, available for students to gather for clubs and activities and just to socialize.[26] Once a student has shown an ID to enter Kent, he or she does not need to show an ID again to enter from Kent into High Rise and/or Andrews – a person's authority to enter High Rise and/or Andrews is not challenged if he has accessed the complex through Kent.[27]

During the day, the desks at the residence halls are staffed by student desk workers who work

---

[22]*Simons depo.* 14:14.

[23]*Simons depo.* 15:16.

[24]*Beu depo.* 114:19; *Simons depo.* 22:25.

[25]*Simons depo.* 15:03.

[26]*Beu depo.* 29:01.

[27]*Simons depo.* 23:15.

for the residence directors.[28]   At night, the desks are staffed by campus security officers who work under the supervision of Campus Security.[29]  The desk security workers are students; this was DOE's job.

In addition to the classroom buildings, the other places on campus where students may spend time include the CSC Student Center.[30]  The Student Center contains meeting rooms for clubs and activities, a cafeteria and snack bar, and a game room.  The Student Senate meets there.  There is also a free computer lab, where students can work and print out documents.  The Student Center is also home to a retail store and campus bookstore.[31]

The Physical Activity Center is referred to, in shorthand, as "the PAC."  It is open to all students and faculty.[32]  Former Director of Student Housing & Residence Life Sherri Simons testified that the PAC is an important part of student life, as is the CSC library.[33]  The library provides a quiet place for students to focus, study and research.

The CSC student population is overwhelmingly Caucasian/white.  Hansen estimates that maybe 12-14% of its students are people of color.[34]  Some of those students are international students

---

[28]*Simons depo.* 18:04.

[29]*Id.*

[30]*Simons depo.* 17:03.

[31]*Id.*

[32]*Simons depo.* 17:19.

[33]*Id.* 17:24.

[34]*Hansen depo.* 37:10.

from African nations such as Ethiopia, which has a 20-year history with CSC[35], and Mali, where DOE is from.  CSC actively recruits international students[36], and proclaims in its Mission Statement for its International Student Program that CSC's mission is

> to recruit and retain international students from all around the world, deliver quality U.S. academic education and social experiences and promote international cultural understanding to enrich the campus and the community.[37]

CSC recruits international students through its website; through contractors in other countries; and from community colleges.[38]  (DOE for her part was attracted to CSC by its website.[39])

Financially, international students are not eligible to receive grants or scholarships paid for with Title IV funds.  There are some scholarships available through the college foundation, and some tuition waivers are available, but no federal funds support CSC's International Student Program.[40]

B.      How seriously did CSC take its Title IX responsibilities?

Board Policy 3020[41] addresses "Sexual Violence or Sexual Harassment Reporting, Policies and Procedures."  Its preamble states:

> The Board of Trustees of the Nebraska State Colleges is committed to providing an environment in which all students who participate in College programs and activities can work together in an atmosphere free from unlawful discrimination, harassment,

---

[35]*Hansen depo.* 40:10.

[36]*Hansen depo.* 35:24.

[37]*Depo. exhibit 63.*

[38]*Hansen depo.* 37:17.

[39]*DOE depo.* 34:08.

[40]*Hansen depo.* 43:19.

[41]*Depo. exhibit 8.*

or violence.  Sexual violence and sexual harassment are prohibited by law and by Board policy and the Colleges will not tolerate sexual violence or sexual harassment in any form, including, but not limited to, sexual assault; acquaintance, date or stranger rape; non-consensual sexual intercourse; sexual cyber harassment or sexual bullying.  The Colleges will take appropriate action to prevent, correct, and discipline harassing or violent behavior that is found to violate Board policies and principles of equal opportunity and access.[42]

This is the policy at issue in this case – the policy that CSC found Anthony Ige violated, by raping

DOE in May and September 2016.[43]

Asked for training materials that CSC administrators have received relative to Title IX,

Defendants produced a paper entitled "Institutional Betrayal,"[44] whose content includes:

When victims reach out for help, they place a great deal of *trust* [emphasis added] in the legal, medical, and mental health systems as they risk disbelief, blame, and refusals of help.  This relationship to institutions suggests that these types of traumatic experiences can be examined through a lens of betrayal trauma in much the same way as abuse occurring within a close personal relationship. This lens helps to account for the potential for betrayal even when an individual may not purport to "trust" an institution (e.g., a member of a marginalized group who does not trust the legal system to take his or her reports of domestic violence seriously), as the necessity of the institution (e.g., filing for a divorce) may create an unavoidable dependency. This deep lack of validation of an interpersonal trauma by an institution mirrors a mechanism thought to predict the development of complex posttraumatic responses.

Institutional betrayal is associated with complex outcomes similar to those associated with interpersonal betrayal.  When measured directly, the exacerbative effects of institutional betrayal on psychological well-being are clear and consistent with betrayal trauma theory: higher rates of dissociation, anxiety, sexual dysfunction, and other trauma-related

---

[42]*Depo. exhibit 8* at 1.

[43]*Depo. exhibit 1* at 2.

[44]*Depo. exhibit 51*.

[45]*Depo. exhibit 51* at 4.

Vice President Hansen thinks he has reviewed this paper.[46]

Another training document that Defendant's administrators used or received is dated October 7, 2016, a date that falls right in the middle of the investigation of DOE's Title IX complaint. Its title is "The Psychology of Betrayal Trauma."[47] Hansen has not seen it, but apparently someone at CSC has (given that Defendant produced it in discovery).[48] That document defines institutional betrayal as "harming those dependent on the institution ... the failure to prevent or respond supportively to wrongdoings within the institution when there is a reasonable expectation of protection."[49] That document further teaches whomever at CSC read it that institutional betrayal exacerbates trauma symptoms such as anxiety and sexual abuse-related symptoms.[50] Hansen understands the meaning of "institutional betrayal" in the Title IX context, and agrees that insufficient institutional response to sexual assault can contribute to existing traumatic stress.[51]

On November 19, 2014, Hansen delivered remarks on Board Policy 3020.[52] His remarks were reported by local media and can be found at *Deposition exhibit 54*. Hansen said that "society must hold men accountable, and men need to hold other men accountable"; and that BOARD had redefined sexual violence consistent with the United States Department of Education's mandate, due

---

[46]*Hansen depo.* 56:15.

[47]*Depo. exhibit 52*.

[48]*Hansen depo.* 57:22.

[49]*Depo. exhibit 52* at 26.

[50]*Depo. exhibit 52* at 33.

[51]*Hansen depo.* 56:25.

[52]*Depo. exhibit 8*.

to the "shift in approach to these issues."[53]

Hansen listed five objectives in CSC's plan in that regard:

*      "Crack down on offenders," which Hansen says means to properly investigate reports and hold offenders accountable[54];

*      "Increase support for survivors";

*      "Improve prevention and education";

*      "Improve communication"; and

*      "Listen and report back, 100%."

That is what Hansen told the media; but the facts show that CSC's approach to sexual violence is unserious, to the detriment of a survivor like DOE. The facts show that "crack down on offenders" really meant "*let the offenders continue their lives without serious disruption*"; that "increase support for survivors" meant "*treat the survivors of sexual assault as if they are equal contributors to their own rapes*"; and that "improve communication" meant "*tell survivors to eat what they are being fed and shut up.*"

1)      *Serial interim Title IX coordinators*

In the period from 2013 - 2019, CSC experienced turnover in the role of Title IX Coordinator, with people staffing that role on an interim or short-term basis.[55] In 2013, then-Director of Student Affairs Aaron Prestwich also held the role of interim Title IX coordinator; Shelley Dunbar held that position in 2014; then-Director of Student Housing & Residence Life Sherri Simons added the Title IX coordinator responsibilities to her plate in 2015; Vice President

---

[53]*Depo. exhibit 54*.

[54]*Hansen depo.* 60:05.

[55]*Simons depo.* 71:05.

of Human Resources Anne DeMersseman held that role in 2016; Sherri Simons held it again in 2017; and in 2018, CSC created a dedicated, full-time permanent position of Title IX Coordinator and hired Ted Tehawade to staff that position.[56]   During these years, CSC did not advertise for a permanent, dedicated Title IX coordinator.[57]   It just filled the role with a series of interims, who also held other positions while carrying out their Title IX coordinator responsibilities.[58]

Sherri Simons is not sure why it was so hard to get the position of Title IX coordinator permanently staffed[59]; when she asked Vice President Jon Hansen about the reason for the turnover, she was told "personnel issues."[60]  The first time that Simons became the interim Title IX coordinator was in 2015, when Hansen asked her to take on that role in addition to her existing duties as Director of Student Housing & Residence Life.[61]  It was understood that she would hold the Title IX coordinator position on an interim basis.  Before Hansen asked Simons to take on this new role, she was only "vaguely" familiar with Title IX, as a mandatory reporter.[62]

Although Simons holds a high-level administrative position at CSC, she is not a college graduate, a fact known to Hansen.[63]  Asked why Hansen decided Simons would be an appropriate

---

[56]*Id.* 70:09.

[57]*Hansen depo.* 65:17.

[58]*Id.*

[59]*Id.* 71:17.

[60]*Id.* 31:13.

[61]*Simons depo.* 30:07.

[62]*Id.* 26:23.

[63]*Hansen depo.* 66:05.

13

person to staff the role of Title IX coordinator, Simons answered "the only thing was my experience in interviewing students" about their dorm experiences and complaints.[64]  She had only a few days' notice before this new role was to become effective.[65]  Her "training" was over the phone from Board Counsel Kristin Petersen and with Jon Hansen in her office, to go over some forms and templates that CSC used for Title IX matters.[66]

After a year, Simons sent a letter to Hansen, in which she said "please hire a Title IX," and that she did not want to keep the position, because she was overwhelmed with holding the Title IX coordinator role along with her permanent role as Director of Student Housing & Residence Life.[67] The next person to hold the job of Title IX coordinator was Vice-President of Human Resources Anne DeMersseman, who had come to CSC in 2015.  At the time of her hiring, DeMersseman says that if CSC had given her the understanding that she would become the Title IX coordinator at some point, it was in less-than-certain terms[68]; but, when she interviewed for the position of Vice-President of Human Resources, DeMersseman was asked questions by the search committee about Title IX, so she was not surprised when, in the spring of 2016[69], the role of Title IX coordinator passed from Simons to her.

But like Simons, DeMersseman quickly found that handling the job of Title IX coordinator

---

[64]*Id.* 27:19.

[65]*Id.* 25:03.

[66]*Id.* 25:17.

[67]*Id.* 34:16.

[68]*DeMersseman depo.* 28:10.

[69]*Id.* 26:15.

14

in addition to the official job for which she was hired was untenable.  DeMersseman was not paid extra for handling the Title IX coordinator duties.[70]  In spring 2017, DeMersseman informed CSC President Randy Rhine that the college needed to make the position of Title IX coordinator a permanent, dedicated, full-time position, and she stepped down from that role.[71]  Hansen inveigled Sherri Simons to take the role of interim Title IX coordinator once again[72], until CSC created a full-time, dedicated position for a Title IX coordinator in 2018 and staffed it with alum Ted Tehawade.

2)    *Students who confess to sexual assault, or whom the Title IX coordinator found to have committed sexual assault, were allowed to remain on campus as students.*

When a Title IX coordinator makes a finding that a student has violated Board Policy 3020, to include sexual assault, the Title IX coordinator does not determine the sanction or discipline to be imposed.  That is done by Vice President Jon Hansen.[73]  Asked whether he agrees that for serious sexual misconduct, the sanction's primary purpose should not be developmental (meaning education), Hansen said that sanctions "have to be a lot of different things"[74]; but he eventually agreed that where there is a finding of serious sexual misconduct, the primary purpose should not be developmental.  Hansen agrees with training he has received which says that "the sanctions for serious sexual misconduct are intended to protect the victim and the community."[75]

---

[70]*DeMersseman depo.* 33:01.

[71]*DeMersseman depo.* 30:25.

[72]*Simons depo.* 35:07.

[73]*Simons depo.* 40:10; *Hansen depo.* 68:08; *Depo. exhibit 8*.

[74]*Hansen depo.* 50:25.

[75]*Hansen depo.* 51:15; *Depo. exhibit 55*.

Hansen has never expelled a student for violating Board Policy 3020.[76]  Some Title IX respondents have elected to withdraw as students upon receiving a Title IX coordinator's finding that they committed sexual assault, but no one has ever lost his status as a student due to a Title IX sanction at CSC.  Former Title IX coordinator Anne DeMersseman cannot remember ever recommending expulsion for any student found to have committed sexual assault.[77]

To expel a student completely from college – meaning they cannot take classes even online – would trigger due process concerns[78], although the Title IX respondent can (like Ige in this case) waive his due process rights.  *But what about allowing the respondent to continue coursework remotely and/or online, and banning him from campus?*  The CSC administrators are not certain whether banning a Title IX respondent from campus, yet allowing him to take classes online, would trigger due process rights: DeMersseman[79], Simons[80] and Beu[81] do not believe that banning a respondent from campus triggers due process concerns; whereas Hansen believes that he can only ban a respondent from certain facilities without triggering due process concerns[82] but would run into due process concerns if he were to ban a respondent from the entire campus.

Director of Student Housing & Residence Life, and twice-interim Title IX coordinator, Sherri

---

[76]*Hansen depo.* 144:10; *see also DeMersseman depo.* 51:20.

[77]*DeMersseman depo.* 52:13.

[78]*DeMersseman depo.* 39:15.

[79]*DeMersseman depo.* 39:05.

[80]*Simons depo.* 41:10.

[81]*Beu depo.* 37:25.

[82]*Hansen depo.* 73:16, 76:19.

Simons has never heard of a student even being banned from campus (yet allowed to continue classes online) as a result of committing sexual assault.[83]  Anne DeMersseman testified:

Q:    There's no real criteria written out anywhere for what it takes to get banned from a dorm, is there?

A:    I don't know.

Q:    Or for what it takes to get banned from campus, right?

A:    As a student, I don't know.

Q:    Apparently, based on what we see in this case, a person can commit a rape in a dorm, can commit sexual assault in a dorm and still have access to [the same dorm], right?

A:    (Deponent moves head up and down.)

Q:    Right?  You nodded your head.  Does that mean yes?

A:    Using your terminology, yes.[84]

None of CSC's administrators could explain why, when a perpetrator admits to sexual assault or is found to have committed sexual assault, he should be allowed access to most or all of the campus. Hansen does not perform any sort of risk assessment to determine whether a perpetrator who must be banned from a dorm can be safely allowed in, for example, the PAC[85], and he does not consider any written criteria to that end.  He says, "it is my determination, my judgment" – period.

_____3)    *Victims and perpetrators are treated as equal contributors to sexual violence*

*Deposition exhibit 61* is a spreadsheet, produced by Defendant, summarizing Title IX

---

[83]*Simons depo.* 42:02.

[84]*DeMersseman depo.* 158:07.

[85]*Hansen depo.* 83:22.

complaints, investigations and outcomes between March 5, 2014 and September 27, 2017. While some complaints dissipated if the complainant withdrew cooperation with the investigation, *Deposition exhibit 61* confirms that the sanctions on student who are found to have committed sexual assault – even when they admit committing sexual assault – are minimal enough to allow those perpetrators to experience very little disruption to their lives; and in some instances, the victim is punished along with the perpetrator with a no-contact order on her record, even after a finding that assault occurred.

In 2015, Simons made findings that sexual assault had occurred in two cases (in one of those cases, the perpetrator confessed the allegations), and that sexual violence had occurred in a third case. The sanctions imposed were:

* In the sexual assault case wherein the perpetrator confessed the allegations, Hansen placed the perpetrator on behavioral probation, and a no-contact order was placed on both the complainant and the perpetrator.

* In the other case in which Simons determined that sexual assault had occurred, Hansen banned the perpetrator was banned from the residence halls, put him on behavioral probation and directed him to undergo counseling. Both the perpetrator and the complainant were put on no-contact orders.

* In the sexual violence case, Hansen placed the perpetrator on behavioral probation, a no-contact order was continued, and the perpetrator was ordered to receive counseling and "education on consent and respect."[86]

In 2016, the only case in which DeMersseman made a finding that sexual assault occurred was DOE's case; the sanction imposed on Ige was consistent with this pattern.[87]

---

[86]*Deposition exhibit 61*.

[87]*Depo. exhibit 3*.

18

Hansen was asked in his deposition why, if CSC finds that a person committed sexual assault and finds that it must ban that person from *some* places on campus as a result, there is any reason to let that person access other parts of the campus.  Put otherwise, why not ban a perpetrator from campus completely, and tell the perpetrator to find another way to complete his studies?  Hansen's response was that he picks the restrictions "that are the least detrimental to **_all_** parties"[88] – emphasis added, for a reason.  Repeatedly in depositions, CSC administrators explained that they wanted to "protect" or impose restrictions that are "least detrimental" to "all parties," even when one party has been found to be, or has even confessed to be, a perpetrator of sexual violence.[89]

For example, **E61** shows that it is common for CSC to impose no-contact orders in Title IX cases on both the respondent and the complainant – as if what the complainant is reporting is just a silly boyfriend-girlfriend spat between kids who need to knock it off, instead of reporting sexual assault.  Nor does CSC inform Title IX complainants of any available appeal process to remove these no-contact orders from their records.[90]  Asked to explain that pattern in the context of one of her 2015 investigations, twice-former interim Title IX coordinator Sherri Simons testified:

Q:     You also put a no-contact order on the complainant, though; is that right?

A:     Yes.

---

[88]***Hansen depo.*** 82:22.

[89]***See, e.g., DeMersseman depo.*** 143:16 (""I would have advocated for what I thought gave us the best solution for both parties") and 195:21 ("I think we were trying to do what was right by both parties as we could"); ***Simons depo.*** 46:10 (explaining her decision, after a perpetrator admits to sexual assault, to put a no-contact order on both the perpetrator and the victim "to protect both parties").

[90]***Simons depo.*** 51:20.

19

Q:      Why?

A:      In these cases we typically had no contact, no contact meaning either one couldn't violate that, to protect both.

Q:      You made a finding that there was some form of apparently non-consensual behavior, right?

A:      Correct.

Q:      But you're putting a punishment on the complainant as well, right?

A:      I would say in my mind what we're asking is for them to have no contact both ways.

Q:      And so the complainant gets to have that on her record in the future, that a no-contact order was put on her in the course of asking for help from the college, right?

A:      I see that as protection on her side, too.

Q:      That wasn't the question I asked, though, was it?  I'm going to try again.  She makes a complaint.  She reports this complaint, correct?

A:      Correct.

Q:      Asking for help, right?

A:      Correct.

Q:      And you make a finding that there was unwanted physical contact and sex harassment or sexual violence, correct?

A:      Correct.

Q:      And, in fact, the guy even admits the allegations, correct?

A:      Correct.

Q:      And one of the outcomes of her coming to the college and asking for help is that she now has a no-contact order on her record, right?

A:      Well, I think that's correct.

Q:  Can you see why that would seem odd, that if a person goes and asks for help for founded allegations, she comes away with a black mark on her record?

A:  Again, I didn't see that as a black mark.

Q:  Other people might, though, right?

A:  I can't speak to what other people might see in that, I guess.

Q:  You're protecting her by telling her what -- by putting a restriction on her. Why not just restrict him?

A:  I can't speak to that.

Q:  You're the one who -- well, I guess you didn't decide the result, though, did you?

A:  No.

Q:  Did you impose the no-contact order?

A:  I probably asked for that, yes.  I issued the no-contact, which means I asked for that to happen.

Q:  You asked for it to happen. Why not just say: "I need the no-contact order on him"?  He's the one who admitted that he committed unwanted  physical contact and sexual harassment or violence?  (Pause)  You're thinking about this one.

A:  No. I -- I did it to protect both parties.[91]

Simons could not explain why "both parties" need protection, if she has made a finding that only one of those parties is a sexual perpetrator and the other party is the victim.

    This data makes concrete the disparity between the clear language of Board Policy 3020 and the administration's actual view of sexual assault on campus – *i.e.*, that it can be diminished to a silly misunderstanding between boys and girls, and that rapists and their victims can coexist on a small

---

[91] *Simons depo.* 43:20.

campus thanks to mutual no-contact orders (as if a victim needs to be told to not contact her rapist).

Senior Director of Student Affairs Pat Beu, who was involved in carrying out discipline in Title IX

cases (including this case), showed in his testimony how he views the seriousness of rape on campus:

> Q:   What's more serious, getting caught with a beer in your dorm room or forcing someone to have sex?  (pause)  I see that you're struggling with  this question, sir.  You're looking at the ceiling.  You're kind of looking like I've asked something that you don't understand. What's hard about this?
>
> A:   All I can say is rape is a horrible thing and students involved with rape are addressed.
>
> Q:   What does that mean?
>
> A:   Well, it means that they're met with, that they're ...
>
> Q:   "Met with"?
>
> A:   Um, again, all I can say is that the school works with students, both the victim and the perpetrator.  And I'm not the Title IX coordinator.  I don't know specifically what the sanctions are.  I would imagine that there's any number of sanctions that are involved with that.
>
> Q:   Like meeting with them?
>
> A:   Uh-huh.
>
> Q:   With the rapist?
>
> A:   Uh-huh.
>
> Q:   Do you think that's appropriate?  You've just said that rape is a horrible thing. Do you think it's appropriate to treat rape in the same way that you would treat being caught with alcohol in your dorm room?  (Pause)  Again, I see you kind of looking off.  You're thinking about this.  What's hard about this?
>
> A:   All I can say is that the school deals with students.  In my world, alcohol issues, there's a lot of factors that go into the situations, and I would imagine that there's a lot of factors that go into sexual assault. I don't question whether the school handles those or not. I know the school handles that. I'm not involved with that process.

22

Q:     What are the factors that you think go into sexual assault?

A:     I'm sure the circumstances that brought it about.

Q:     Meaning what?

A:     I'm ...

Q:     You've worked in educational administration for 40 years. You're serving in a disciplinary role right now. You have a master's degree in ed psych. So given all of those qualifications, tell me what you think are the factors that go into sexual assault.

A:     I think that there is obviously the circumstances that brought about the incident.

Q:     Meaning what?

A:     Well ...

Q:     Did she ask for it, is that what you're getting at?

A:     Well, yeah, was there a consensual experience? I don't know.

Q:     Do you understand that when sexual assault has been found, that means that there was no consent?

A:     Yes, I suppose. But even still, there's a lot of circumstances surrounding intimate behavior between individuals, so ...

Q:     What got us down this road was discussing whether there should be a sanction protocol for sexual assault. In other words, where you've determined that a sexual assault did happen.

A:     All I can say is I'm not the Title IX coordinator. I don't deal with those issues. All I know is those issues happen. They're handled by the Title IX7 coordinator.

Q:     And yet you have involvement with banning people from campus that are involved in Title IX investigations, right?

A:     I might, yeah. I'm told, "we need a ban for campus," okay, and I put the ban in place.

23

Q:      And you don't try to learn anything about it?

A:      Depends on the circumstance.[92]

Beu is not a low-level employee with no meaningful responsibility – he is a senior administrator, who was charged with carrying out safety plans, communication and discipline in this case. His testimony, excerpted above, is an unfortunate but honest expression of the disconnect between Board Policy 3020 and CSC's execution of the that policy.

Dr. Charol Shakeshaft, DOE's expert witness, summarizes the significance of CSC's pattern:

[u]nder Vice Principal Hansen, Chadron State College has a history of putting restrictions on the victims and under-punishing the perpetrators of sexual assault violations with less than adequate sanctions thereby giving preferential treatment to the perpetrators. Additionally, in cases like these[93], it was a practice for the school to put no-contact orders on the victims as well as perpetrators. This has a two-fold effect. It puts the burden of avoiding the perpetrator, at least partly, on the victim's shoulders, and the order is recorded in the victim's school records and may be perceived negatively by anyone reviewing the records thus serving as a potential punishment for the victim.[94] _____

Which is exactly what happened in this case after DOE trusted CSC to help her. Despite Ige's admission to twice forcing DOE into sexual intercourse, Ige was allowed the run of nearly the entire campus, while Hansen told DOE to either take her classes online at home or else take her chances of encountering Ige again.

_____

[92]**Beu depo.** 21:16.

[93]In case **Depo. exhibit 16** is unclear, confirmation that CSC put no-contact orders on both Ige _and_ DOE appears in **Depo. exhibit 61**, prepared by Defendant, in which the entry corresponding to DOE's September 19, 2016 report states that "Chadron State College issued a No Contact Order for both parties." **See also Depo. exhibit 44** at 5 ("I have delivered no contact orders to both you and [Ige]") and **Depo. exhibit 5** at 1 ¶ A ("On September 30, 2015, the College issued a "No Contact/No Retaliation" order between you and Mr. Ige").

[94]**Shakeshaft February 2019 report** at 46.

24

C.    JANE DOE

DOE is now 24 years old.  She lives in Denver.  She speaks three languages – French, Bambara and English.  She is about 5'3" tall and weighs about 115 pounds.[95]  Her mental health counselor at CSC, Robin Bila, described DOE as "very petite" and "very, like closed, closed in, and was very cautious about what she said.  And she was very, um, soft spoken[.]"[96]

1)    *DOE's life in Mali*

DOE was raised with one brother and three sisters, all of whom left Mali for either the United States or Canada for educational opportunities.[97]  Her family lived in Chicago for a few years, starting when DOE was three years old, while DOE's father pursued his education in Chicago[98], and then they returned to Mali.

DOE's life in Mali was marked by trauma and pain.  She testified:

I was raped by my cousin.  The first time I was raped was when I was 14 years old, and he was a cousin who was at least 14 years older than me, whom I trusted with my life. Basically, he was like a brother to me.  And at 15 years old, I was raped by another cousin who was living with us.  He had been living with us since I was about nine years old.  And he was molesting my big sister and myself for a few years.  And he went from molesting to raping.  And the Malian justice system doesn't prosecute rapes. There's a lot of corruption. Sex is a taboo topic.  I couldn't get the help that I needed there.[99]

DOE's first rapist in Mali perpetrated on her once; her second rapist perpetrated on her multiple

---

[95]**DOE depo.** 225:18.

[96]**Bila depo.** 43:13.

[97]**DOE depo.** 26:01.

[98]**DOE depo.** 27:05.

[99]**DOE depo.** 28:15.

times "over the course of years."[100]

DOE did not report either of her cousins to Malian law enforcement:

> The Malian law enforcement does not get involved.  There is so much corruption that women do not report rapes because nothing happens.  They don't protect victims.  They don't try to help victims.  It's a very taboo topic.  It's something that always gets swept under the rug and no one does anything about it ...[101]

She told her older sister, and eventually she told her parents[102], in two conversations.

DOE's first attempt to report sexual abuse to her parents came when her rapist cousin began perpetrating on her younger sisters.[103]  DOE's parents are strict Christians and traditional Malians, and they did not receive DOE's report well.  Her father implied that DOE might be lying, and that even if they believed her, they would do nothing to report the rape:

> When I told my parents about what he did to me and then what he was doing to my little sisters, my father said that they are his kids.  And that I should mind my own business.  He also did tell me that if it was true that they would talk -- that they would tell [the cousin] themselves.  And he also said that he believes my cousin was just playing with them as a big brother by touching their butts.[104]

Her parents did not report the cousin to police: "Nothing happened because that's how things are in Mali.  The police doesn't do anything about rape."[105]

The message sent to DOE, and the message she received, was one of shame.  She testified:

---

[100]*DOE depo.* 30:22.

[101]*DOE depo.* 29:19.

[102]*DOE depo.* 30:25.

[103]*DOE depo.* 32:22.

[104]*DOE depo.* 33:17.

[105]*DOE depo.* 31:15.

That was the day that I was so -- I was so devastated, because we were just taught to hold everything inside, not show emotions, not talk about our emotions, hide what happened to us, hide our feelings. And for once I told them what happened to me. I finally had the courage to tell them what happened to me. Tell them what's happening to my little sisters, to try to protect my little sisters. And not only did he tell me to mind my own business, they're his kids, and also that my cousin was just playing with them. He also told me that I had to talk to that cousin, because I had stopped talking to him. So he said that I had to continue talking to that cousin and continue -- and respect that cousin, basically.[106]

DOE describes her feelings at that time as "so devastated. I was trapped. I felt like there was nowhere to go."

When Defendant challenges why DOE did not call police the first time that Ige raped her[107], and when Defendant questions why video footage of the Andrews Hall desk and basement before and after the second rape does not show DOE screaming and slapping Ige, Defendant ignores the complexity of DOE's cultural background and history of sexual trauma in Mali:

Q:    Would you tell us what it means in Mali to be taught to *endure*?

A:    In Mali, there's a saying in Bambara called "mounyouli." They talk about it in songs. It's our culture. Women are raised like that. They teach women to *endure* just about everything. To *endure* their husbands cheating on them, to *endure* their husband beating them, to *endure* their family, their brothers, their cousins beating them. To *endure* getting raped. It's that culture where they think that women should just *endure* it and just put it aside and hide it. They don't want us to speak on our issues to try to -- basically in Mali, the women's rights are very, very bad. Women don't really have rights there. The husbands and the fathers have the rights over the women. And that's how we're raised. We're raised to just respect and obey our husbands and fathers. And it's okay if they beat us bloody. It's okay if they rape us. The police doesn't get involve. The police call that "family matters," and they do not get involved in family matters.

---

[106]*DOE depo.* 34:03.

[107]Based on what we see in this case, what reason is there to think that the result would have been different if DOE had reported the first rape?

Q:     Were you taught to *endure* as growing up in that culture?

A:     I was.

Q:     Did you see that lesson of "*endure*" being taught to other people you know?

A:     Yes, and I also saw it with my mom.  She got yelled at a lot with my -- by my father.  She went through a lot of, I guess, emotional abuse with my father.  And she still stayed.  I saw it with one of my best friends.  She got gang raped, and they slid that under the table, too.  It's just women don't report rape anymore, because the police don't get involved.  The police don't care.  Everything is so corrupted that you can't believe in the justice system, because it does not exist.  It's about who has money and what they want to get involved in, which is what I really loved about America.  Because I always told people, I was like, "well,  at least America's justice system is better than Mali's justice system."  Institutions have more justice -- there's more -- they help people.  There's more women's rights here.    Women are respected.  Women are protected as opposed to Mali.  I've seen husbands, brothers, fathers, beat their daughter so bloody that it's so sick to your stomach, and no one gets involved.  It's like let them deal with it between themselves. And you're supposed to as a women, you're just supposed to sit there and take that, and just, you know, keep *enduring*.  They have all these songs in the culture about, *enduring, enduring, enduring*.

Q:     Is that what you had to do when you were raped by your cousins?

A:     I had to, because no one wants to face -- they considered that a shame. Even if a girl is raped, and it's not her fault.  The society makes it a shame.  I was raised in a strict, religious family with a pastor and a reverend.  And he still preaches to this day, no sex before marriage. And when something happens, everyone hides it because no one wants to know that the child's -- that virginity that -- it's so, so such a big deal in Mali, so, so precious.  Especially in the Christian community, that everything is just hushed under the table.[108]

Of course, it does not take growing up in Mali for a woman to feel shame and fear about reporting her rape.  It is a common phenomenon even for women who are native to the United States.  But DOE's history of being shamed by her own parents for reporting her sexual trauma provides insight

---

[108]**DOE *depo.*** 222:25.

28

as to why a woman would try to *endure*, and try to protect herself, instead of provoking a rapist when history proves that no one else will protect her.

2)      *The effects of rape trauma on DOE in Mali*

After DOE's parents rebuked her for reporting her rape, DOE attempted suicide.[109]  She swallowed pills.[110]  She felt that "no one was going to help or protect me," and she was afraid for her younger sisters.  She testified that "I was in so much pain that I just -- I just wanted to be free. I didn't want to feel all that pain and everything I had been feeling."[111]  She remembers "thinking that I'm finally at peace, and everything is fine."  But DOE had told her older sister (who had fled to Canada) that she loved her, so her sister knew something was wrong and contacted DOE's parents.[112]

Consistent with their response when DOE reported being raped to them, DOE's parents responded poorly to the report that she had attempted suicide:

Q:      Did your parents take you to a hospital then?

A:      Not at that moment.  My sister was frantic, and she was angry.  And she told my father that he was mean.  And coming from our culture, that's a very big deal because we're raised about everything is respect.  We can't raise our voices.  We can't even say "what" to our parents.  It's huge respect culture. So before he came in and he dragged me, and kicked me and hit me and beat me and told me that I had to tell my sister that he's not mean and explain to my sister what happened.

Q:      Who did that?  Who beat you?

---

[109]***DOE depo.*** 34:20.

[110]***DOE depo.*** 125:12.

[111]***DOE depo.*** 34:23.

[112]***DOE depo.*** 125:12.

29

A:      My father did.[113]

After her suicide attempt, DOE experienced panic attacks.  She went to the hospital in Mali numerous times because she could not breathe.[114]  She was seen by specialists who told her there was nothing wrong with her, or at least not a pulmonological etiology for her loss of breath.[115]  But there was no consideration of whether DOE's symptoms stemmed from rape trauma or PTSD: "Mental illness is very taboo in Mali.  When someone has a mental illness, they call the person crazy. Society shuns the people."[116]

3)      *DOE comes to the United States, and to Chadron State College*

As she personally experienced the effects of rape culture, and observed her older sister's new life far away from Mali, DOE concluded that she wanted to come to the United States for college. She testified:

> [W]hen I went through all that trauma, I didn't have help because the Mali justice system doesn't prosecute certain cases.  And I believed in coming to the United States because it was -- to me it was the land of free justice and I wanted a fresh start. I wanted to build -- be in a new community, be somewhere where I felt safe, where I felt protected, and I was excited for a new start.[117]

As she envisioned a new life in college, DOE felt excited about coming to the United States, "because I always had a notion that there was justice."[118]

---

[113]*DOE depo.* 126:01.

[114]*DOE depo.* 35:04.

[115]*DOE depo.* 35:15.

[116]*DOE depo.* 35:12.

[117]*DOE depo.* 27:25.

[118]*DOE depo.* 30:01.

DOE became interested in attending Chadron State through its website, which Hansen has acknowledged to be part of CSC's tools for recruiting international students.[119]  DOE testified:

> I was looking at colleges in the Midwest, like Wayne State College and Wichita.  And I went on Chadron's website, and what drew me was it had -- it seemed to be very friendly, very welcoming, seemed to be diverse.  I looked at their international section, and they seemed to have a good community of international students, activities going on, like the International Students Club. And everything was -- they were welcoming.  The website was showed this community where it's like, you feel like you're going to belong.  You feel like they're going to care for you.  You feel like, you know, you're going to become a part of their community because that's how it seems that  they care about the students that go there, and they want to help the students and care for them and protect them.[120]

She applied, and was accepted.  DOE's acceptance to Chadron State represented an opportunity for a new life.  She stopped cutting herself, "[b]ecause I was like, this is my fresh start. And I didn't want to die anymore, because I said that this is my chance."[121]  She traveled from Mali to Chadron, and began a new life.

Before Ige raped DOE, CSC was a comfortable place for DOE.  She became involved in the International Club and served as an officer in a student group of the National Mental Health Alliance.[122]  She volunteered to help at campus events.  DOE loved being away from Mali, and the opportunities to be part of CSC campus life.  She testified that it was "a blessing": "I worked on my mental health.  I was going to the gym.  I was running.  I was getting involved in as many activities

---

[119]*Hansen depo.* 37:17.

[120]*DOE depo.* 36:08.

[121]*DOE depo.* 127:16.

[122]*DOE depo.* 174:06.

that I could to move forward and try to become the person I was before the trauma."[123]

DOE declared a major in Justice Studies, a tight-knit and competitive program run by Justice Studies professors Michael Bogner and Lisette Leesch.  Bogner and Leesch, who worked with DOE every semester that she was at CSC, have never had any reason to doubt DOE's honesty.[124]  They describe her as motivated, goal-oriented and a good student interested in the subject matter of Justice Studies.[125]  DOE's plans upon graduation were to become a paralegal or go to law school.[126]

As an international student, DOE was not allowed to work off-campus.[127]  The regulations governing international students allow them to work in on-campus employment up to 20 hours/week during the school year, and up to 40 hours/week during breaks.  She obtained a job working for Campus Security, doing desk security and sometimes working as a rover (*e.g.*, moving from dorm to dorm to see if another desk security worker needs a break or can't get to their shift).[128]  Her usual work hours were 2300 - 0300 or 2300 - 0700, *i.e.*, overnight.[129]

In that position, DOE worked at each of the residence halls at one time or another over her four years, but until Ige raped her the second time, DOE spent most of her time working at the

---

[123]*DOE depo.* 127:22.

[124]*Leesch depo.* 15:03; *Bogner depo.* 32:05.

[125]*Bogner depo.* 46:23; *Leesch depo.* 14:14.

[126]*Bila depo.* 69:20.

[127]*Hansen depo.* 44:04.

[128]*DOE depo.* 80:17.

[129]*DOE depo.* 93:21.

Kent/High Rise/Andrews complex.[130]  She testified that "[Campus Security supervisor Don Keiper] liked the way I worked, so he trusted me to work in Kent as well as those buildings, because even when there are issues, I know how to handle it, know how to document issues."[131]

DOE enjoyed her desk security job.  Working in the Kent/High Rise/Andrews complex, she could communicate with other desk security workers who might need someone to cover their shifts while they left town for school breaks (DOE did not leave town during breaks), which gave her the opportunity to earn extra money over breaks.[132]  The income was extremely important to DOE.[133] The overnight shift was also a quiet time for her to study.[134]

D.      DOE begins counseling with CSC counselor Robin Bila

In the fall semester of 2015, DOE was living on and off with her then-boyfriend, Everton Holder.  Before he began dating DOE, Holder was known to CSC security and administrators as a person whose volatility made him disruptive for other people.[135]  Unbeknownst to DOE, Holder was no longer even a student at CSC by this time.[136]  Holder was abusive to DOE.

DOE began to wake up in the night unable to breathe.  This happened several nights in a

---

[130]*DOE depo.* 90:07.

[131]*DOE depo.* 90:21.

[132]*DOE depo.* 87:22.

[133]*DOE depo.* 88:04.

[134]*Keiper depo.* 31:05.

[135]*Simons depo.* 75:18.

[136]*Beu depo.* 88:02.

row, and on the third night DOE called the police in terror.[137]  The police took DOE to the hospital. Her symptoms worsened in the emergency room, and she had to dash outside to get fresh air due to the feeling that she was suffocating.[138]  Hospital personnel advised DOE that she was having panic attacks.[139]  At that time, DOE knew nothing about panic attacks, or even what they were.  The hospital personnel administered medication and referred DOE to Robin Bila, M.A., who works at the CSC Counseling Center under the supervision of Senior Director of Student Services Pat Beu.[140]

The CSC Counseling Center provides mental health counseling free of charge to CSC students.  The Counseling Center employs just two counselors, both with master's degrees but not doctoral degrees.  The counselors are Robin Bila and Jerry Cassidy.  **Deposition exhibit 104** is the CSC Counseling Center Informed Consent form.   Among its advisements to students is the following:

> Your counselor might consult with another counselor about your needs. This is consistent with the ethics of the counseling profession. Consultation helps a counselor ensure that he or she understands the client and is treating the client appropriately.[141]

 While the version of the informed consent form in this Evidence Index is dated 2017, this version of the form is believed to have been included in the informed consent documents used by the CSC Counseling Center in 2015, other than provisions for students who are referred for counseling by

---

[137]**DOE depo.** 51:04.

[138]**DOE depo.** 51:21.

[139]**DOE depo.** 51:08.

[140]**Bila depo.** 102:17.

[141]**Depo. exhibit 104** at 2.

administrators or whose records must be released pursuant to legal orders.[142]

At the initial intake session on September 24, 2015, DOE reported a history of suicidal thoughts, panic attacks and depression, and said her goal was to finish the school year without missing classes.[143]   Robin Bila wrote of DOE:

> This is the client's 1st session.  She was referred by CSC Clinic staff due to panic attacks.  She was presented Setraline 1 week ago.  She has not taken it in the past 3 days.  We discussed the importance of medication compliance.  She has been experiencing anxiety and mild panic attacks on/off for the past 7 years.  She had a traumatic experience 7 years ago.  She did not elaborate as to what happened.  Her panic attacks have escalated in frequency and duration.[144]

Bila scheduled DOE for weekly counseling.

This was DOE's first counseling experience.  It took time for DOE to develop trust in Bila.[145]

Eventually DOE came to rely on Bila to the extent that she would call and/or text Bila when she was in acute distress.  Bila became invested in DOE's safety, once calling the police directly for DOE when DOE had called Bila and Bila could hear Holder being abusive to DOE over the phone.[146]

On December 3, 2015, DOE began to reveal her history of sexual trauma in Mali to Bila. Bila wrote:

> [S]tudent is counting days until her BF leaves for Baltimore.  She says he is moving on campus next semester.  He continues to try to have sex w/her when she says no and when she is sleeping.  We discussed inappropriate and poor boundaries between her and her BF.  We discussed physical abuse by her father and being sexually

---

[142]*Bila depo.* 19:18.

[143]*Depo. exhibit 102* at 2.

[144]*Depo. exhibit 102* at 3.

[145]*DOE depo.* 195:03.

[146]*DOE depo.* 63:23.

assaulted at 14 have played a part in (*illegible*).[147]

Through counseling, DOE was beginning to understand that "since I was so eager to have a fresh start, I did, you know, suppress the stuff that happened to me in Mali and hid them away and decided to just have a fresh start without confronting those issues."[148]

As DOE shared about her relationship with Everton Holder, Bila gave DOE information about the domestic violence shelter in Chadron.[149]  Bila worked with DOE to help her come to understand that she did not have to tolerate Holder's abuse.  She testified:

> Q:    In your training and experience, have you seen whether it is unusual for a victim of sexual or domestic violence to be at risk for being victimized again by other people in the future?
>
> A:    It's not uncommon.
>
> Q:    What is the dynamic that explains why a woman who has been victimized by one person finds her way to another?  That came out wrong.  I don't mean she's looking for them but why it would happen that she would be vulnerable in that way.
>
> A:    A simple way to put it is we're creatures of habit and we seek what we know until we know differently.  That's what they feel like they deserve.
>
> Q:    I take it in explaining that, you're not meaning to say that a woman in that position is wanting to get another abuser?
>
> A:    No.  It's just low self-esteem, low self-worth.  And it goes back to the abusers, too, they have a way of manipulating victims.  They know who's easy to victimize and they manipulate.
>
> Q:    Does it seem, from your observation and your experience, that somehow the

----

[147]*Depo. exhibit 102* at 11.

[148]*DOE depo.* 52:06.

[149]*DOE depo.* 67:25.

36

abusers know who to pick?

A:     Exactly.[150]

Bila acknowledged that this was a live concern during her time counseling DOE, given DOE's history of trauma when she lived in Africa.

E.     CSC's delay in banning Everton Holder from campus

In March 2016, with guidance from the local domestic violence shelter, DOE sought a protective order against Holder.[151] Bila provided emotional support to DOE during this process. Bila also engaged in an email discussion with her supervisor, Senior Director of Student Affairs Pat Beu, about the situation. Beu was informed that Holder had physically harmed DOE.[152] Again, Holder was known as a problem to both Beu[153] and Simons for reasons unrelated to DOE[154]; he had been an ongoing problem for CSC for reasons unrelated to DOE[155], but CSC had not banned him yet in spite of the disruptions he had caused in residence halls with a prior girlfriend.[156]

Beu discussed Holder with DOE at his office. Beu informed DOE that contrary to her understanding, Holder was not a CSC student, notwithstanding what Holder had led DOE to

---

[150]*Bila depo.* 52:25.

[151]*Deposition exhibit 58* at 3-4.

[152]*Deposition exhibit 58* at 1.

[153]*Beu depo.* 85:01.

[154]*Simons depo.* 74:10.

[155]*Simons depo.* 75:06, *Beu depo.* 84:24.

[156]*Simons depo.* 75:15.

believe.[157]  Beu sent Bila an email after he met with DOE, informing Bila:

> Obviously, her abusive treatment is now compounded by feelings of betrayal and deceit.  We discussed this vulnerable status and my concerns that she will soften over time and let him back into her life.
>
> We discussed some of the physical and emotional abuse and the patterns of behavior over time that have influenced her relationship with him. I discussed a "no-contact" order but she doesn't feel threatened at this time. I told her we can revisit that topic at a later time if she desires.
>
> She talked briefly about her estranged relationship with her father. We did discuss how that can impact our relationship with men. We discussed personal boundaries and space, both emotionally and well as physically.  I told her she needed to protect her space and that regular visits with you and such organizations as DOVES can help her with that.[158]

We respectfully ask the Court to keep in mind what Beu learned about DOE in this March 2016 interaction in reviewing Beu's role in the disposition of DOE's September 2016 report of rape.

Upon reading Beu's email, Bila wrote back to Beu (on March 16, 2016 at 1100) to ask him if he would ban Holder from campus.[159]  Whether to ban Holder from campus should have been an easy call: Holder was not even a CSC student (**i.e.**, zero due process rights), and he had a history of disruptions in the residence halls.[160]  But even so, and even with a protective order from the district court in place, Beu did not ban Holder that day.  Beu did not get around to banning Holder from campus until the next day, **after** Holder served Beu with a subpoena (Holder was contesting DOE's

---

[157]***Beu depo.*** 88:06.

[158]***Depo. exhibit 58*** at 1.

[159]***Beu depo.*** 100:13.

[160]***Simons depo.*** 75:15.

38

protective order and had demanded a hearing).[161]

The local district judge upheld the protective order.  Holder promptly violated it, went to jail and bonded out.[162]  DOE continued in counseling with Bila during this time, with Bila documenting DOE's anxiety symptoms and panic attacks.[163]  Working through DOE's history of abuse by her father in counseling triggered flashbacks, which DOE at that time self-medicated with alcohol.[164]

After he bonded out of jail, Holder flouted the protective order by walking outside of DOE's door and talking loudly enough for her to hear him.[165]  Holder's friends harassed DOE as well, leading to more police contacts.[166]  As the spring 2016 semester came to an end in early May, Bila was still treating DOE for nightmares, flashbacks and panic attacks.[167]  She was unable to refill her prescription for Zoloft until she got paid.[168]  But Bila observed DOE to remain focused on her studies, motivated to succeed in spite of the acute distress she was in.[169]

F.      The first rape

In May 2016, DOE was working for Campus Security on an overnight shift.  While she was

---

[161]*Depo. exhibit 100*; *Beu depo.* 91:10.

[162]*Depo. exhibit 102* at 18; *Bila depo.* 58:19.

[163]*Depo. exhibit 102* at 17.

[164]*Depo. exhibit 102* at 18.

[165]*Depo. exhibit 102* at 19.

[166]*Depo. exhibit 102* at 20.

[167]*Depo. exhibit 102* at 22.

[168]*Id.*

[169]*Bila depo.* 59:21.

in Kent Hall, a student named Olumide Anthony Ige approached her desk, reached over and grabbed her Monster Energy Drink, and ran down the hall.[170]

DOE knew Ige slightly, having met him early in the spring semester when Ige approached her to ask her if she spoke French.[171]   On that occasion, Everton Holder had been in the vicinity, saw Ige's contact with DOE and threatened Ige.[172]   After Holder was banned from campus, Ige approached DOE several other times on nights when she was working security at the desks in the Kent/High Rise/Andrews complex and occasionally at the gym.[173]   DOE was not romantically interested in Ige, as she was still healing from Holder's abuse.[174]  She would converse briefly with Ige at the desk and then tell him that she was busy and needed to study.[175]

But on the night in question in May 2016, Ige reached over the desk, grabbed DOE's beverage and trotted off to his room.  DOE followed him to his room, asked him for her beverage and Ige pointed to his refrigerator.  There was discussion of Ige using a friend's car to give DOE a ride home at the end of her shift.[176]  Then DOE opened the refrigerator to retrieve her drink, and Ige

---

[170]*DOE depo.* 106:10.

[171]*DOE depo.* 99:01.  DOE, as a native of Mali, speaks French and Bambara as well as English.

[172]*DOE depo.* 100:02.

[173]*DOE depo.* 102:11.

[174]*DOE depo.* 103:23.

[175]*Id.*

[176]*DOE depo.* 116:22.

40

began to grope her breasts and buttocks.[177]  She wrestled away from Ige, left his room and returned to the desk.[178]

DOE was startled, and she did not want anyone to know what had happened.  She was working as a rover that night, meaning that she visited each residence hall to spell the desk security workers if they needed to take a short break.[179]  DOE returned to Kent at the end of her shift, which was customary; and the other worker told her that while she was gone, Ige had emerged from his room, and had told the other desk security worker that he would give DOE a ride home.[180]

DOE was nervous about Ige taking her home, but it was 0300 hours, so she accepted the offer in lieu of walking alone through Chadron at that hour.  She found Ige, and they walked into the parking lot to look for Ige's friend's car.  When Ige could not find the car, they walked back to Ige's room so he could call the owner of the car.[181]  The friend did not respond to Ige's calls and texts, so Ige told DOE to just stay in his room and he would get her home later.[182]

DOE declined, and began to leave Ige's room.  Ige restrained her, forced her onto the bed and removed her pants against her will.  Ige then raped her both vaginally and anally.[183]  In response to Defendant's detailed questions, DOE testified:

---

[177]*DOE depo.* 110:10.

[178]*DOE depo.* 111:22.

[179]*DOE depo.* 114:10.

[180]*DOE depo.* 113:12.

[181]*DOE depo.* 119:22.

[182]*DOE depo.* 120:08.

[183]*DOE depo.* 121:04.

Q:     So he physically restrained you, stopped you from leaving the room, and then he put you on the bed; is that right?

A:     Yes.  And after he was raping me vaginally, he had anal sex with me without -- without anyone warning, without any lubrication, without anything. It was so painful.  That time I did scream, because it was so, so  painful.  And instead he held my hands behind me so badly that I twisted a muscle. I still have the lymph node on my right neck, on the side of my right neck right now from that situation.[184]

*          *          *          *          *          *

Q:     All right.  And were you face down on the bed or face up on the bed or on your stomach or on your back?

A:     I was face down, which is how, after he had – after he raped me anally, and I tried to get away. It was so painful, I screamed and tried to get away, and he held both of my hands behind me and push my head deeper into the bed. And I twisted my shoulder, and had this painful -- and I still have the painful lymph node. I had to go to the hospital because for a while my shoulder and my back was hurting me.

Q:     Did he penetrate you vaginally first?

A:     He penetrated me vaginally first, then anally, then vaginally again, which is why I got bacterial vaginosis, and I had to go to the hospital for that.[185]

Eventually, Ige finished and went to the bathroom.  DOE fled from his room[186], and walked home.[187]

DOE did not report the rape to CSC or law enforcement.  She testified:

Q:     What did you do when you got home?

A:     I don't remember what I did.  I know I was scared, sick to my stomach.  I was confused. I was numb, and I was terrified.  And basically dejected.  I know I

---

[184]*DOE depo.* 121:14.

[185]*DOE depo.* 122:05.

[186]*DOE depo.* 123:01.

[187]*DOE depo.* 124:15.

42

> did cut myself. I did cut my wrist, because the same thing that I escaped Mali for ended up happening again. I was so sure that this wouldn't happen when I came to America, and I thought that was behind me, and it happened again.[188]

On May 23, 2016, when DOE attended her next counseling appointment at the CSC Counseling Center, she gave Bila some information, but not many details, of what happened. Bila wrote:

> [S]tudent has not picked up her Zoloft or Alazopram due to decreased paycheck. She cannot sleep at night, thus she is sleeping all day. Rarely goes outside in daytime. Has been going to the bars. Denies drinking to the point of intoxication. She has an increased tolerance level for alcohol. We discussed alcohol being a depressant which further depresses mood. She had an incident w/a student during finals week which she did not want to discuss but was worried about STDs. Questioned consent, etcetera. We discussed "no" means "no."[189]

That summer, Bila helped DOE process that "no mean[s] no when it comes to sex or anything else,"[190] and "how abusers are good at manipulating even intelligent people like her."[191]

DOE suffered physically from the rape. She contracted bacterial vaginosis as a result of Ige raping her anally and then forcing his penis into her vagina. She also had a swollen lymph node, which persists to this day. She had to seek treatment at the hospital for the strain to her shoulder and back caused by Ige jerking her arms behind her back and restraining her while anally raping her. She went to the clinic to get checked for sexually transmitted infections and to get treatment for the bacterial vaginosis, and she went to the hospital for evaluation of her swollen lymph node.[192]

---

[188]*DOE depo.* 124:20.

[189]*Depo. exhibit 102* at 23.

[190]*Depo. exhibit 102* at 24.

[191]*Id.* at 24.

[192]*DOE depo.* 115:10.

43

Bila knew about these medical consultations.[193]  She spoke with DOE about reporting the rape to police, but DOE was resistant, saying "I just want to move on."[194]  Bila testified:

Q:    Have you seen that in other rape trauma patients as well?

A:    Yes.

Q:    What in your training and your education explains that dynamic?

A:    Well, you know, bringing it up and talking about it over and over again is hard, and they just want to move forward.  And a lot of times they don't want to, um, have to tell a bunch of people about that event. They just want it to go away. "I want to forget about it. I want it to go away."

Q:    Has that dynamic that you've seen in your training and experience, do you think that was true with [DOE] at the time she was telling you about that first assault?

A:    Absolutely.

Q:    Is it also true in your training and experience that victims of sexual assault can almost get, "conditioned" is not the right word but I can't think of a better word, so maybe you can. You may have a more clinical word. But conditioned to tolerate the perpetrator?

A:    Um, I don't know if "conditioned" would be the right word, but yes, I guess.

Q:    You're struggling for the right word, too?

A:    Yes.

Q:    "Conditioned" is not quite right, but there's a dynamic that explains why someone doesn't go to the police the first time immediately when they were molested or assaulted, and that's the word we're struggling to find right now?

A:    Yes.

---

[193]*Bila depo.* 61:20.

[194]*Bila depo.* 62:01.

44

Q:     Why does that happen?

A:     It's a very personal thing that happens, and they're ashamed and embarrassed. And you have to go tell strangers about that. And then -- and you know that you're not going to just tell one person; you have to tell another person. And getting up in front of, you know, people that you don't know and telling them very personal things when you're humiliated is a hard thing to do.

Q:     Fear that you might be blamed?

A:     Yes.

Q:     Fear that you might not be believed?

A:     Yes.

Q:     Fear that nothing will be done and then it could happen again?

A:     Yes.[195]

Bila did not push DOE to report, and did not make any mandatory reports of her own.

Maybe a week later, DOE encountered Ige on campus. She had hoped that "I could just push myself in studying and not have to deal with him as long as I avoided him,"[196] but Ige found her in the computer lab of the Student Center:

And he was taunting me about the May situation, when he raped me in May. He started taunting me about it and then saying that – saying crude things. And, basically, at that point then he squeezed my thigh and kept like trying to take my papers and read what I'm doing or come behind me. So I just printed what I could and I left, and I went to the Old Administration Building for my next class.[197]

Ige also approached DOE on several occasions when she was working security at the desks of Kent,

---

[195]*Bila depo.* 62:04.

[196]*DOE depo.* 129:06.

[197]*DOE depo.* 130:07.

High Rise and Andrews[198] and in passing elsewhere on campus.  As  DOE described, Ige would "taunt me about it and just use some crude remarks about -- and this is words he used, fucking me in the ass, and just taunting me about what he did, even though he knew it was very painful to me."[199]

Through that summer, DOE's presentation at counseling was of a patient in acute distress. Bila documented that DOE appeared tired and was tearful, and that she had reported increasing panic attacks.[200]  She was struggling to sleep.[201]  She disappeared from counseling after July, and did not see Bila again until the fall semester began.  DOE presented on September 16, 2016, still in a state of anxiety and depression.  Bila wrote:

> Tearful throughout session.  Family issues, depression.  Has not been to see therapist since July.  Is going to CSC clinic to refill Zoloft.  Has been experiencing flashbacks, nightmares and increased panic attacks.  Is stressed b/c her sister's Visa was denied and she has to leave Canada in 2-3 weeks and has applied for refugee status. Worries about her sister returning to [Mali] and her 1 year old son due to dad's abuse.[202]

DOE had one semester left of school.  Her plan was to *endure*, and graduate.

G.      The second rape

From 2300 hours on September 18 until 0700 on September 19, DOE was working as desk security at Andrews Hall.  At her supervisor Don Keiper's request, she was training a new employee

---

[198]*DOE depo.* 131:03.

[199]*DOE depo.* 133:04.

[200]*Depo. exhibit 102* at 25-26.

[201]*Id.* at 27.

[202]*Depo. exhibit 102* at 28.

named Misty, who was scheduled to work until 0300 (a half-shift).[203]

Ige approached the desk and began harassing DOE, taking her drink again and now grabbing DOE's phone when it was unlocked and using it to take photos of himself (which DOE later submitted to Chadron Police).  DOE threatened to write him up if he would not stop.  Ige dashed away from the desk, with DOE's phone, and down the stairs into the basement of Andrews Hall.[204]

DOE left the desk and followed him, to get her phone back and to keep him from reading her private messages.[205]  She left her trainee at the desk, anticipating a quick return.  As DOE came downstairs, Ige grabbed her from the stairwell where he was hiding and began to grope her.[206]  DOE said "no":

> And I kept on trying to get away. I told him that I'm training someone. I told him that I have to be at -- I have to go back to my desk. I told him to stop, and I told him no multiple times.[207]

She could feel his penis against her body and could tell that Ige was sexually aroused.[208]  Ige put his hands inside DOE's clothing and attempted to digitally penetrate her.[209]  DOE was frightened and was much smaller than Ige (who had come to CSC with the plan of walking on for the football

---

[203] *DOE depo.* 136:08.

[204] *DOE depo.* 137:01.

[205] *DOE depo.* 137:09.

[206] *DOE depo.* 139:01.

[207] *DOE depo.* 139:05.

[208] *DOE depo.* 140:07.

[209] *DOE depo.* 140:13.

team[210]).  She bit him on the hand and ran into the women's bathroom.[211]

DOE testified:

A:     I was shaking, and I was trying to get myself together and regain my
       composure before going back upstairs to face Misty. Because I take my job so
       seriously, I was so scared of her thinking that I left her while I was downstairs
       fooling with someone when that wasn't the case.  Because everyone that I
       train, I train them very, very seriously so that they know how to do their job,
       and that doesn't reflect on me.

Q:     Were you worrying about losing your job at that point in time?

A:     I was -- I didn't want someone to come and misunderstand the situation.[212]

But as shown on the video surveillance, Ige followed DOE into the women's bathroom.  He grabbed

DOE from behind, pulled out his penis and taunted her that she was just "afraid of [my] big dick."[213]

DOE struggled to get away: this struggle went on for some time, with Ige penetrating and DOE

fighting him off repeatedly.[214]  Ige eventually accomplished vaginal penetration from behind as he

forced DOE's neck down into the sink.[215]

DOE was able to wrestle away before Ige ejaculated.  She pleaded with him to let her leave

because she was training another student upstairs.[216]  She knew Misty would leave at 0300 hours, and

---

[210]*Depo. exhibit 79*.

[211]*DOE depo.* 140:24.

[212]*DOE depo.* 141:07.

[213]*DOE depo.* 142:15.

[214]*DOE depo.* 146:11.

[215]*DOE depo.* 147:01.

[216]*DOE depo.* 145:10.

if the desk were unattended, "I was concerned over losing my job over a situation that was not my fault."[217] She pulled up her pants in the bathroom – she had pulled her pants up several times in the course of Ige attacking her in the bathroom and trying to pull her pants down[218]) – adjusted her wig so that the trainee would not see her looking disheveled, and exited the bathroom.  Ige followed her, and DOE told him to not follow her.[219]

The video footage shows DOE and Ige at the desk and in the basement of Andrews.  The implicit suggestion from Defendant is that because it does not show DOE screaming and fighting, that means there was no rape.[220]  But video also does not show DOE and Ige kissing, walking hand-in-hand, snuggling or even DOE smiling at Ige.  It shows a woman who has learned to not make noise, to not provoke, to not risk further harm – to *endure*.

DOE was back upstairs in time for Misty to leave so that the desk would not be unattended.  She was ashamed and embarrassed and in shock and tried to pretend that everything was normal.  As is typical for rape victims, DOE's memory is fuzzy on some details, like not remembering kicking Ige (which Chadron Police noted in their review of the video[221]) and whether she had to ask Ige for her phone again, but at some point DOE eventually had her phone back, and she used it to send Ige

---

[217]***DOE depo.*** 146:02.

[218]***DOE depo.*** 147:02.

[219]***DOE depo.*** 147:20.

[220]Even though Ige admitted DOE did not consent, and DeMersseman found that Ige sexually assaulted DOE, and Hansen accepted that finding.

[221]***Depo. exhibit 38.***

an angry message.[222]  When her shift ended at 0700 on September 19, 2016, DOE walked home.

Robin Bila's notes for September 19, 2016 read as follows:

Student did not come to her 1100 appt.  We conversed through text messages for several hours.  It was evident that some type of incident occurred that was traumatic for her.  She made it clear that it happened while she was working.  Therapist picked up the student so she could talk w/CSC nurse.  After speaking w/nurse, student disclosed that she was attacked and sexually assaulted at work.  She was unsure whether she wanted to report the attack.  She missed her appt w/the CSC clinic and w/this therapist b/c she was having panic attacks and did not want to talk about it.  She just wanted to finish out her semester here in peace.  Therapist voiced concern for her safety, since she would return to work and her attacker would continue to have access to her.  We also discussed getting checked to make sure she did not haveany health issues (STD) due to this incident.  Around 4:45 she texted this therapist, asking questions re: hospital policy on reporting to police.  She wasn't sure if she wanted police involved b/c she did not know if she wanted to press charges.  Around 5:15 she stated she did want to go to the hospital.  This therapist escorted her to the ER around 5:30.  After speaking w/doctor at great length, she decided to speak w/police.  Went through exam and interview and left hospital at approx. midnight.  She was exhausted and emotionally trained, had several panic attacks during the evening.[223]

DOE was anxious, disheveled, tight and shaky.[224]  Bila stayed at the hospital with DOE, and actually witnessed DOE suffer a panic attack while at the hospital: as Bila observed, "[DOE] was having a difficult time breathing.  Her heart rate was really fast, and she was shaky and she got tearful."[225]

DOE was extremely reluctant to report the rape to police.  Even when the Chadron Police Department arrived (on the hospital's notification), Bila recalls that the officer "gave [DOE] the

---

[222]**DOE depo.** 150:05.  DOE's texts and Facebook exchanges with Ige can be found at *Depo. exhibit 34*.

[223]*Depo. exhibit 102* at 29.

[224]**Bila depo.** 66:20, 67:08.

[225]**Bila depo.** 74:11.

decision to talk to them or not. It kind of went on for a couple of hours until she decided."[226]  DOE eventually agreed to be interviewed, and she eventually identified Ige to police as her rapist. When the rape kit examination and police interview were concluded, Bila drove DOE back to her apartment.[227]

H.     The Title IX investigation begins

**It was not DOE who reported her rape to CSC**. While DOE was at the hospital, CSC's then-Title IX coordinator Anne DeMersseman received a call from Chadron Police Chief Tim Lordino. He advised DeMersseman that "we had a potential Title IX" who was, at that time, still at the hospital with her counselor.[228]  (Lordino was not the officer who went to the hospital to interview DOE.)  DeMersseman went to her office, "did a no-contact order" and delivered it to Ige.[229]  Ige was still in the Campus Resource Officer's office in the Kent/High Rise/Andrews complex, giving an interview to the Chadron Police Department about DOE's report.

It was, by then, the very early morning of September 20, 2016; the next day, DeMersseman started "making out my plan" to interview people in accordance with Title IX procedures.[230]  She began her interviews on September 22, 2016.

In the days that followed, DOE submitted to additional interviews by the Chadron Police,

_____

[226]*Bila depo.* 72:22.

[227]*Bila depo.* 75:06.

[228]*DeMersseman depo.* 95:17.

[229]*DeMersseman depo.* 97:23.

[230]*DeMersseman depo.* 100:01.

held at the CSC Campus Security office.[231] DOE watched the video surveillance that Defendant has offered in support of its Motion.[232] The Chadron Police wrote reports on their interviews, which DeMersseman reviewed (along with the video surveillance) in the course of her Title IX investigation.[233]

I.     CSC seeks to modify DOE's work, instead of modifying Ige's housing

Within hours of formally opening a Title IX investigation, DeMersseman emailed DOE's supervisor, Campus Security supervisor Don Keiper, at 1340 hours on September 20, 2016, with the subject matter "[Jane Doe's] shift." **Defendants have not produced that email;** but Defendants did produce Keiper's response:

> [Jane Doe] picked up the letter in my office at 1425 today (9/20/16).  I did not discuss the situation with her, but she again expressed a desire not to pursue this matter. Just FYI.[234]

Keiper emailed this to DeMersseman at 2035 hours on September 20.[235] DeMersseman claims to remember nothing about what precipitated this exchange.[236]

Keiper recalled that earlier on September 20, 2016, DeMersseman had asked him to come to her office to pick up an envelope that she wanted to have delivered to DOE.  DeMersseman told Keiper that DOE had been "involved in an incident."  At some point that day before 2035 hours,

---

[231]*DOE depo.* 135:10.

[232]*DOE depo.* 137:07.

[233]*DeMersseman depo.* 151:21.

[234]*Depo. exhibit 85*.

[235]*Deposition exhibit 85*.

[236]*DeMersseman depo.* 101:04.

52

DeMersseman also asked Keiper "if there was a possibility that [DOE] could be moved to another dorm – if her work assignment could be changed to another dorm."[237]   It is not clear why DeMersseman's first action was to move and disrupt DOE, rather than to move and disrupt Ige.

Keiper told DeMersseman he would check the schdule and see what could be done.  Keiper then called DOE and asked her to come to the security office to pick up an envelope from DeMersseman.  DOE was still extremely reluctant to initiate any kind of formal proceedings.  She told Keiper, "I was told that I didn't have to talk to law enforcement." Keiper told her that he wasn't going to question her, just deliver a letter; so DOE came to the security office at 1425 hours, picked up her letter and again expressed to Keiper that she didn't want to press charges and did not want to talk to law enforcement again.[238]

Keiper agrees that there is also a second email between him and DeMersseman besides what precedes **Depo. exhibit 85** – another email that Defendant has not produced – in which he told DeMersseman that he had contacted DOE and she was on her way to pick up her letter; and, "because I told [DeMersseman] I would check the schedule, and I told her that [DOE]'s shift could be changed, just for her information her shift could be changed to same days, Sunday and Thursday in Brooks, and the change could be permanent and I'd wait for a response from her."[239]

Keiper had not discussed this with DOE when she came to pick up her letter because, Keiper says, "[i]t was not my place to. This was something that DeMersseman asked me if it could be done.

---

[237]**Keiper depo.** 45:24.

[238]**Keiper depo.** 47:20.

[239]**Keiper depo.** 48:25.

[DeMersseman] didn't explain what her thought process was, why she was asking. So I figured since she was the Title IX person and if that's what [DOE] was dealing with, they would work it out. I just had to let DeMersseman know."[240]

Asked whether she disagreed with Keiper's recollection that it was DeMersseman who approached him (and not the other way around), DeMersseman did not disagree.[241] She testified:

> Q:     Why ask Mr. Keiper about changing [DOE's] duty assignment on September 20th?
>
> A:     In case she wanted to be somewhere else.
>
> Q:     Why not ask [DOE]?
>
> A:     I hadn't met with [DOE] yet.
>
> Q:     Is there an alternative to moving [DOE]? In order to make sure that she doesn't come into contact with Mr. Ige, would there be an alternative to moving her?
>
> A:     Yes.
>
> Q:     What's the alternative?
>
> A:     And that would have been to ban him from a particular building.
>
> Q:     Had you taken any steps to ban Mr. Ige from any particular building by the time that you communicated with Mr. Keiper about moving [DOE]?
>
> A:     And I don't recall.[242]

But Defendant has produced no evidence that she had taken any such steps. The only evidence is

---

[240]*Keiper depo.* 49:15.

[241]*DeMersseman depo.* 102:23.

[242]*DeMersseman depo.* 102:25.

that DeMersseman immediately began investigating "solutions" that would move and disrupt DOE while leaving Ige in place.

J.     DeMersseman's first interview of DOE

On September 22, 2016, DeMersseman interviewed DOE. It appears that there is no audio recording for DeMersseman's interviews in this investigation.[243] Her notes appear at **Deposition exhibit 44**. DeMersseman explained Title IX to DOE and told DOE that DOE's protection was a priority.[244]

Relative to the first rape in May 2016, DeMersseman's notes read (with all typographical errors included as they appear in the original document):

> Last semester he was taking my stuff and running to his room with it
> (Tsion was the other worker -
> Last semester was wrose thn this becuae I had to go to hospital.. necik was hurting .. had a strain from when he held both my hands behind my back
>
> Then he did Anal without eavne asking me or using goop and I think I strained my soldier when I was tyryin got get away.
> This itme I didn't think hw=e was stuid enough to do this
> Why didin't y ou reprot MAy?
> I had just coe out of a domestic abuse situation and had a protection order and there was just too much going on with police and ocurt dates ... I was seeing Robin and I was seeing Doves ...[245]
>
> In May it was not consencusal. I have never ahd consensual sex with him.
>
> It was his room ... it was like the same thing he was grabbing my stuff, it's in my fridge, you come get it.
> trying to get me back to his room When I would come back from rounds (roverO he would

---

[243] **DeMersseman depo.** 115:10.

[244] **Depo. exhibit 4** at 1; **DeMersseman depo.** 190:03.

[245] **Depo. exhibit 44** at 2.

*come bback*
*Tsion Woldekiros. she si not going ot want to talk. There was an incident last year.*[246]

Relative to the September rape, DeMersseman's notes read:

*Playfully, swatting at me, but then taking my stuff*
*Advised Misty to wirte this kind of thing down*
*Kept taking my food, then took my phone. I have an exam and I need to study.*
*Just kept taking pictures with my phone and would not return it (ask Misty howm any*
*times?*[247])
*Annoyed, following him to basement to get her phone back*
*Pulled under stairs and groping and pulling pants down*
*Strated fingering me*
*Kept telling him I was going to scream.*
*Training girl upstars - she should be able to hear - - stop, she could hear*
*Tried to dry hump and kept hitting him ...*
*Can't be seen going to bathroom upstairs,,, didn't dwant her to thinkwe were fooling*
*around upstirs*
*So iwent down to basement bathroom, I kept telling him there wre security cameras*
*I kept telling him to get out*
*Bthroom doesn't lock, just the stalls*
*Held both my yhands and took my pants off*
*Kept telling him to stop*
*I told you to stop like 50 times (Do the texts bear this out*[248])
*HE kept holding his dick in his ahdn and he said I was just scared of how big it was*
*I'm not scared - I have to go*
*I didn't want misty thinkg we*
*I would never jepradize my job like htat*
*HE waited downstairs for a bit*
*After Misty left he cmae back*
*HE took my ohone again - and it was unlocked*[249]
*The first time you were under the stairs - yes, that's why I ran to bathroom ...*

*What sexual activity took place? He used fingers, I could feel he was hard for rubbing*
*himself against*

---

[246]***Depo. exhibit 44*** at 5 (all spelling and typographical errors in original).

[247]This parenthetical is believed to be DeMersseman's note to herself.

[248]This is believed to be DeMersseman's note to herself.

[249]***Depo. exhibit 44*** at 2.

*me. Holding me with one hand and using his other hand.*
*Did you want to engage in that activity? No*
*I told him No may times.*
*I told you no and I told you sot stop.*
*The first time you were in the women's restroom? He followed me into the bathroom and kept forcing*
*himself. He did go in me, and afterward*
*What sexual activity took place? Penetrated*
*What sexual activity took place?*
*Did you want to engage in that activity? No*
*I kept staying no and stop. Anyone could come in ad I would get fired. I said no and stop over and over.*
*I was on my phone os it was unlcliked, grabbing my drink and kept on trying to grab my stuff, but then*
*when he grapbbed my unlocked ohone I was relaly mad.*
*Telling him he was just a child and I'm serious and I am seriously going to write him up. He just kept*
*going through my ohone an dluaghing.*
*HE ran down the staris with it and he woudn't stop going thorugh it*
*Running around with my phone and I was so mad and frantic cause my ohone was unlocked.*
*I think*
*Easier to explain when the camera was there and could help me remember ...*[250]

DOE does not agree that DeMersseman's notes accurately describe what she told DeMerssman. She denies making a reference to "goop" (when Ige was anally raping her in May).[251] She denies saying "I don't think [Ige] had been drinking, he's just like that," which DeMersseman wrote; DOE observes that she did not know Ige well enough to know what Ige is "like."[252]

DOE took direct issue with other statements that DeMersseman wrote and attributed to her:

A:      And [***Deposition exhibit 44***] says, "I think I strained my shoulder while trying to get away." I didn't tell [DeMersseman] that I think I strained my shoulder.

---

[250]***Depo. exhibit 44*** at 4.

[251]***DOE depo.*** 162:09.

[252]***DOE depo.*** 166:20.

I told her that I *did*, because I did have to go to the hospital because of that. And I also told [DeMersseman] because of that, I had a swollen lymph node on my neck which she didn't write [in *Deposition exhibit 44*0, because till this day I still have that swollen lymph node, and the hospital did confirm that it was a strain.

Q:     Anything else?

A:     [W]hen [DeMersseman] says: "When you went into the bathroom, what did you say exactly?"  She wrote [as DOE's answer]: "Same reason I didn't want her to see my hair messed up. I didn't want her to notice or see anything. [DeMersseman asked] "why did you not want her to know if you [couldn't] help. [DeMersseman wrote as DOE's answer "I just didn't want a big mess. I just know I kicked and bit him," but that is not accurate either.  Because when I went to the bathroom, I did tell him to stop, and I said no many times. And I did not say that I didn't want Misty to notice or see anything.  I said, "I didn't want her to think that I was basically messing around with someone while I'm supposed to be doing my job and while I'm supposed to be training."[253]

DOE notes that DeMersseman's notes omit at least two entire areas of inquiry that DeMersseman raised, including DeMersseman's question to DOE of "why didn't you scream."[254]  DOE told DeMersseman:

I was in shock.  I was being raped again.  I was scared.  I was -- I didn't want to lose my job.  I was in so much shock.  I was busy fighting him off.  The first thing that came to my mind wasn't screaming.  The first thing that came to my mind was how can I get away?  How can I protect myself?[255]

But DeMersseman did not include that exchange in her notes.

DeMersseman also omitted part of DOE's answer to "why didn't you report the May rape?"

DOE told DeMersseman:

---

[253]*DOE depo.* 162:19.

[254]*DOE depo.* 164:20.

[255]*Id.*

> I gave her numerous reasons.  Like, I said, I was -- I just came out of an exhausting domestic abuse situation about my protection order.  You know I -- all the things, events I went through with my ex-boyfriend.  And also, I thought that if I didn't see [Ige] again, if I avoided him, that it wouldn't happen again ... I was scared of repercussion when I had -- when I had my situation with my ex-boyfriend.  His friends were harassing me.  His friends were -- even came to my window early in the morning yelling profanities at me to the point I had to call the police.  There were several other college students who got harassed when they spoke up what happened to them.  And I didn't want any repercussions. I didn't want to get  harassed. I didn't want [Ige] and his friends coming after me.[256]

That content also is missing from DeMersseman's notes.  Nor do DeMersseman's notes include DOE's description of her worries that her trainee, Misty, would mistakenly think DOE had voluntarily left Misty upstairs so she could have some sort of tryst with Ige.[257]

At the conclusion of the September 22, 2016 interview, the subject arose of not to protect DOE from further encounters with Ige.  DeMersseman wrote in her notes that she told DOE that "I have asked Don Keiper to have your shift moved to a different building.  Do you have a problem with that" and that DOE allegedly said "no."  DOE vehemently disagrees with the accuracy of DeMersseman's notes on this point.  She testified:

> A:   And also, "I have asked Don Keiper to have your shift moved to different building.  Do you have a problem with that?" And the answer is saying, "no," that is completely, completely false, very, very false.
>
> Q:   What would be the truth of that?
>
> A:   She told me that her duty under Title IX was to ensure my safety, and to make sure I'm protected and feel safe during the investigation.  And she asked me what she could do to help me feel safe.  And I told her that I don't want to be penalized by being the victim who has to move to another dorm, because I didn't do anything wrong. I was the one who was raped. That was

---

[256] *DOE depo.* 165:18.

[257] *DOE depo.* 162:01.

> my dorm. I was working there. I was working in that complex. And then I would have to be the one to go to a whole different dorm at a whole different place and change my schedule because he raped me, and she said that –
>
> Q:      So are you saying that Anne DeMersseman never asked you if it was ever okay to move your shift to a different building?
>
> A:      She did not, because she said she was going to -- she said that she was going to move him to Brooks or Edna.[258]

Later in the same set of notes, DeMersseman writes that she asked DOE "do you want me to pursue having [Ige] moved to a different building" and DOE said "yes."[259]

In this litigation, Defendant asserts that DOE should have trusted CSC to help her when Taylor Sinclair got involved after DOE hired counsel. Thus it matters that in her deposition, DeMersseman agreed that it was not unreasonable for DOE to want CSC to move Ige into a different building[260]; and, importantly, DeMersseman did not dispute DOE's testimony that at the end of her September 22, 2016 interview of DOE, DeMersseman warranted that CSC would move Ige out of the Kent/High Rise/Andrews complex:

> Q:      [DOE] says: "When I talked to the Title IX coordinator before the conclusion of the investigation, I was working in Andrews. Since I did not want to move to another complex, the Title IX coordinator told me she would move [Ige] to either Brooks or Edna because under Title IX my protection was a priority." Do you take issue with that statement?
>
> A:      I don't recall saying that specifically, so I can't say one way or the other.
>
> Q:      I want to be clear: Are you denying that you said that?

---

[258]*DOE depo.* 163:19.

[259]*Depo exhibit 44* at 7.

[260]*DeMersseman depo.* 111:13.

A:      No.[261]

DeMersseman warrantied to DOE that DOE could trust CSC on this important point.

After the interview, DOE emailed Justice Studies Professor Michael Bogner, advising him that "I just finished meeting with the Title IX coordinator just a little while ago and unfortunately, I will not be able to make it to class for the exam.  I signed a release form giving my counselor permission to talk to you in detail, however I would like to know if there is a time I can catch up on my topics exam next week?  I'm still struggling to get back on my feet after an incident early Monday morning, but will do my best to catch up as soon as possible."[262]  Bogner wrote back and assured DOE that they could find a time for her to make up her assignments.

K.     DeMersseman interviews Ige

While DOE was communicating with Bogner, DeMersseman interviewed Ige.  She saw no sign that Ige was intellectually incapable of understanding what was happening.[263]  Ige agreed to be interviewed, did not assert Fifth Amendment privileges and did not refuse to answer any of DeMersseman's questions.  She did not record the interview, but her notes appear at *Deposition exhibit 24*.  Ige acknowledged sexual contact, with the only issue being whether DOE consented; but DeMersseman's notes indicate that he did make this admission (with Ige's words appearing in blue), and that DeMersseman did have an internal response to that admission:

Did she ever say stop?

---

[261]*DeMersseman depo.* 189:06.

[262]*Depo. exhibit 29*.

[263]*DeMersseman depo.* 169:05.

> **The only time she told me to stop was when we were in the bathroom and she told me she had to be back at 3:00, she told me she had to go back upstairs.**

So she did tell you to stop when you were in the bathroom?

> **Yeah.**

Did you stop?

> **Yeah, when it was 3:00 and she had to back upstairs because the lady she was training had to leave at three. That's why we came back upstairs.**

Did she ever say no?

> **She never said no.**

And she only told you to stop the one time?

> **She did tell me stop early on because she might get fired from leaving the desk.**

So where were you early on when she told you to stop?

> **In the bathroom.**

[I pushed on this earlier claim of stop, and then he then backpedaled and said she only had to stop because she had to go back upstairs. He said he stopped once it was time for her to go upstairs.][264]

That was, apparently, DeMersseman's internal parenthetical at the time she interviewed Ige and/or at the time she wrote her notes.

Her contemporaneous internal parenthetical differs from her explanation in deposition, which was that "not having any evidence[265] one way or the other, my concern was how he perceived *their*

---

[264]*Depo. exhibit 24* at 2.

[265]Apparently DOE's account, and the seriousness of her report as embodied in seeking medical evaluation, was not "evidence" to DeMersseman, at least as of the time of her deposition.

62

*play.*"[266]   In her multiple interviews with DeMersseman and Chadron Police, DOE had not described anything collaborative with Ige that would warrant DeMersseman's use of "their"; and DOE had not described anything "playful" that would warrant DeMersseman's repulsive use of the word "play." And after the end of DeMersseman's interview of DOE, DeMersseman was making plans with other CSC administrators to remove Ige from Kent/High Rise/Andrews[267] – which does not suggest that DeMersseman had discredited DOE's account.

In fact, DeMersseman's notes of her interview of Ige indicate that she challenged Ige's dismissive attitude about consent. Per her notes, DeMersseman pointed out to Ige that "in the texts, [DOE] claims that she told you to stop several times."[268]   She tried to ask Ige why he thought DOE was blocking him on Facebook.[269]   When Ige agreed that he had taken DOE's phone and kept it when she wanted it back, DeMersseman asked him, "can you see why I might be concerned that if you are not listening to her about her phone, you might not be listening to her about sex?"[270]

Ige blamed DOE for various things. He complained about Everton Holder.[271]   He said he and Mr. Holder were friends. He claimed DOE was plotting and scheming to get them both in trouble[272] (DOE had had no contact with Holder since he violated the protective order). DeMersseman told

---

[266]*DeMersseman depo.* 125:11.

[267]*Depo. exhibit 21* at 2.

[268]*Depo. exhibit 24* at 4.

[269]*Id.* at 6.

[270]*Id.* at 7.

[271]*DeMersseman depo.* 127:06.

[272]*DeMersseman depo.* 127:10.

Ige:

> A number of things are concerning me and I think you need to think very carefully about your choices from here on out.  The fact that there is an allegation of two separate instances and that you followed her into the women's room indicate to me that you are not making good choices or that you are making assumptions, possibly very wrong assumptions, about sexual messages ... **You haven't told me anything that makes me think that she gave you consent.**[273]

At the conclusion of her interview, DeMersseman reminded Ige of his no-contact order and told him that someone in the administration would let Ige know "what we were going to do about residency and the dorms"[274] – consistent with DOE's recollection that DeMersseman told her that Ige would be moved out of Kent/High Rise/Andrews.

Although it is not documented in DeMersseman's notes, at some point in her investigation DeMersseman had an in-person visit with Robin Bila in her office.  Bila recalls that DOE had made DeMersseman aware that she was receiving counseling from Bila, so DeMersseman "wanted to make sure that [DOE] was able to access my services and was being seen."[275]  Bila recalls that this was early in DeMersseman's investigation, before DeMersseman memorialized her findings.

L.     CSC contracts its safety plan and does not warn DOE

Before she began her interview of Ige on September 22, 2016 at 1630 hours, DeMersseman started the process of doing what she told DOE she would do, *i.e.*, move Ige out of the Kent/High Rise/Andrews complex.  This, too,  is consistent with DOE's testimony that she told DeMersseman that she did <u>not</u> want to change her work assignment to a different residence hall, and that it should

---

[273]*Depo. exhibit 24* at 6.

[274]*Id.* at 7.

[275]*Bila depo.* 78:10.

64

be Ige who has to move.  At 1516 hours on September 22, DeMersseman sent an email to Senior

Director of Student Affairs Pat Beu:

> Hi Pat, I left you a voicemail earlier today, but in case you haven't had a chance to
> pick it up, I wanted to let you know that based on further information I have received
> in the last 24 hours, we will need to proceed with having Mr. Ige moved out of the
> Andrews/High Rise/Kent complex.[276]

Beu then forwarded the email to Director of Student Housing & Residence Life Sherri Simons and

one of Simons' associate directors, Austen Stephens.   Beu wrote, "my understanding is

[DeMersseman] is not going to request to have [DOE's] job moved but that she can stay in

Andrews[277]" – again, consistent with DOE's testimony that she told DeMersseman she did <u>not</u> want

to change her work assignment. Beu asked, "is there someplace in Edna Mr. Ige can be moved to?"

> Austen Stephens replied that
>
> it looks like Mr. Ige is in High Rise 910 with a roommate.  There are empty rooms in
> the Edna Wing basement but also some guys that need roommates in Brooks Hall as
> well, which might be better, unless his roommate is moving with him.[278]

Beu replied, "since Brooks is not where she will be going, that might be alright.  Let's talk"[279] – again,

consistent with DOE's testimony that she told DeMersseman that she did not want to change her

work assignment.

> By this time, DeMersseman was not participating in the discussion, as her interview of Ige

---

[276]*Depo. exhibit 21* at 2.

[277]*Id.* at 2.

[278]*Id.* at 1.

[279]*Id.*

65

had begun at 1630 hours.[280]   But at this point, Sherri Simons threw up the first documented resistance to moving Ige, writing:

**Edna Wing would not be good since it is in the basement with no supervision!**[281]

*What does this mean?*  Simons refused to explain this remark in her deposition.  Simons initially said, "we like all of our students to have supervision"[282]; but she acknowledged that at that time, there were freshmen living in Edna Wing on floors without a resident advisor (RA).[283]

Why did Ige, an upperclassman, need more "supervision" than those freshmen?  The undersigned tried to find an answer to this question.  Defendant successfully resisted production of Ige's student files in the course of discovery herein.  Consequently, all we know is what came up in the course of DeMersseman's interviews: that apparently CSC had drafted at least one prior no-contact order on Ige, in December 2015[284];  but that it had never been delivered to Ige, for reasons never made fully clear by any witness herein.[285]

Defendant has not produced any responses to Simons' emailed remark about not putting Ige in a dorm without supervision.  But we know that something happened – someone made a decision, somehow – because Ige was not moved out of his dorm room in High Rise.[286]   The next day,

---

[280]*Depo. exhibit 24* at 1.

[281]*Depo. exhibit 21* at 1.

[282]*Simons depo.* 88:18.

[283]*Id.* 88:23.

[284]*Depo. exhibit 41.*

[285]*DeMersseman depo.* 127:18; *Beu depo.* 109:03; *Simons depo.* 98:07.

[286]*Simons depo.* 90:19.

September 23, 2016, at 1215 hours, DeMersseman emailed Beu:

> As a follow-up to our conversation last night ...
>
> Were you able to find out anything as to whether or not we have documentation that [Ige] received the no-contact order in December of 2015 as pertained to Darcy Lindsey?
>
> Also, after a conversation with Sherri last night, I think the best thing for all the parties concerned is to issue a ban from Andrews Hall for Anthony. This allows us to not disrupt Anna in her work position, and keeps him out of Andrews which was what my original request was intended to do. But Sherri's solution works better and makes more sense for both I think.
>
> When I ended our conversation with him yesterday, I advised him that someone from Residence Life would be contacting him about his move out of High-Rise. Would you like me to contact him and let him know we are doing a ban instead, or do you just want to let him know that when you deliver the ban?[287]

In the "conversation last night," DeMersseman agrees, she had asked Beu for information about Ige's apparent December 2015 no-contact order; by noon on September 23, Beu had not responded, prompting DeMersseman's follow-up email.[288]

But there was also a "conversation with Sherri," that – per *Depo. exhibit 41* – prompted DeMersseman to tell Beu that instead of moving Ige out of Kent/High Rise/Andrews, they would just ban him from one of those three connected dorms. *What changed?* DeMersseman wouldn't say:

> Q:     At 1516 hours on September 22nd, in *Depo. exhibit 21*, you were telling Dr. Beu that "we will need to proceed with having Mr. Ige moved out of the Andrews/High Rise/Kent complex.
>
> A:     Yes, I have an e-mail about moving him, yes.
>
> Q:     And then we move to 12:15 on September 23rd, which is *Depo. exhibit 41*,

---

[287]*Depo. exhibit 41* at 4.

[288]*DeMersseman depo.* 140:10.

and you're telling Dr. Beu that "after a conversation with Sherri last night, I think the best thing for the parties concerned is to issue a ban from Andrews." So the plan had changed, correct?

A:     It looks like that, yeah.

Q:     What changed the plan?

A:     I don't recall.

Q:     Did [DOE] contribute to that plan?

A:     I don't recall.[289]

Q:     If [DOE] walked out of her meeting with you thinking that he was going to be banned from the complex, had anyone interceded to her to let her know that the plan had changed?

A:     I don't recall.

Q:     If [DOE] walked out of there thinking that he was going to be banned from the complex, if that's what you told her, do you think it would be reasonable for her to believe that she would be notified if that plan changed?

A:     If that's what I told her, yes. Ask me the question again.

Q:     If you told her that he was going to be banned from the complex, is it reasonable for her to think she'd be notified if that plan changed?

A:     If that was what I told her, that's reasonable.[290]

Simons' memory of the "conversation with Sherri" has also failed; even **Depo. exhibit 41** did not refresh her memory about what her "solution" was, or who was advocating to let Ige stay in his High Rise dorm room, or why.[291]

---

[289]She did not.

[290]**DeMersseman depo.** 141:10.

[291]**Simons depo.** 95:09.

Asked whether she was the one advocating to allow Ige to continue residing in the Kent/High Rise/Andrews complex, DeMersseman replied:

A:     I would have advocated for what I thought gave us the best solution for both parties.

Q:     He's a party that has admitted that he had sex with someone who didn't consent, right?

A:     Correct.

Q:     Why are we thinking of the best solution for his comfort and consideration?

A:     It wasn't what was best for comfort but what would keep, what would be safest to keep them apart.

Q:     Well, how about moving him out of the complex?

A:     I don't have a response.[292]

DeMersseman agrees that in **Depo. exhibit 41**, she had contracted her original safety plan. Originally, CSC would move Ige out of the Kent/High Rise/Andrews complex (and told DOE that was the plan); now, CSC would just ban Ige from Andrews, one of the three connected dorms, while allowing him to keep his dorm room and roommate in High Rise.[293]

DeMersseman conceded the impact of her contraction of the original safety plan:

Q:     How does that make it better for [DOE]?

A:     I can't remember the order of the conversations that we had about who was going to go where, so I can't answer that.

Q:     The end result of what you're proposing in this e-mail is that Mr. Ige is still allowed to walk into Kent, right?

---

[292]*DeMersseman depo.* 143:16.

[293]*DeMersseman depo.* 145:23.

A:     Okay.

Q:     Still allowed to walk into High Rise, I mean, right?

A:     Okay.

Q:     If [DOE] is crossing through those buildings on her way to her duty assignment, she risks seeing him, correct?

A:     Potentially.

Q:     For that matter, there's nothing to prevent him from walking into Andrews from one of those other corridors, correct?

A:     There's a ban.

Q:     Other than the ban?  It's a ban on somebody that also knows you're not supposed to rape but did, so that's where we're at.  There's nothing in the buildings that would prevent him from going, from traversing from Kent and High Rise into Andrews, correct?

A:     Physically?

Q:     Right.

A:     Nobody was preventing -- nobody was physically holding him back. Nothing was physically holding him back. He just had the ban.[294]

For review, once a student shows an ID to enter Kent, he does not need to show an ID again to enter into High Rise and/or Andrews – a person's authority to enter High Rise and/or Andrews is not challenged if he has accessed the complex through Kent.[295]

Not only did CSC betray DOE by contracting the safety plan; but it compounded that betrayal by not warning her of that decision.  Defendant has produced zero documentation to

---

[294]*DeMersseman depo.* 146:03.

[295]*Simons depo.* 23:15.

70

indicate that anyone communicated the  contraction of the safety plan to DOE.  DeMersseman says she does not recall if she told DOE[296], even though she knew how to get ahold of DOE.[297]  Beu did not tell DOE.[298]  Neither did Simons.[299]  Beu gave Ige a no-trespass order, dated September 23, 2016[300], advising him that he was banned from Andrews Hall and citing Board Policy 3020.  Beu copied the order to various CSC administrators, Board counsel Kristin Petersen, Campus Security and Chadron Police, but not to DOE.[301]

Thus on the first night that DOE attempted to return to work after the rape (possibly that same night, *i.e.*, September 23, 2016), at her ordinary duty assignment at Andrews, she was alarmed to see Ige in the Kent/High Rise/Andrews complex.[302]  DOE was walking to Andrews Hall, and saw Ige coming from High Rise in the corridor where Kent, High Rise and Andrews intersect:

> It was as if he was walking towards Kent.  The moment I saw him, all the flashbacks and trauma came back. I just rushed to Andrews. I didn't watch what  direction he went in.[303]

DOE reported this encounter to Don Keiper, and did not go to her next shift.

DOE told Keiper that she could not go back to work until he moved her: "that it was because

---

[296]*DeMersseman depo.* 147:25.

[297]*DeMersseman depo.* 147:15.

[298]*Beu depo.* 117:02.

[299]*Simons depo.* 101:06.

[300]*Depo. exhibit 11*.

[301]*Id.*

[302]*DOE depo.* 187:22.

[303]*DOE depo.* 187:18.

they said they were going to move him and they didn't."[304]   DOE reported this incident to her

counselor, Robin Bila, and to DeMersseman:

> A:   Yes. The moment I found out [that Ige had not, in fact, been required to move out of the Kent/High Rise/Andrews complex], I called her to try to ... I called [DeMersseman], because I was so confused, and I wanted answers as to why I was told he would be moved, and he wasn't.
>
> Q:   When did you call her?
>
> A:   I don't remember the exact date. But I did recall talking to -- I don't know if it's her assistant, but whoever answered -- there was a lady who answered the phone that day, and we did talk about that. And I talked with Anne again after the call.
>
> Q:   Did you talk to Anne by phone or person-to-person?
>
> A:   I believe I came to her office as well.[305]

DOE's memory is correct: on September 30, 2016, DeMersseman conducted a second

interview of DOE at her office, remarking in her notes that DOE

> was even more agitated that she was in our first interview.  She is visibly shaking all over.  She advised they have prescribed her two different medications to try and calm her anxiety enough so that she can be on campus.[306]

DeMersseman questioned DOE about statements Ige had made during his interview and about the

video footage.  DOE denied Ige's claims that they had had a prior relationship; reiterated that she

did not consent to sex with Ige; and pointed out to DeMersseman that, as a Campus Security

employee, she knows there is video surveillance and she thus hoped the presence of video would

---

[304]***DOE depo.*** 188:22.

[305]***DOE depo.*** 189:24.

[306]***Depo. exhibit 22*** at 2; *see also **DeMersseman depo.*** 171:12.

protect her.  DOE asked DeMersseman:

> Why would I go have sex with him when I know there are cameras and that my boss checks cameras, I know my boss checks – why would I do that?  Why would I put my job in jeopardy?[307]

(It is undisputed that over her 3 ½ years of working for Campus Security, DOE had never been written up for on-the-job misconduct – before, after or including the time of the rape – and in fact she had been assigned by Keiper to train new employees due to her reliability.)

At the conclusion of that interview, the subject came up of DeMersseman first telling DOE she would move Ige out of the Kent/High Rise/Andrews complex, then contracting that safety plan without telling DOE.  In her notes, DeMersseman acknowledges that she had not communicated to DOE about the contraction of the safety plan:

> [DOE] said she gave up her shift last night when she found out [Ige] had only been banned from Andrews, not moved to a different complex. I explained why we thought it was more effective to ban him from her building.[308]

Asked about this note, DeMersseman acknowledges that "it doesn't look like we did" tell DOE about the contraction of the safety plan to allow Ige to remain in the Kent/High Rise/Andrews complex; and she characterizes the failure of communication as "unfortunate."[309]

DeMersseman testified:

Q:     What do you think it was like for [DOE] in the moment to see Mr. Ige in the complex?

A:     Did she see him in the complex?

---

[307] *Id.*

[308] *Depo. exhibit 22* at 3.

[309] *DeMersseman depo.* 162:02.

Q:      What do you think it was like for her to see him?

A:      I don't know that she saw him.

Q:      The question is:  What do you think it was like for her?  I'm asking you to put yourself into her shoes for a moment.

A:      And I'm not [DOE].

Q:      If you can think about what it would be like for a rape victim to take the chance of reporting it – you know, summon the courage to report it instead of just deciding she's going to live with it, which is what she had done before, and this time  she's going to trust you; she's going to trust the  system; she's going to trust that she'll be taken care of, trust that the things that are told to her will be followed through; and then see Mr. Ige, there's your circumstances.  What do you think it would be like for someone in those shoes?

A:      If someone in that situation saw him, I'm sure it would be very difficult.

Q:      Do you think that she was unreasonable to be upset upon learning that he had not been moved to a different complex?

A:      No.

Q:      And can you see how it would cause a rape victim to lose confidence in the college's willingness to protect her if she is first told she is not going to see him some place and then she does?

A:      I don't know that she saw him.

Q:      That wasn't the question I asked you ... what I'm asking you is: Can you see how it would cause a rape victim to lose confidence in the college's willingness to protect her –

A:      Hypothetically, yes.[310]

Notwithstanding DeMersseman's apparent presumption that DOE must have lied in saying that she

encountered Ige – in a place where DeMersseman allowed Ige to remain, where DeMersseman knew

---

[310] *DeMersseman depo.* 162:07.

DOE to work – Defendant has never produced any evidence that DOE is just making this up.

Defendant characterizes this as a minor "miscommunication." It is not – DeMersseman knew it was important to DOE, and she knew it was her job to make sure DOE was informed of the safety plan (and any changes to it). Perhaps she sensed that if she told DOE in advance that she was contracting the original safety plan because Simons thought Ige needed "supervision," DOE would rightfully ask her why Ige was allowed to remain on campus at all. At any rate, DeMersseman knew this communication was critical, and she did not care enough to make sure it happened.

Asked why it mattered that, when DeMersseman contracted the safety plan, she let DOE learn that decision by being exposed to Ige in the dorm instead of through a professional communication from somebody in the administration, DOE's expert, Charol Shakeshaft, explained:

> Q:   What is the impact of that kind of a failure?
>
> A:   One impact can be that you then just don't trust anything. If you're not being told what's happening and you believe that one thing has been done, "this person's been banned from this building," and then you see the person and find out that, in fact, he wasn't banned, you don't trust that whatever is happening is intended to keep you safe. It also ups your stress level. If you think the university is protecting you and looking out for you, you might feel less stress. If you suddenly realize that the things they're telling you aren't true or that you're finding out about changes later after you've experienced more trauma, then that just increases your lack of trust and increases your stress and trauma.[311]

Although Beu issued the no-trespass order to Ige on September 23, 2016, no one communicated the Andrews ban to the residence halls for another four days.[312] No one can answer why. DeMersseman says "it's not in my expertise," though she acknowledges that as Title IX

---

[311]*Shakeshaft depo.* 52:23.

[312]*Depo. exhibit 20.*

coordinator, part of her job was to make sure these protections are in place, and that she is supposed to work with the Director of Student Affairs to see that happen.[313]  Beu, the Senior Director of Student Affairs, can't explain the delay.[314]  DeMersseman, Beu, and Vice-President Hansen all agree that the delay is unacceptable[315], but no one takes responsibility for the fact that on the day that DOE encountered Ige, this confessed rapist was on the "honor system" (which he was dancing on the edge of violating, in the intersection of Kent, High Rise and Andrews when he encountered DOE) with the dorms unaware of the no-trespass order.

When Beu got around to sending out his no-trespass order, he advised Simons, Austen Stephens and Don Keiper (among others) that the ban "could end as early as next semester."[316] Presumably this is a reference to DOE's expected graduation in December 2016, though no administrator would admit it.  Beu thinks that he "was probably told that [the ban] could end" by either Hansen or DeMersseman.[317]  DeMersseman testified:

Q:      Why let this ban end as early as next semester?

A:      I don't know what [Beu] was thinking.

Q:      Why let a man who has admitted to committing a sexual assault in Andrews Hall back into Andrews Hall as soon as the semester is over?

A:      I don't have an answer for that.

---

[313]*DeMersseman depo.* 150:14.

[314]*Beu depo.* 121:18.

[315]*DeMersseman depo.* 151:17; *Beu depo.* 121:25; *Hansen depo.* 107:25.

[316]*Depo. exhibit 39*.

[317]*Beu depo.* 125:10.

Q:     Do you approve of it? I mean, does that sound good to you?

A:     If the individual is no longer there, it would be a consideration.

Q:     Why has he not lost his privilege permanently?  If you commit a rape in a dorm, why have you not lost your privilege permanently to re-enter that dorm?

A:     I don't have an answer for you.[318]

For DeMersseman to reason that "if the individual" – presumably she means DOE – "is no longer there," it is okay to lift a rapist's ban on that dorm diminishes acquaintance rape to a silly dispute between a boyfriend and girlfriend.  But Ige and DOE were not boyfriend and girlfriend, and Board Policy 3020 makes clear that acquaintance rape is sexual violence.[319]  DeMersseman's testimony shows how unseriously CSC took DOE's serious report – and the import of Ige's admission.

## M.      DeMersseman officially finds that Ige sexually assaulted DOE (twice)

On September 30, 2016 – the same day as her second interview of DOE[320] – DeMersseman concluded her investigation and finalized her determination.  She had interviewed DOE twice and Ige once; she had reviewed Facebook messages between Ige and DOE, the Chadron Police reports and the surveillance video footage.[321]  DeMersseman's investigation was complete, as she had access to all the evidence she wanted to review and no one had refused to be interviewed.[322]  Her findings appear in *Deposition exhibit 1*.  DeMersseman wrote her determination letter in collaboration with

---

[318]*DeMersseman depo.* 157:17.

[319]*Depo. exhibit 8* at 1.

[320]*Depo. exhibit 22.*

[321]*DeMersseman depo.* 151:23.

[322]*DeMersseman depo.* 138:01.

Board counsel Kristin Petersen.[323]  No one forced her to find a violation of Board Policy 3020 if she

did not think such a finding was supportable.[324]

> She found that Ige violated Board Policy 3020, on two occasions.  DeMersseman wrote:

> Even with the differences in your statements as to the frequency of the words "no" and "stop," and the context in which they were being used, [Ige] admits he did not receive affirmative consent from you.  He also admitted that you had said "stop" at least one time early on in your encounter in the bathroom.

> Mr. Ige also admitted that you ran away from him and into the bathroom, at which time he pursued you.  Given those admissions and his assumptions that your statements of "no" and "stop" were a joke, I have determined that non-consensual sex occurred.

> He did state that after you had both returned to the Andrews lobby, you gave him your phone and that showed you were okay with the sex that had occurred earlier.  However, the video shows that after you had both returned to the Andrews lobby, he did in fact take your phone, and prevented you from retrieving it.[325]  He did return it shortly thereafter, but took it again a couple of minutes later and prevented you from retrieving it again.

> I therefore have determined that sexual acts occurred in May and in September, which you did not consent to.[326]

Lest there is any question as to the meaning of DeMersseman's findings, DeMersseman testified:

> Q:    Is there, in your mind, a difference between "sexual acts that occurred in May and September which you did not consent to," and sexual assault?

> A:    Please say the question again.

> Q:    [Board Policy] 3020 talks about the different forms of sexual violence.  In your mind, is there a difference between your terms, which were "sexual acts

---

[323]*DeMersseman depo.* 137:14.

[324]*DeMersseman depo.* 138:10.

[325]In other words, DeMersseman found that Ige lied to her.

[326]*Depo. exhibit 1* at 2.

occurred in May and September which you did not consent to," and sexual assault?

A:  ___Sexual assault as defined by Board Policy 3020 took place___.[327]

DeMersseman concluded her findings by advising DOE that Ige would receive a no-contact, no retaliation order and would be banned from Andrews Hall; and by reminding DOE that "your no-contact order with Mr. Ige will also remain in place."[328]  DeMersseman sent her determination letter to Vice President Hansen, Pat Beu and Sherri Simons.  **However, although her determination letter is dated September 30, 2016, DeMersseman did not send the determination letter to DOE and Ige until October 3, 2016.**[329]

N.    CSC moves DOE's work assignment to Brooks Hall

Vice President Jon Hansen agrees that if, as between victim and perpetrator, someone has to move, and have their ordinary campus life disrupted, in order to prevent future contact, it is the perpetrator who should move.[330]  He could not formulate an answer for why, after DeMersseman found that Ige twice sexually assaulted DOE, the person who had to experience further disruption should be DOE.[331]  But on October 1, 2016, DeMersseman notified Campus Security supervisor Don Keiper that DOE's duty assignment had been officially changed to Brooks Hall.[332]  By this time, DOE

---

[327]*DeMersseman depo.* 168:18.

[328]*Depo. exhibit 1* at 3.

[329]*Depo. exhibit 27.*

[330]*Hansen depo.* 119:14.

[331]*Hansen depo.* 120:04.

[332]*Depo. exhibit 26.*

79

had not yet received DeMersseman's September 30 determination letter, because DeMersseman had not sent it to DOE yet.[333]

DOE had already contacted Keiper herself after the shock of realizing that CSC had reneged on the plan to move Ige out of the Kent/High Rise/Andrews complex, but one week later, DeMersseman got around to contacting Keiper again, telling him to permanently restrict DOE's duty assignment to Brooks.[334]   DeMersseman told Keiper that "the decision had been made and that [DOE] needed to be moved immediately, which would begin on [October 2]."[335]   Vice President Hansen says he was unaware of this decision, and that DeMersseman did not consult him about it.[336]

Upon receiving this directive from DeMersseman, Keiper tried to call DOE and, when he did not reach her, sent her an email.  Since she did not confirm receipt of his email before her shift was to begin, Keiper had a patrol officer meet DOE when she reported for duty at Andrews and escort her over to Brooks.[337]   Importantly, Keiper clarified that he does not dispute that DOE had communicated with him directly about needing her duty assignment moved in light of CSC's contraction of the original safety plan – he simply does not remember the conversations DOE recalled, but does not deny that they happened as DOE describes.[338]

The change in duty assignments was a meaningful difference for DOE for several reasons.

---

[333]*Depo. exhibit 27.*

[334]*Keiper depo.* 57:23.

[335]*Keiper depo.* 58:03.

[336]*Hansen depo.*

[337]*Keiper depo.* 60:08.

[338]*Keiper depo.* 61:13.

One was that working in the Kent/High Rise/Andrews complex gave DOE the opportunity for extra income, because she had contact with desk security workers who periodically needed someone to cover a shift for them.[339]  Another reason was that she just liked that assignment better:

> I always loved working at the High Rise/Andrews/Kent complex.  Especially Andrews -- like, I had started working there for a while now.  And it was -- at that certain time it was kind of quite.  I just liked that dorm because I had been working there.  I had friends working there.  And we also had so much more things accessible to us like the C-Store for food, if we need food, because we're working from 11 p.m. to 7 a.m., usually.[340]

But a third reason was that as between disrupting DOE's world and disrupting Ige's world, DOE felt that CSC should not default to disrupting her world.

Ige was the rapist.  Ige admitted that DOE said "stop," and he admitted he forced her into sex anyway.  Yet DOE lost a duty assignment she enjoyed so that CSC could avoid having to deal with whatever issues were created by Ige's need for "supervision"[341] – that was not consistent with Title IX's protections for victims of sexual assault.

O.  CSC cares so little that it loses track of where it has banned Ige from

On October 2, 2016, Beu issued a new no-trespass order to Ige, now banning him from Brooks Hall and advising him that "the previous suspension from Andrews Hall is lifted."[342]  Thus there was an inconsistency when DOE received DeMersseman's determination[343], which

---

[339]*DOE depo.* 190:20.

[340]*DOE depo.* 226:08.

[341]*Depo. exhibit 21* at 1.

[342]*Depo. exhibit 12*.

[343]*Depo. exhibit 1*.

DeMersseman sent DOE on October 3[344], and which concluded by advising DOE that Ige was "permanently restricted from Andrews Hall."[345]  Ige received DeMersseman's determination with the Andrews ban on that same day – but, also on October 3, Ige signed Pat Beu's order banning him from Brooks.[346]  DeMersseman herself told Hansen, Beu, Simons, Board counsel Kristin Petersen and CSC President Randy Rhine on October 3 that she was banning Ige from Andrews, in an email sent at 1423 hours.[347]  Yet at 1942 hours on October 3, Beu was emailing his staff to advise that Ige was no longer banned from Andrews and was now banned from Brooks.[348]

Beu does not remember what happened between 1423 hours and 1942 hours to change Ige's ban from Andrews to Brooks.[349]  DeMersseman and Beu acknowledge another failure of communication, but just like the failure to communicate with DOE about the contracted safety plan, neither has an explanation for it.[350]  For that matter, DeMersseman is not sure why it took her until October 3 to send DOE her September 30 determination letter, other than a vague explanation of wanting Ige to receive that determination first.

DeMersseman did send DOE an email at 1642 hours:

Don Keiper informed me of your request to have your shifts moved to Brooks.  In

---

[344]*Depo. exhibit 27*.

[345]*Depo. exhibit 1* at 3.

[346]*Depo. exhibit 13*.

[347]*Depo. exhibit 27*.

[348]*Depo. exhibit 39* at 1.

[349]*Beu depo.* 133:10.

[350]*DeMersseman depo.* 177:02; *Beu depo.* 132:10.

> light of that, I just want you to know that Mr. Ige's ban will now be on Brooks, not on Andrews.  (In the letter I sent you earlier today, we advised that the ban on Andrews would remain in place.  This is an update/correction to that letter.) [351]

But DOE had only "requested" to have her shifts moved to Brooks for one reason:  due to her discovery, via encountering Ige, that DeMersseman had contracted the original safety plan of moving Ige out of Kent/High Rise/Andrews without telling DOE.

DeMersseman's no-trespass order banned Ige only from Brooks Hall.  DeMersseman did not ban Ige from the Student Center, the Physical Activity Center or anywhere else.[352]  Even for the "no contact" order to kick in, Ige would have to see DOE first, or hope that DOE doesn't notice that he is there.[353]  And since DeMersseman had also put a no-contact order on DOE, effectively that forced DOE to leave if she saw Ige.

Asked how it keeps the rest of the CSC campus safe to ban Ige only from Brooks, DeMersseman answered that "[DOE] was the only person I knew that had a problem with [Ige]"[354], again suggesting that this was a silly boyfriend-girlfriend dispute in spite of the absence of any relationship beyond acquaintance between DOE and Ige, other than victim-perpetrator.  DeMersseman testified:

> Q:    Do you get one free rape before you get banned from the campus?[355]

---

[351]*Depo. exhibit 87.*

[352]*DeMersseman depo.* 179:01.

[353]*DeMersseman depo.* 179:08.

[354]*DeMersseman depo.* 180:07.

[355]More accurately, two free rapes.  DeMersseman found that sexual acts occurred in May and September which DOE did not consent to, and Ige did not contest that finding.

A:     I don't think that's a fair assessment.

Q:     You can commit a sexual assault within the meaning of [Board Policy] 3020 and be allowed to go anywhere you want on campus as long as you don't see the person that you raped, right?

A:     That's your characterization.

Q:     Is there anything about it that I said that's not true?

A:     I don't know how to answer that.

MR. JOHNSON:        Her question was: Is it possible to violate Policy 3020 and still be on campus, basically.

A:     Yes, it is.

Q:     The question was, you can commit a sexual assault and go anywhere you want on campus as long as you don't see the person you raped, true?

A:     You can commit a violation of 3020 and not be banned from campus.

Q:     Sexual assault violation, not just grabbing a butt but sexual intercourse, right?

A:     Correct.[356]

Although it would be Hansen who would impose the final sanction on Ige, it was on DeMersseman to put a safety plan in place until the time of that sanction – and DeMersseman had already contracted her original safety plan without telling DOE (apparently due to Simons' concern that Ige needed "supervision"), **_and_** allowed DOE to encounter her rapist as a result, **_and_** whiffed her communications with everyone on her new safety plan, **_and_** then directed Keiper to officially and permanently restrict DOE to Brooks Hall so that Ige could remain unrestricted.

The other event of October 2, 2016 was that Hansen sent a memorandum to DOE, advising:

---

[356]*DeMersseman depo.* 180:09.

based on the information that was gathered during the investigation and Ms. DeMersseman's findings and determination, I believe misconduct, as defined in Board Policy 3100, occurred.  Accordingly, I have decided that disciplinary proceedings should be initiated.[357]

Hansen felt confident in the completeness of DeMersseman's investigation, and he did not disrupt or challenge any of her findings.[358]  Hansen sent a similar memo to Ige on the same day.

While DeMersseman was switching up her safety plans and Hansen was accepting her findings that sexual assault occurred, DOE saw her counselor at the CSC Counseling Center, Robin Bila.  Bila wrote:

[DOE] started cutting over the weekend.  Has not cut in 3 years.  Cut her wrist w/razor blade but would not show the counselor her wrist.  Did spend time w/friends and was able to relax.  Avoids going anyplace besides class and work due to panic attacks.[359]

That is Bila's note for October 3, 2016.

P.      CSC decides that Ige's rape of DOE is a rape, but not a serious rape

*Deposition exhibit 56* was produced by Defendant, in response to our Request that Defendant produce Title IX training materials its administrators have reviewed or received.  Its last page reads:

**Watch victim blaming!**

> *         Lack of physical resistance

> *         Role of alcohol/drugs

> *         Inconsistencies/memory loss

---

[357] *Depo. exhibit 2*.

[358] *Hansen depo.* 122:22.

[359] *Depo. exhibit 103* at 31.

\*  Delayed Reporting

\*  Prior relationships

\*  "Pre-consent"/Flirting

\*  Pre-desired outcomes

\*  Post-incident consensual acts

\*  "What were you thinking" (vs. "feeling")[360]

Hansen does not take issue with anything on this page of ***Depo. exhibit 56***. He agrees that at whatever point someone forces a person to have sex when that persons says they don't want to have it, that is rape.[361] But there is a genuine issue of fact as to whether Hansen and DeMersseman practiced the principles in ***Depo. exhibit 56*** in this case.

Hansen's October 2, 2016 transmission of ***Deposition exhibit 2*** to DOE, and its counterpart to Ige, triggered a 7-day period in which Ige or, theoretically, DOE could appeal DeMersseman's findings (though Hansen agrees there is no reason why DOE would appeal[362]). During those seven days, Hansen had contact with DeMersseman on several occasions to discuss her findings.[363] He solicited her input regarding what sanction to impose on Ige, and he communicated with Board counsel Kristin Petersen.

Somewhere in these communications, DeMersseman apparently began to express that she reached her determination that sexual assault occurred only because she "had to find the way she

---

[360]***Depo. exhibit 56*** at 8.

[361]***Hansen depo.*** 89:15.

[362]***Hansen depo.*** 184:17.

[363]***Hansen depo.*** 127:15.

found."[364]  DeMersseman has claimed that "had I not had [Ige] saying she never said yes, I wouldn't

– I didn't have any evidence"[365] – which incorrectly suggests that the victim's report is not evidence,

and that a Title IX coordinator cannot make a finding that sexual assault occurred unless the

perpetrator confesses.  DeMersseman says, "[i]t was a he said/she said, I can't assume he's doing that

to other people" – which incorrectly suggests that a Title IX coordinator cannot make a finding that

sexual assault occurred unless there is more than one victim.[366]  (Plus, "he said/she said" implies that

"he" did not confess – which Ige did.)

But per Hansen and per DeMersseman, that is what they were discussing between October

2 and October 9, 2016.  DeMersseman had found that "sexual acts occurred in May and September

which [DOE] did not consent to"; but she had reneged on her safety plan, perhaps because it was

inconvenient for CSC administrators to carry out, and DOE had called her out on it[367] on the same

day that DeMersseman wrote her determination.  Now Hansen and DeMersseman were, apparently,

looking for a reason to justify DeMersseman's decision to leave Ige in High Rise, and a reason to

justify a similarly lenient final sanction by Hansen.

Hansen testified:

Q:      Can you point out to me where in [DeMersseman's] determination she says
        this was not a strong case or I was forced to make my determination based on
        Mr. Ige's statements?

A:      I can't -- no, I don't know any place on there that it's written there, no.

---

[364]*Hansen depo.* 128:15.

[365]*DeMersseman depo.* 155:05.

[366]*Id.*

[367]*Depo. exhibit 22* at 2; *see also DeMersseman depo.* 171:12.

Q:    She didn't say that in [**Depo. exhibit 1**], did she?

A:    No.

Q:    She could find that a sexual assault occurred without him admitting to it, correct?

A:    No, that's not what I understood.

Q:    Let me hand you **Depo. exhibit 8** and I'd like you to show me where it says that sexual assault cannot be found unless the perpetrator admits to it.

A:    No, I'm not saying that.

Q:    There doesn't have to be an admission from Mr. Ige for her to say that she believes the victim, correct?

A:    Correct.

Q:    There are plenty of Title IX cases in which things are disputed; they may even go to a full hearing but can still result in a finding that the victim was telling the truth, correct?

A:    Agreed.

Q:    [DeMersseman] didn't cite in here or she didn't say that she found Ms. Dembele to be uncredible in her determination, correct?

A:    Correct.

Q:    It helps a finding when a perpetrator actually is willing to make an admission, but it's not necessary, right?

A:    Correct.

Q:    Whatever [DeMersseman] told you about supposed questions about [DOE's] credibility, she did not include in her Title IX determination, did she?

A:    No.[368]

---

[368]**Hansen depo.** 129:05.

> \*          \*          \*          \*          \*          \*

> Q:     [Was DeMersseman] saying, "I reviewed this entire case and I think it's a rape but only rape-ish?" I'm trying to understand how you find that it's a rape but still say that it's kind of not.

> A:     She finds that there's a violation of Board Policy 3020. She doesn't find the -- the terminology you're using is not terminology we use when we deal with policy.

> Q:     She found that sexual acts occurred on two occasions to which [DOE] did not consent, right?

> A:     That is what she found, but she also --

> Q:     Well, let's take it one step at a time. You can come to your "but" later. She found that sexual acts occurred in May and September that [DOE] did not consent to, correct?

> A:     That's what her finding says.

> Q:     *How is that not sexual assault?*

> A:     *I'm not saying that it's not sexual assault.*

> Q:     *It is, isn't it?*

> A:     *It is sexual assault.*[369]

But, as DeMersseman and Hansen discussed the case, they concluded that anal and vaginal rape in May and vaginal rape in September, both rapes occurring in the residence halls and both rapes perpetrated on a CSC campus security worker, was not serious enough to warrant a serious sanction.

Hansen's version of a risk assessment for Ige was to ask DeMersseman, who had interviewed Ige one time and who was not a risk assessment professional[370], "in your estimation of your contact

---

[369]*Hansen depo.* 131:12.

[370]*Hansen depo.* 134:17.

89

with this student, is there a continued threat?  Do we have any problems, would this student need to be expelled or can this student be retained?"[371]  This was in reference to Ige, who had been found to have twice raped DOE and who lied to DeMerrseman on points that her review of the video refuted.  Hansen's explanation for easing off on a sanction was that Ige claimed he thought he had consent – even though DeMersseman found there was no consent, and even though Hansen has never received any Title IX training to impose a more lenient sanction if the perpetrator's excuse is that he thought he had consent.[372]

Q.    <u>Ige admits to DOE's allegations</u>

Ige did not appeal DeMersseman's findings.  On October 11, 2016, Ige "admitted the misconduct violations and requested that the College take whatever action seems appropriate."[373]  For another two weeks, no one at CSC notified DOE that Ige had confessed to DeMersseman's findings.[374]  This many failures to communicate with DOE are not aberrations – they were a pattern, and a pattern that illustrates how much CSC cared about protecting this rape victim.

From **October 11 - October 24, 2016**, nothing happened that any CSC administrator can identify.  No CSC administrator had communicated with DOE since October 2, 2016, even though Hansen expects that the Title IX coordinator should remain in communication with a sexual assault victim during the process.[375]  In that timeframe, DOE was decompensating.  On October 10, 2016,

---

[371]*Hansen depo.* 128:24.

[372]*Hansen depo.* 136:06.

[373]*Depo. exhibit 17*.

[374]*Hansen depo.* 143:01; *see also Depo. exhibit 3*.

[375]*Hansen depo.* 149:23.

Bila wrote:

> [S]tudent is finding it more difficult to leave her apartment.  Had a panic attack in class when the professor closed the door to the classroom.  "I felt trapped."  Increased flashbacks.  Missed her other class this morning after her panic attack.  Hasn't heard anything from VP of Student Affairs regarding disciplinary action against the male student who sexually assaulted her.  Has increased self-mutilation but denies being suicidal.  She was permanently sent to security in Brooks Hall.[376]

Bila saw that these proceedings were adding to DOE's stress.[377]  Her symptoms were intensifying.[378]

> On October 11, 2016, Bila wrote:

> At 0116, this therapist rec'd a text message from the client stating that she has actually been suicidal for awhile, even though yesterday morning in session she denied being suicidal.  Stated that the sexual assault made things worse.  She has been fighting her whole life and now she is drained and tired.  Referenced an overdose she took a few years ago when she was living in her country.  Texted that when she isn't feeling suicidal, she is craving hurting herself.  Hurts even during class.  [I] immediately texted her back to ask if she was okay and if she had a plan.  She apologized for texting and states she thought I would see the text later.  Texted that she was fine, was tired and was going to try to sleep b/c she had an exam at 0930.  Denied taking pills or doing anything else to harm herself, stated she would not harm herself, just wanted to rest before her test.  Agreed to contact me at 0800 to say she was okay.  Said there was no need to call police.  At 0755, I texted the student several times and called twice before student texted back to say she overslept.  She said she was OK and was going to get ready for her 0930 test.  She agreed to come in for another session later in the week.  Denied having a plan or intent to harm herself.[379]

It was apparent to Bila that DOE was suffering.[380]

---

[376]*Depo. exhibit 103* at 32.

[377]*Bila depo.* 89:02.

[378]*Bila depo.* 89:10.

[379]*Depo. exhibit 102* at 33.

[380]*Bila depo.* 92:25.

Her Justice Studies professor Michael Bogner noticed that DOE was missing class.[381]  Bogner's class records indicate the following for DOE's attendance, before and after September 19, 2016:

| Date | Classes attended at least in part | Classes missed |
|------|-----------------------------------|----------------|
| Pre-rape | 20 | 2 |
| Post-rape | 28 | 42[382] |

Bogner noticed that were times when DOE would come to class and sign in, but left "abruptly" midway through.[383]  Bogner recalls that "her eyes would tear up and you could see her visibly shake, her hands shake, that sort of thing."[384]  One of those occasions was because DOE had encountered Ige in the building where Bogner held class.[385]  Some of DOE's communications with Bogner are documented in emails[386] wherein she described her symptoms of stress for Bogner, and Bogner agreed to allow her opportunities to make up the work or tests that she missed.

Charol Shakeshaft, DOE's expert witness, explains:

Q:     What message is sent to the victim when there a lengthy delay between a determination that sexual assault occurred and the eventual imposition of discipline?

A:     I believe that for victims to feel safe, once there's been a determination made, there needs to be consequences to the offender instituted.· So the delay, again, puts the victim in a period of unknown.· "What's happening?· What's

---

[381]*Bogner depo.* 67:08.

[382]*Professor Michael Bogner attendance records*, Fall 2016 semester.

[383]*Bogner depo.* 66:08.

[384]*Bogner depo.* 70:02.

[385]*Bogner depo.* 72:18.

[386]*Depo. exhibits 29, 35*.

going on?· Am I safe?· Is he going to be removed from campus?· Will I be able to do these things?"  And so the longer that you delay that determination, the more likely the victim is to feel that the victim's interest isn't being taken into account.[387]

S.    Hansen determines Ige's sanction

> **"When a finding has been made of a sexual assault on campus, the victim's right to attend class and activities on campus should take priority over the perpetrator's right to attend class and activities on campus."**

Hansen, DeMersseman, Beu and Simons all agree with this proposition.[388]  Between October 11, 2016 and October 24, 2016, Hansen had time to consider what sanction would give DOE access to her educational experience that was equal to that of someone who had not been sexually assaulted, like Ige.  He decided against expelling Ige, despite that Ige had confessed DeMersseman's findings of twice raping DOE, because "[Ige] needed the opportunity to continue his education and that we could safeguard [DOE]."[389]

Asked why an admitted sexual perpetrator "needed the opportunity to continue his education," Hansen reverted to pretending that DeMersseman did not find what she found.  Hansen said, "there's a lot more to this case than his admission,"[390] _even though Hansen and DeMersseman agree that Ige sexually assaulted Doe._  Because Ige had admitted DeMersseman's findings and waived his due process rights, Hansen could have expelled Ige immediately without the need for a

---

[387]*Shakeshaft depo.* 53:20.

[388]*Hansen depo.* 04:19; *DeMersseman depo.* 61:04; *Beu depo.* 71:17; *Simons depo.* 59:08.

[389]*Hansen depo.* 145:20.

[390]*Hansen depo.* 146:09.

hearing.[391] But Hansen decided that "things don't line up," and selected a far more lenient sanction.

*On what did Hansen base his decision that "things don't line up"?* He did not review DeMersseman's notes of her interview with Ige, containing Ige's admission.[392] He did not review DeMersseman's notes of her two interviews with DOE.[393] He read DeMersseman's findings, which state that sexual acts occurred in May and September which DOE did not consent to – there is nothing in DeMersseman's September 30, 2016 determination letter, ***Depo. exhibit 1***, upon which to predicate an opinion that "things don't line up." This could be based only on Hansen's oral discussions with DeMersseman, which apparently contradicted DeMersseman's own official findings, which Hansen himself approved and accepted on October 3, 2016.

On October 24, 2016, Hansen sent Ige a letter imposing a sanction in five components:

1.   The "No Contact Order" between you and [DOE] is continued indefinitely. Furthermore, you are banned from Brooks residence hall until further notice. Additionally, you are required to immediately leave any function, event, gathering, or location you attend if [DOE] is also present.

2.   You will schedule weekly counseling with the Chadron State College Counseling Office immediately. Your counselor will determine the need for adjustment of your counseling needs every semester and make recommendations to the Senior Director of Student Affairs.

3.   You are now on behavioral probation until you graduate or otherwise depart Chadron State College. Any reports of similar behavior will result in immediate temporary suspension from Chadron State College, investigation, and the potential for additional sanctions that could include dismissal.

4.   You will read "The Macho Paradox: Why Some Men Hurt Women and How

---

[391] ***Hansen depo.*** 148:10.

[392] ***Hansen depo.*** 102:19.

[393] ***Hansen depo.*** 103:07.

All Men Can Help", by Jackson Katz and provide a journal of your thoughts and understanding of the topics covered. Additionally, you will schedule a meeting with your counselor and Mr. Jon Hansen to discuss your journal and what you have learned. Completion of this action is required prior to December 1, 2016.

5.    You are required to successfully complete the online Consent and Alcohol Wise courses provided to all incoming students. Completion is required prior to November 4, 2016.[394]

Each of these components warrants discussion.

 *1) No contact order and restriction to Brooks*

In this case, mutual no-contact orders on a 280-acre campus are not "equal access to educational opportunities" for DOE and Ige. This component of the sanction allowed Ige to stay in his choice of dorm and travel anywhere on campus (other than one small residence hall where he did not live), so long as he leaves if DOE sees him. In contrast, DOE had to choose between avoiding campus, or else risk encountering Ige everywhere except Brooks Hall. Ige's ban from Brooks was only "until further notice," meaning that Ige could get that privilege back at any time (and we have seen how well CSC was communicating contractions to its safety plans to DOE by then).

Hansen was asked how he could give a sanction that is so disproportionately lenient given the seriousness of DeMersseman's findings:

Q: What was the purpose of [banning Ige from Brooks]?

A: Because at that time my understanding from the Title IX coordinator was that that was her place of work on campus.

Q: So why ban him from there?

A: So that she would not come in contact with him.

---

[394]*Depo. exhibit 17.*

Q:     Was it for her safety?

A:     Yes, and for her wellbeing, period.

Q:     By saying it was for her safety, is it because [Ige] presented a risk to her safety?

A:     To --

Q:     He raped her.  Before you go there, think carefully about this answer.  If he was banned for her safety, is it because he was a risk to her safety?

A:     To ensure that he would not be a risk, then I imposed the ban.

Q:     Had there been a finding that he already had harmed her safety, sir?

A:     Yes.

Q:     Sexual assault, right?

A:     Correct.[395]

Hansen agreed that banning Ige from *someplace* was necessary for safety reasons; he did not explain why only banning an admitted rapist from one residence hall satisfied reasonable safety concerns.

As to the no-contact order, Hansen testified:

Q:     The no-contact order doesn't get triggered  unless she sees him or he sees her, right?

A:     Yes, ma'am.

Q:     They have to be in proximity in order for the no-contact to kick in, correct?

A:     Understood.

Q:     Why not ban him from the gym so that we don't have to have the risk of that kind of an encounter?

A:     No reason.

---

[395]*Hansen depo.* 151:25.

96

Q:     Why not ban him from the Student Center?

A:     The same answer, no reason.

Q:     Why not ban him from the library?

A:     I've already said that I could have banned him from anywhere that I decided to.

Q:     Why not just tell him that "you cannot go anywhere on campus except class and your dorm room in High Rise?"

A:     I could have done that.[396]

But he didn't.

As an aside, if DOE were so un-credible as to warrant prioritizing Ige's access to education and campus activities over DOE's, one would think that the no-contact order would be lifted. Hansen's explanation is that the no-contact order "was appropriate because of the finding that we have from the Title IX coordinator"[397] – which was a finding that Ige sexually assaulted DOE.

2)     *Generalized counseling, without a plan, for an admitted sexual perpetrator*

While providing counseling for the perpetrator may be an appropriate Title IX remedy in some cases, in <u>this</u> case Hansen directed Ige to receive six sessions of counseling without any thought, research or consultation to:

\*      How CSC could protect DOE, who had an existing counseling relationship at the CSC Counseling Center, from the risk of encountering Ige there – especially in light of its record of reckless communication failures in this case;

\*      Why there was no conflict of interest in sending the rapist to the same two-professional campus counseling center as the victim;

---

[396]*Hansen depo.* 193:04.

[397]*Hansen depo.* 151:18.

97

    \*      Why six sessions of counseling was an appropriate remedy for Ige, given his admission to findings that he had twice raped DOE, given that DeMersseman caught him in lies and given his total remorselessness in his interview with DeMersseman;

    \*      Whether CSC's "all-purpose" counseling center, whose master's-level counselors had neither protocols for sex offender treatment nor any training in the same, could provide the type of treatment that a rapist needs in order to cease being a sexual predator.

In <u>this</u> case, there is insufficient evidentiary support for making "counseling for the perpetrator" an appropriate remedy.  Hansen chose it because it was easy, not because he had studied Ige and consulted with mental health professionals to reach an informed conclusion that Ige was remediable through six sessions of CSC's counseling services.

    Hansen's justification for this component was

    [s]o that the counselor**s** would be able to continue to assess [Ige] and provide him any counseling needed in order to ensure that there wasn't any kind of, a repeat of the behavior that he was sanctioned for and violation of 3020.[398]

Hansen did not say "counselor," singular; he said "counselor**s**," plural.  This is relevant because the CSC Counseling Center employed only two counselors: Bila, who had been treating DOE for sexual trauma for a year, and Jerry Cassidy.

    Sex offender treatment is serious business, and bears mixed results even when performed with thoughtful deliberation by a specialist in that area.  But Hansen did not research this issue, or even discuss it with the CSC counselors orally, before deciding to send Ige to counseling.[399]  Hansen admits that he does not know, and did not ask:

---

[398]***Hansen depo.*** 154:04.

[399]***Hansen depo.*** 155:15.

*     whether or how counseling turns someone who committed sexual assault into a non-sexual assaulter;

*     how much time sex offender treatment specialists need in order to turn a sexual assaulter into a non-sexual assaulter; or

*     anything about treatment outcomes for sex offenders who attend counseling only because they've been ordered to do so.[400]

He knew that no one in the CSC Counseling Office was trained in sex offender treatment; he knew that no one in the CSC Counseling Office was even a doctoral-level psychologist.[401]  He had no reason to think that the CSC Counseling Office even had protocols for the treatment of sex offenders (and it doesn't)[402].

Hansen considered whether there may be a conflict of interest in ordering a sexual perpetrator to counseling at the same two-professional clinic as the victim.[403]  But that is all he did – consider it.  He made no inquiries, did no research, and did not ask whether DOE, who had an established relationship with Bila for treatment of rape trauma, had thoughts on Ige attending counseling in the same basement clinic.  Hansen's tautological answer for how he concluded that there was no conflict of interest was, "that's what I concluded."[404]  Hansen did not ask whether the counselors at the CSC Counseling Center staff cases with each other or what their informed consent

---

[400]**Hansen depo.** 154:20.

[401]**Hansen depo.** 155:25.

[402]**Hansen depo.** 156:13.

[403]**Hansen depo.** 158:08.

[404]**Hansen depo.** 158:22.

form says.[405]  He did not think what it would be like for DOE to think of her rapist coming to the Counseling Center on one day to share his resentments and conspiracy theories about DOE that he shared with DeMersseman[406], with DOE scheduled for the next day to process Ige anally raping her.

Hansen could have directed Ige to figure out how to seek counseling from a private counselor in town, but he didn't.[407]  His justification was that "I had a counselor available here on campus ... I had the resource, so I used it."  No questions; he did not care even a little bit about DOE.

>   3)   *"Behavioral probation" – a meaningless term, unless the meaning is "we'll do something if you rape anyone else"*

In the criminal justice world, probation entails assignment to a probation officer, specified terms of what the offender can and cannot do, and scheduled communication between offender and probation officer.  Probation is a creature of statute and court rule.  It entails deliberate and dedicated oversight and structure, to rehabilitate the offender.

Not so at Chadron State College: there is no definition of "behavioral probation" in CSC or Board policies, at least as far as Hansen is aware.[408]  He did not assign Beu or anyone else to supervise Ige on his "behavioral probation."[409]  No reports are submitted to him or anyone else about Ige's so-called progress, if any, on "behavioral probation."

The only "terms" of behavioral probation are what Hansen wrote in ***Depo. exhibit 17***.

---

[405]***Hansen depo.*** 160:10.

[406]***Depo. exhibit 24*** at 6.

[407]***Hansen depo.*** 160:14.

[408]***Hansen depo.*** 161:20.

[409]***Hansen depo.*** 162:23.

Hansen says that translates to "if you have **_another incident like this_**, then you will be immediately temporarily suspended and investigated and potential dismissal"[410] (emphasis added).  Put otherwise, two rapes will get a student put on "behavioral probation"; it will take a third rape to lead to suspension or expulsion.

4)       *Reading a book and writing in a journal as discipline for two rapes*

Hansen is unaware of any sex offender treatment program that includes reading The Macho Paradox and writing in a journal as part of their treatment protocol.[411]  But he had gone to a training program where he saw the author, Jackson Katz, speak, so he bought Katz' book.[412]  Hansen thought that ordering Ige to read the book "could have a positive impact on the young man's future."[413]  In his October 25, 2016 letter to Ige, Hansen ordered Ige to meet with him, counselor Jerry Cassidy and Beu to discuss what he has learned by no later than December 1 – a whole five weeks later.[414]

5)       *Taking an already-required online class*

The online classes that Hansen required Ige to take were, in fact, already required of all students as a condition of coming to college[415], although Ige (an upperclassman) had not taken it

---

[410]*Hansen depo.* 161:21.

[411]*Hansen depo.* 163:15.

[412]*Hansen depo.* 48:19.

[413]*Hansen depo.* 163:18.

[414]*Hansen depo.* 164:10.

[415]*Beu depo.* 151:15.

yet[416] – Pat Beu says, "oftentimes students don't take it very seriously."[417]  The class takes about 30-45 minutes to complete.[418]

It is unclear why Hansen ordered Ige to take the "Alcohol Wise" course, other than that it is required of all incoming freshmen and Ige had blown it off.  Hansen acknowledges that he has no information to suggest that either Ige or DOE was under the influence of alcohol, either in the May rape or the September rape.[419]

DOE's expert, Charol Shakeshaft, has this commentary on Hansen's decision to have Ige do things like write in a journal, read a book and take an online class (discussed below):

> What a victim could easily read into the, into the sanctions, is just, "hey, read a book, talk about it, go to the counselor a little bit, that should do it."· There's no evidence in the research literature that that kind of response would change behavior.· Moreover, that response is more a response about help the offender become a better person, it's not a response -- it's not a sanction.· It has nothing to do with punishing the person for what they did.

> And there's nothing wrong with trying to help the person become a better person, but not at the expense of providing any disciplinary action to that person.   There was really no discipline in there at all.  Everything that was under the "sanctions" were really developmental opportunities for the offender to learn something.[420]

Hansen knew this.  His training was that for serious sexual misconduct, the primary purpose of a sanction should not be developmental.[421]  His training is that "the sanctions for serious sexual

---

[416]*Hansen depo.* 165:10.

[417]*Beu depo.* 149:10.

[418]*Beu depo.* 153:10.

[419]*Hansen depo.* 165:17.

[420]*Shakeshaft depo.* 57:21.

[421]*Hansen depo.* 50:25.

misconduct are intended to protect the victim and the community,"[422] and he understands that sexual assault is a form of serious sexual misconduct.  But "developmental" is the best that can be said for his choice of sanction for a man who admitted findings that he raped a campus security worker twice.

### T.     **The cup of endurance runs over**

Hansen notified Ige of his sanction on October 24, 2016.[423]  The date of Hansen's notification to DOE of his sanction is a day later, *i.e.*, October 25.[424]

Hansen's lenient sanction of Ige, and his decision to give Ige full access not only to nearly all of the campus but to DOE's counseling clinic, was devastating for her.  Hansen's decision included no advice to DOE as to how she was to navigate a 280-acre campus, knowing that Ige could be anyplace she might want to go – from building to building, to the gym, to the Student Center, to the library.  Hansen did not acknowledge in his letter to DOE the potential that DOE would encounter Ige in the Counseling Center (this communication said nothing about "we'll work it out so you and Ige will come on different days"); nor did Hansen acknowledge the potential for a conflict of interest, even though he had considered that potential.  Hansen's letter to DOE simply told her what the sanction for Ige was, reminded her that the mutual no-contact order was still in effect, and left it up to DOE to "buck up" and figure it out.

**And thus the cup of endurance, which DOE had been trained and accultured**

---

[422]*Hansen depo.* 51:15; *Depo. exhibit 55*.

[423]*Depo. exhibit 17*.

[424]*Depo. exhibit 3*.

**throughout her life, finally ran over**:

> \*   She had struggled to overcome her fear that reporting Ige would expose her to more harm, and *endured* the discomfort of a rape kit examination and multiple police interviews.

> \*   She hesitantly placed her trust in DeMersseman, knowing that CSC expected her to *endure* all of DeMersseman's questions. and accepting DeMersseman's assurance that her safety was CSC's priority.

> \*   She accepted DeMersseman's assurance that Ige would be moved out of Kent/High Rise/Andrews, only to learn that CSC had betrayed her – and that CSC expected her to *endure* working in the same complex where it allowed Ige to remain as a resident; and

> \*   She made her own arrangements to move her duty assignment, and to *endure* losing a duty assignment she had really liked, so that CSC could allow Ige to stay comfortable and undisrupted in the venue of DOE's workplace.

And now, Hansen was telling her to *endure* encountering her rapist anytime, anyplace outside of Brooks Hall.

DOE's expert witness, Charol Shakeshaft, explains the message Hansen sent DOE by first telling her "we agree you were raped" and then telling her to *endure* seeing her rapist anytime, anyplace:

> Q:   Can the messages that a college sends to a sexual assault victim through its actions and inactions, can those messages themselves impact the victim's access to educational benefits, when they are receiving the message that the college is not taking this seriously and is dismissive of the victim's experience?

> A:   If the victim feels that they're not being taken seriously or that the response is not going to make them safe, then it increases the stress and the trauma.· It makes the victim – remember, this is just a kid, a kid, an undergraduate, without, without a family there, without a whole support system.  That person depends upon the university to look after them.  They depend upon the fact that the university is going to protect me.  "The offender admitted that he raped me twice; it's been found by the Title IX coordinator.  There's a decision that's been made, and I should expect the fullest protection and support," and when that doesn't come, the victim, who feels all alone anyway,

is further made to feel isolated, and it increases the fear, it increases the stress, it increases the trauma, and it increases the sense that "there's no one on my side, no one who will help me, no one who's looking out for me."[425]

That was the message Hansen sent in ***Depo. exhibit 3***.  *We agree you were raped; now you figure out how to live on this campus with your rapist.*

Title IX is supposed to provide equal access to educational opportunities for all students; and when a student is sexually assaulted, the school is supposed to stop the discrimination and address its effects.  DOE knew there was no "equal access" when Ige could travel the campus without restriction or discomfort.  There was no "equal access" when Hansen made zero acknowledgment of DOE's yearlong counseling relationship (much less of the safety that counseling relationship represented), before he made Ige's access to the Counseling Center his priority.  There was no "equal access" for DOE in the message Hansen was sending in ***Depo. exhibit 3***, which was "what you reported is not serious to us – if it bothers you, you figure out how to *endure*."

In response to defense counsel's questions in deposition, DOE explained:

Q:    Was the primary thing that upset you about [Hansen's October 25, 2016 letter] the fact that Mr. Ige would be allowed to remain on campus?

A:    The primary thing was that the institution I had trusted had betrayed my trust.  Said they believed me and will protect me, then refused to do so.  And they didn't care about my safety or my mental health.

Q:    And was the fact that he was allowed to remain on campus what led you to conclude that they didn't care about your safety or health?

A:    After being betrayed by them numerous times, that was the final -- that was the -- I guess it was my final disappointment.  And when I understood that

---

[425]***Shakeshaft depo.*** 55:05.

they really weren't going to help me. And that they didn't care.[426]

Hansen's sanction meant that Ige had more access to educational opportunities than DOE had. Ige could go to class, to the Counseling Center, to the gym, to the Student Center, to athletic events, to any dorm except Brooks, and could hang out on the lawn on a nice day, without any worry that he would be triggered into disabling panic attacks by encountering a rapist. DOE could not.

Hansen's letter broke DOE. She could not *endure* this anymore.

U.    DOE loses her counseling relationship

By October 25, 2016, the date when Hansen informed DOE that his sanction for Ige would include counseling at the CSC Counseling Center, DOE had been receiving counseling for over one year from Robin Bila.[427] DOE had been hesitant to open up to Bila, as it was her first counseling experience; but she had come to trust and lean on Bila for support through the end of her relationship with Everton Holder, through Ige's first rape of DOE, and in the literal immediate wake of Ige's second rape, when Bila accompanied DOE to the hospital. Hansen acknowledges that if there were a conflict of interest in sending both perpetrator and victim to the same two-professional clinic, DOE was there first.[428]

But now, Hansen had physically injected Ige into what had been DOE's safe place – the CSC Counseling Center, where she had spent a year opening up about the physical and sexual abuse she had suffered in Mali and in Chadron. Through his sanction decision, Hansen did not just allow Ige

---

[426] *DOE depo.* 215:06.

[427] *Depo. exhibit 102* at 1.

[428] *Hansen depo.* 160:14.

to roam the entire CSC campus except for Brooks – he directly placed Ige into the sacred space where DOE had shared the most painful events of her life. Hansen had not even accorded DOE the respect of acknowledging, in *Deposition exhibit 3*, that this could affect DOE's counseling relationship. And when they learned about Hansen's decision, neither Robin Bila nor the other CSC counselor, Jerry Cassidy, did anything to protest it.

In her deposition, DOE made clear why this was a problem:

Q:    On the subject of counseling, when you learned that Ige was being sent to counseling at the CSC counseling center, why didn't you either ask for an alternative or after you hired me, how come you didn't have me go get an alternative for you?

A:    Because I had no reason to trust Chadron State College anymore. Not only did they lie to me numerous times, but they knew that I was a trauma victim who really, really needed the counseling. And they suggested the counseling. But then they compromised my relationship with my counselor by sending my abuser there.

Q:    Did Ms. Bila or Mr. Hansen or anyone else ever ask you in advance if you would be willing to give consent to the counseling arrangement that Mr. Hansen created in his discipline of Ige?

A:    They never asked me, which is another reason why their decision hurt me a lot, because I believe that as the one who is raped, I should have a say in the process. But instead, he was the one who they decided everything -- I didn't get a say. I just was told their decision. If they had asked me, I definitely would have said I'm not okay sharing -- going to counseling with him, having him be with my counselor's colleague. That is sick to me.

Q:    Would you be able to feel comfortable opening up to Robin about your rape, knowing that her counseling partner was -- even if it's on a different day, knowing that her counseling partner is listening to Ige telling his version of events?

A:    I don't, because there's too much conflict of interest. They're colleagues, and it just -- I don't know how they can consult on cases when one is working with the victim, and the other is working with the rapist. I don't know how that works. And how I can feel comfortable. It takes me so long to trust.

How am I going to trust someone when something like this happens again?[429]
It broke DOE's heart that the counselor whom she had trusted to accompany her to a rape kit exam had capitulated to Hansen's plan to inject Ige into the Counseling Center – that DOE's counselor Robin Bila had not stood up to Hansen or fought for DOE to be able to keep this critical counseling relationship.

When Bila learned that Hansen had assigned Ige to receive some counseling at the CSC Counseling Center, she did not consult with or protest to anyone, even her partner in the Counseling Center (who would become Ige's counselor), about the wisdom of Hansen's decision.[430] She did not reach out to anyone in the administration to point out that DOE had given her informed consent for treatment at the Counseling Center long before Hansen assigned Ige to receive some counseling there.[431] Bila never initiated any discussion about whether Ige (or DOE) should be referred elsewhere for counseling.[432]

Since Bila agrees that no one consulted her[433], the undersigned asked her what would have happened if someone in the CSC administration actually had consulted about the wisdom of sending the rapist to the same two-person counseling center where the victim has been obtaining counseling for a year:

Q:    I'm asking you to go to Fantasyland with me where somebody calls you and

---

[429]**DOE depo.** 227:24.

[430]**Bila depo.** 100:08.

[431]**Bila depo.** 102:08.

[432]**Bila depo.** 104:16.

[433]**Bila depo.** 95:15.

108

says, "Ms. Bila, we know that you are [DOE's] therapist and we know that you're treating her for rape trauma and we know that the person that raped her was Anthony Ige and he's admitted it. Do you think it's a good idea for us to order Anthony Ige to come get counseling in the CSC counseling center?" What would you have said?

A:   I would have said, "something needs to be worked out so they're not there at the same time. And that's all -- all I would have said is that my concern would be that they don't show up at the same time, the same day.

Q:   Why would that be a concern for you?

A:   Because that just brings -- that's just more stressful for [DOE], more re-victimizing.

Q:   It's not just stressful; it could trigger panic attacks, right?

A:   Yes.

Q:   It's unknown what Mr. Ige's response would be when he saw her, right?

A:   Right.

Q:   He could say something to her, right?

A:   I guess theoretically, yes.

Q:   He could smirk at her or smile at her or, you know, make some sort of a gesture at her, right?

A:   Yeah.

Q:   And the result on her, as the person who was anally raped by Ige, would be what?

A:   It would be different for -- I mean --

Q:   I'm talking about [DOE].

A:   I think it would have caused her probably to have a panic attack.

Q:   As a therapist, can you imagine how upsetting that would be for her to go to counseling and encounter her rapist there?

109

A:      Yes.

Q:      Do you think that it was unreasonable for her to fear that she would encounter Mr. Ige if she presented at the counseling office for her counseling needs?

A:      No.

Q:      Do you think that she's being unreasonable to not trust that all communications and scheduling would be done to guarantee that she wouldn't encounter Mr. Ige in the basement of Crites Hall?

A:      Can you say that again?

Q:      Yeah.  Do you think that she would be unreasonable if she said, "how do I know that they aren't going to screw up on their communication and scheduling and then there I am in the basement of Crites Hall with my rapist? Do you think that that would be unreasonable for her to worry about?

A:      No.[434]

CSC had already failed to notify DOE when it contracted its safety plan (from moving Ige out of the complex to only banning him from Andrews); failed to notify the dorms for four days when it banned Ige from Andrews; notified DOE it was banning Ige from Andrews and, later the same day, contacted her again to say, "no, actually we're banning him from Brooks."  DOE had zero reason to trust that CSC would keep Ige away from her in the Counseling Center.

And like Hansen, Bila saw no potential conflict of interest in the two-professional CSC Counseling Center providing counseling to both victim and perpetrator.  The CSC Counseling Center does not even have a protocol for when two of its counseling patients have adversarial interests[435] – like a couple getting divorced or, in this case, a rape victim and her perpetrator.  Of

---

[434] *Bila depo.* 96:06.

[435] *Bila depo.* 24:19.

concern, Bila doesn't see the need for such a protocol, or even the need to let a patient know that

someone adverse to her is bringing his version of events to her counselor's professional partner:

> Q:    Should there be informed consent  from both clients that the same small
>        clinic is providing counseling for both of them?
>
> A:    I don't think so because in my mind that would be – if I was seeing the wife
>        and Jerry was seeing the husband, I certainly wouldn't be telling the wife that
>        Jerry was seeing the husband because that would be confidentiality reasons.
>
> Q:    Given that there's the potential that the professionals may be roundtabling
>        or visiting about clients, does the client have the right to be aware that the
>        person adverse to them is seeking counseling at the same small center so they
>        can make a decision about whether they might want to go elsewhere?
>
> A:    I don't know. See, that's an ethical situation there and that's where I would
>        probably consult with somebody above me to see what would be done.[436]

But Bila did not pursue any such ethical consultation.[437]  DOE did worry that information would be

shared, one way or another[438]; and Bila, in their final contact, gave DOE no assurances to the

contrary.

On October 28, 2016, DOE terminated counseling at the CSC Counseling Center.  Bila

documented that contact as follows:

> [S]tudent sent a random text saying she would be taking her phone off for the rest
> of the day and would no longer becoming to counseling.  Thanked me for everything.
> I requested she at least come for a termination session at her regular time on
> 10/31/16.  She replied she was done w/therapy and medication.  Was unhappy and
> angry w/disciplinary action taken against her alleged rapist.  I encouraged her to not
> give up on herself and to rethink counseling and medication.  She asked this therapist
> to be a beneficiary of her bank account should anything happen to her and didn't

---

[436]*Bila depo.* 25:06.

[437]*Bila depo.* 104:16.

[438]*DOE depo.* 194:04.

respond to further messages.  I went to her apartment, knocked on her door for 10 minutes.  She texted saying she was OK and sleeping.  I refused to leave until she could be physically seen and assessed.  When she came to the door, she appeared to have just woken up, was in PJ's and hair disheveled.  She was tired but oriented X3.  Strongly denied having intent to harm herself, said she was tired and wanted to rest.  Did not appear to have any more self-inflicted wounds on wrists/forearms, agreed to go to CSC clinic to d/c her Zoloft in a safe and appropriate manner.  I encouraged her to rethink discontinuing therapy, told her to call or text if she needed anything, pointed out all the positives in her life and encouraged her to focus on positive things and goals.[439]

This is Bila's final note for DOE.  If Bila did offer to meet with DOE at her private office away from campus (and DOE says she did not), she did not document such an offer anywhere, nor did she report any such offer to anyone.[440]

V.      DOE reaches out to Hansen and Beu

Hansen had included his phone number and email address in his correspondence to DOE and invited her to write to him if she had questions or requests, so she did so.  At 0413 hours on October 31, 2016, DOE wrote an email to Hansen and Beu.[441]  To break down, one paragraph at a time, DOE's words and Hansen, DeMersseman and Beu's responses in deposition:

I received an email about the decision the school reached about the incident that took place on September 19.  I am disappointed with the result and I will be consulting with lawyers as to how to proceed next.  I have been a hard working employee of Chadron State College since 2013, and I was raped while I was working under the scope of Chadron State College's employment. But for working at the college I would not have been raped that night because I do not go to the dorms late at night.  Not only was there evidence of the rape, such as me running to the women's bathroom and him running after me, he admitted that it was non-consensual, and that I said "no" and "stop" several times.  I do not feel safe on

---

[439]*Depo. exhibit 103* at 34.

[440]*Bila depo.* 100:05.

[441]*Depo. exhibit 4.*

campus, and I do not believe that the school responded adequately, despite finding two different instances of sexual assault.[442]

Hansen does not take issue with anything DOE writes in this paragraph, and has no facts to dispute what she writes.[443]  Beu, the other recipient of this email, also does not take issue with anything DOE writes in this paragraph, and does not claim she is saying anything unreasonable.[444]

DOE then wrote:

I do not understand, and I find it frustrating and disappointing that the school constantly tells rape victims to report their rape. and I was pressured by the school to recount the events that happened over and over, but when I finally did, and he admitted to the non-consensual sex, he was given the choice to choose his punishment.  However, I as the victim was not given any voice in the process.[445]

Hansen acknowledges that he did not consult DOE before making a decision regarding Ige's sanction.[446]

In the third paragraph of her email, DOE wrote:

Since the beginning of the investigation I felt unsupported and unprotected by the school despite being a student and an employee.  When I talked to the Title IX coordinator before the conclusion of the investigation, I was working in Andrews. Since I did not want to move to another complex, the Title IX coordinator told me that she would move Anthony in either Brooks or Edna because under Title IX my protection was a priority.  I could not go to school for classes or work for a while due to post traumatic stress disorder and panic attacks based on the incident. However, I was put on medication and I forced myself to go back to work because I was told that he going to be banned from the complex. After going to work thinking that he was not in the complex, I found out a few days later that he was simply banned from

---

[442]*Depo. exhibit 5.*

[443]*Hansen depo.* 167:05.

[444]*Beu depo.* 144:24.

[445]*Depo. exhibit 4*.

[446]*Hansen depo.* 168:02.

one dorm instead of being moved to another complex, which means that I could see him anytime I went into the complex for work, and I was not told about the change until a while later.[447]

Beu acknowledges that nothing DOE writes in this paragraph is unreasonable.[448] DeMersseman does not dispute DOE's attribution to her that she would move Ige because DOE's protection was a priority.[449] Nor does DeMersseman dispute that CSC failed to communicate to DOE that DeMersseman had contracted the original safety plan.[450]

Relative to DOE's statement that she "was told that [Ige] was going to be banned from the complex," Hansen was asked in his deposition whether he ever reached out to DeMersseman to ask whether DOE was accurately describing what she told DOE. He admits that he did not – apparently this report did not interest him enough to investigate, because the only person to whom Hansen reached out was Board counsel Kristin Petersen.[451] Nor did Hansen ask DeMersseman or anyone else whether it was true that DOE "found out a few days later he was simply banned from one dorm instead of moved to another complex. I was not told about the change until awhile later."[452] Hansen agrees that it was reasonable for DOE to be upset about how she learned that the ban had been

---

[447]*Depo. exhibit 4.*

[448]*Beu depo.* 144:24.

[449]*DeMersseman depo.* 189:25.

[450]*DeMersseman* 190:02.

[451]*Hansen depo.* 168:25.

[452]*Hansen depo.* 169:05.  Note that DeMersseman does not dispute DOE's testimony that she told DOE that the college would move Ige out of the Kent/High Rise/Andrews complex.  *See DeMersseman depo.* 186:05.

changed, *i.e.*, by seeing Ige in her workplace in Andrews.[453]  But in spite of agreeing that it was reasonable for a rape victim to be upset, he did not care enough to investigate or otherwise try to correct whatever led to that abject failure of communication.

DOE concluded her October 31, 2016 email to Hansen and Beu by writing:

> Under the Title IX provisions, I do not believe that adequate steps were taken as a response to my sexual assault and based on the final disciplinary decision, I believe that the school has created a hostile environment for me, in which I do not feel safe. As the victim, it seems like I am the one being punished. I am limited to working in Brooks because I do not feel safe in any other dorm he has access to, I am forced to take two different medications because of the post traumatic stress, panic attacks and depression- which caused me, and still causes me to miss classes and assignments. I cannot go to the school's gym, the library, the student center, or any other public place on campus I know I have a chance of running into him at, among other things. I am having trouble with my education based on the hostile environment of being on the same campus as someone who admitted to raping me, and I do not feel safe. Based on this, I would like to know what options are available to me, such as completing the rest of my semester on line or transferring.[454]

This is important:  Hansen understood that DOE was **_not_** asking, in this email, to finish her classes online[455] (nor was she asking to transfer).  He understood, then and now, that DOE was just asking what her options were.[456]  Hansen also agreed that it is reasonable for DOE to feel like she could not go to the gym, library, student center or any other place on campus with her rapist free to roam anyplace but Brooks Hall.[457]

---

[453]*Hansen depo.* 170:05.

[454]*Depo. exhibit 4*.

[455]*Hansen depo.* 170:19.

[456]*Hansen depo.* 170:25.

[457]*Hansen depo.* 170:18.

115

But when Beu was asked whether DOE was unreasonable to say that she doesn't feel safe being in Andrews if Ige is allowed to be in the complex – given that Andrews is where Ige raped DOE – Beu's answer was "I don't know."[458]  Beu testified:

> Q:     This isn't a question of asking you what the temperature is.  Do you think that's an unreasonable feeling on her part? She's a rape victim.
>
> A:     I don't -- I don't know. I've never been a victim of rape.
>
> Q:     Do you ever try to empathize with them and think about what it would be like to be in  her shoes?
>
> A:     I haven't thought about that, no.[459]

Beu, we may recall, had direct knowledge of DOE's history of trauma, vulnerability and abuse, because DOE shared it with him when he was investigating whether to ban Everton Holder at Robin Bila's request.[460]  This is the Senior Director of Student Affairs, who had direct involvement in Title IX proceedings and direct contact with rape victims ... and he admits that he was incapable of imagining what might harm his students' access to education and campus activities.

After she sent her 0413 email to Beu and Hansen, at 0650 hours, DOE emailed her Justice Studies professor, Michael Bogner to ask if she could reschedule an exam, because "I would not be able to sit in class, let alone take an exam."[461]  She attached a copy of **Deposition exhibit 3** so that Bogner could see why she was in distress.

W.    CSC ignores DOE's request to attend class and/or insists she asked to not attend class

---

[458]**Beu depo.** 147:08.

[459]**Beu depo.** 147:13.

[460]**Depo. exhibit 58** at 1.

[461]**Depo. exhibit 35.**

116

DOE sent that email on October 31, 2016 at 0413 hours.  Hansen did not respond to DOE until November 14, 2016.[462]  But we do know that Hansen read DOE's email on October 31.  That day, Hansen decided that the way he was going to deal with a rape victim pushing back on his decision to let Ige roam the campus without restriction was to simply keep the victim off-campus.

At some point after reading DOE's 0413 email, Hansen came to the office[463] of DOE's professor, Michael Bogner, to visit about having her finish her classes online.[464]  Hansen claims he cannot remember whether he affirmatively represented to Bogner that DOE had actually requested online classes[465]; but Bogner says Hansen did make that representation:

> [Hansen] talked to me as [DOE's] instructor and asked whether I would be willing to accommodate a request from [DOE][466] ... I remember that he told me that there had been an incident involving [DOE] and that [DOE] had requested -- that there had been an investigation and that [DOE] had requested that she be allowed to complete her classes in an alternative format.[467]

Again, Hansen knew that DOE had not asked to finish her classes online – she just asked what options were available since Hansen was not banning her rapist from campus.  For Hansen to come directly to Bogner's office was unusual.[468]  Bogner told Hansen that correspondence courses,

---

[462] *Depo. exhibit 5.*

[463] *Bogner depo.* 81:05.

[464] *Hansen depo.* 173:14.

[465] *Hansen depo.* 173:16.

[466] *Bogner depo.* 81:05.

[467] *Bogner depo.* 82:14.

[468] *Bogner depo.* 82:09.

117

independent study and private tutoring would be available.[469]

From there, Hansen sent an email to two other CSC administrators, and told them that DOE

"has requested to complete her studies online," even though DOE had not made that request: Hansen

testified:

> Q:    **Deposition exhibit 42** is an e-mail that you sent later that day to Charles Snare
>       and Jim Margetts and what you'd said here is, "[DOE] is a survivor of a Title
>       IX incident that occurred."  Right?
>
> A:    Yes, ma'am.
>
> Q:    You're not saying that, you know, "she says she is but we think she's
>       unreliable," are you?
>
> A:    No.
>
> Q:    You say that "she has requested to complete her studies online."  When did
>       she request to complete her studies online?
>
> A:    Um, I could have, should have, would have been able to say that she's asking
>       for options to study online.
>
> Q:    But you didn't?
>
> A:    No.
>
> Q:    You represented that [DOE] already had made the request, correct?
>
> A:    My intent was to discover whether or not the faculty would have the ability to
>       provide her that if she requested that.
>
> Q:    You represented it as her having made that request, correct?
>
> A:    I did not intend for that to be the case.
>
> Q:    But that's what it says, right?

---

[469]**Bogner depo.** 82:21.

118

A:      Yes, ma'am.[470]

The "options" that DOE mentioned in her email to Hansen and Beu included online classes _**and**_ transferring – but Hansen never *sua sponte* pursued a transfer for DOE.[471]

Two days later, and still without responding to the substance of DOE's October 31, 2016 email, Hansen emailed DOE a memorandum in which he informed her that "your request [*sic*] to complete your courses off campus this semester has been approved," and telling her to finish her three on-campus courses online.[472] Hansen told DOE that "I will address the other concerns raised in your email separately and in short order."[473]  He didn't, unless "in short order" means twelve days later.

Hansen's insistence that DOE "requested" online classes, and the implication that this is what she wanted, is ironic.  Not only did Hansen not expel Ige, but he did not even ban Ige from campus and relegate Ige to online classes:

Q:      You can be banned from campus and not expelled, right?

A:      That would be a little difficult to go to class.[474]

Yet this is exactly what Hansen did to DOE.  It was "a little difficult to go to class" for DOE, knowing that her rapist was free to go anywhere he wanted – it was also "a little difficult to go" to the Student Center, the gym, the computer lab, the library, and club meetings – but Hansen shoved DOE into online classes when she had not asked for them. *Why didn't he talk to administrators and Ige's professors*

---

[470]*Hansen depo.* 172:05.

[471]*Hansen depo.* 174:05.

[472]*Depo. exhibit 23*.

[473]*Id.*

[474]*Hansen depo.* 133:01.

*about putting Ige in online classes?*  Hansen's preference for sparing Ige from any difficulty, accidentally expressed in his testimony excerpted immediately above, deprived DOE of access to educational opportunities equal to that Hansen gave to her rapist.

X.    Hansen consults with BOARD counsel, then tells DOE she is wrong

It took 14 days for Hansen to respond to DOE's October 31, 2016 email.  During that time, he had one email exchange with DeMersseman, Taylor Sinclair and Board counsel Kristin Petersen regarding DOE.[475]  Hansen says, "I wouldn't be responding [to DOE] without talking to counsel."[476] Finally, on November 14, 2016, Hansen emailed a memorandum[477] to DOE which he did not write by himself – he wrote it in collaboration with Board counsel Kristin Petersen.[478]  Hansen could not explain why it took fourteen days for him and Petersen to draft and finalize *Depo. exhibit 5*.

In that two-week period, Hansen did not make any inquiries about how DOE was doing.[479] His November 14, 2016 letter shows that he knew that DOE was seeing Robin Bila for counseling, but he did not contact Bila to ask about DOE.  If he had, he would have learned that DOE had terminated counseling and informed Bila that she was listing Bila as the "pay on death" beneficiary of her bank account; but he did not (and Bila had not reported that to anyone either).[480]  He acknowledges that he "could have inquired of many different people," or assigned DeMersseman to

---

[475]*Depo. exhibit 84*.

[476]*Hansen depo.* 176:18.

[477]*Depo. exhibit 5*.

[478]*Hansen depo.* 178:20.

[479]*Hansen depo.* 179:05.

[480]*Hansen depo.* 179:01.

make such inquiries, to find out how DOE was doing in those fourteen days.[481]  But he only talked

to Board counsel Kristin Petersen, who had no engagement with DOE.

In the first two pages of his November 14 letter to DOE, Hansen restated the prior steps of

the Title IX proceedings, as if DOE needed to be reminded.  He did so with phrasing such as:

> I informed you that if you disagreed with my decision to commence disciplinary
> proceedings against Ige, you could appeal my decision within seven calendar days.
> You did not appeal my decision.[482]

Asked why DOE would appeal when she was the one asking for Ige to be disciplined, Hansen had no

answer.  He agrees that the fact that DOE did not appeal Hansen's decision to do what she had asked

CSC to do does not prove that CSC was therefore meeting its responsibilities.[483]

Hansen again falsely insisted that DOE had requested to take classes online:

> In an email dated October 31, 2016, you requested that the College allow you to
> complete your on-campus courses through independent study through Dr. Bogner.[484]

Hansen now acknowledges that it was not true that DOE had requested online classes.[485]  He

acknowledges that in her October 31, 2016 email, DOE had asked about options, such finishing

classes online *and transferring,* which he knew when he wrote his November 14, 2016 response.[486]

Hansen took the unusual step of going to DOE's professor's office, falsely telling him DOE asked to

---

[481]*Hansen depo.* 179:18.

[482]*Depo exhibit 5* at 1 ¶ B.

[483]*Hansen depo.* 184:17.

[484]*Depo. exhibit 5* at 1 ¶ A.

[485]*Hansen depo.* 172:18, 170:19, 183:15.

[486]*Hansen depo.* 184:01.

take online classes, and then effectively moving DOE off-campus, all long before he could muster a response to DOE's heartbreak.

Hansen then pasted in the verbatim terms of Ige's sanction, which he had already provided to DOE on October 25 in *Deposition exhibit 3*. He wrote, "I have thoroughly reviewed the report of the incident and the subsequent investigation. I have concluded that the College complied with the Board policies and therefore has also complied with Title IX."[487] By "thoroughly reviewed," Hansen meant that he re-reviewed DeMersseman's September 30, 2016 findings (*Deposition exhibit 1*). He testified:

> Q:   Essentially, what you're saying here is you re-read what was already written and determined that you were right, correct?
>
> A:   Yes.[488]

He still did not read any of DeMersseman's notes with the details of her interviews of Ige and DOE – he still hadn't cared enough to read those notes and details as of when he was deposed in 2018.[489]

Then, Hansen wrote:

> As Ms. DeMersseman mentioned in the letter [dated September 30] you received from her on October 5, Chadron State College employs a licensed student counselor, Ms. Robin Bila.[490] The College encourages you to visit with Ms. Bila about the incident as necessary. Please do so at your earliest convenience. The College has offered you the option of a security escort while you are on campus. To date, you have not requested a security escort at any time. Please remember that this resource

---

[487]*Depo exhibit 5* at 2.

[488]*Hansen depo.* 187:12.

[489]*Hansen depo.* 103:01.

[490]As if DOE did not know that CSC employs a counselor named Ms. Robin Bila. DeMersseman's September 30 letter, which Hansen had now read at least twice, acknowledged that DOE was already receiving counseling from Bila as of the date of DeMersseman's letter.

remains available to you, at your request.

This correspondence appears to be the first documentation of anyone at CSC offering DOE a security escort.   If the undersigned is wrong, she will stand corrected if Defendant produces pre-November 14, 2016 documentation of DeMersseman, Hansen or any other administrator offering DOE a security escort.   A security escort in this case would not have equalized DOE's access to educational opportunities even if it had been offered – but we would like the record to indicate that this seems to be the first documentation of CSC offering a security escort.

Hansen concluded:

> The College has banned Mr. lge from your worksite. To date, the College has not received any information that Mr. Ige has failed to abide by that ban. If you have information to the contrary, or other information that suggests he might fail to abide by it in the future, please let me know as soon as possible. The College has also informed Mr. Ige that he must immediately leave any function, event, gathering, or location he attends if you are in attendance. To date, the College has not received any information that Mr. Ige has failed to abide by this rule. If you have information to the contrary, or other information that suggests he might fail to abide by this rule in the future, please let me know as soon as possible.  The College has accommodated your request[491] to complete your classes off-campus this semester, which should reduce the opportunities for you to encounter Mr. Ige.  If you want or need to visit the gym, student center, library, or any other public part of campus, please feel free (as mentioned above) to request a security escort so that you feel safe and secure.  I believe I have addressed all of the concerns you raised in your October 31, 2016, email.  Please let me know, however, if you disagree, so that I may address any other issues in a subsequent communication or meeting.[492]

Put otherwise: *I am not budging for you.*

In his deposition, Hansen acknowledged problems with the written lecture he delivered in the above-quoted paragraph, in collaboration with Board counsel Kristin Peterson.  First, he acknowledges

---

[491]Again with the "your request," when Hansen knew she had not requested it.

[492]***Depo. exhibit 5*** at 3.

that he had not consulted with Robin Bila, at any point in these Title IX proceedings, regarding DOE or the wisdom of assigning Ige to get some counseling from Bila's one and only colleague in the CSC Counseling Center.[493]  Consequently, Hansen was willfully ignorant of the fact that DOE had already terminated counseling with Bila three weeks before his November 14, 2016 letter.

Second, Hansen acknowledged that the "offer" of a security escort meant an uniformed student security escort following DOE around campus.[494]  Hansen failed to see the irony in the fact that Ige raped DOE *while she was on-duty for Campus Security* – but he acknowledges that apparently Ige was undeterred from committing rape by the fact that DOE was a Campus Security officer.[495] DOE's remark on that was:

> I did not want to have a security escort following me around campus and drawing attention to me and my situation.  And I also believe that [Ige], as the rapist, is the one who needs a security escort, not me.[496]

DOE told Professor Lisette Leesch and her counselor, Robin Bila, that the "offer" of a security escort meant the conspicuous and visible presence of a uniformed escort following her around.[497]

What exactly is the presence of a uniformed, albeit unarmed[498], student security escort supposed to accomplish if DOE were to encounter Ige between classroom buildings, or in the Student Center while trying to buy lunch or use the computer lab, or while trying to work out in the Physical

---

[493]*Hansen depo.* 187:24.

[494]*Hansen depo.* 189:06.

[495]*Hansen depo.* 191:04.

[496]*DOE depo.* 219:20.

[497]*DOE depo.* 201:25.

[498]*Keiper depo.* 12:10.

Activity Center?  The student security escort does not have arrest authority, and Ige could not be arrested for just being in the Student Center when DOE arrives at any rate, because Hansen allowed Ige to go anyplace on campus except Brooks.  Is the idea that the presence of a uniformed student security escort would keep Ige from smirking or gesturing or looking at DOE (since the fact that DOE was a security worker did not deter Ige from raping her twice)?  Or is the idea that the presence of a uniformed student security escort will regulate DOE's amygdala and prevent her from flashing back to being raped?  Like Hansen's unthinking decision to stick Ige in the CSC Counseling Center with no clear therapeutic goal in mind, his flippant "remedy" of an escort does not address the problems that DOE made clear in her October 31 email.

DOE's former counselor, Robin Bila, also acknowledged the inadequacy of a security escort to prevent a rape victim from seeing her rapist, and thereby experiencing the trigger of flashbacks and panic attacks:

> Q: I've seen in the Counseling Services policy it says that a student can request a short-term escort service between counseling sessions and class. What is that supposed to do for the student who has been raped?
>
> A: I don't know, give them a safe -- have a safe person to walk to class with.
>
> Q: Someone in a uniform but not armed, right?
>
> A: Yeah, I guess, yeah.
>
> Q: What does that do if the student sees her rapist? It doesn't prevent it, does it?
>
> A: No.
>
> Q: Not unless the rapist is taken off-campus, right?

A:      Yes.[499]

But Ige was not taken off-campus.  CSC allowed him to go anywhere he wanted except Brooks Hall, as long as he would leave if he saw DOE or DOE saw him.

The third problem that Hansen now acknowledges is that, before writing his November 16, 2016 letter telling DOE to use a uniformed security escort, Hansen had not even looked into whether Campus Security had the staff to follow DOE around campus if that was what DOE had requested.[500] He does not know what would happen if DOE called for an escort and was told, "you'll have to wait, we don't have one available now.  Call back in an hour."

One final note regarding Hansen's flippant "solution" of having a security escort follow the victim around campus while the perpetrator moves about uninhibited:

Q:      Why not have security escort Mr. Ige around instead of [DOE]?

A:      That could be done.

Q:      But you didn't consider that, did you?

A:      No, I didn't.

Q:      He's the one that admitted to sexual assault.  Wouldn't it make more sense to have security keep an eye on him instead of making [DOE] feel conspicuous?

A:      I don't know how -- I don't know how that -- I don't ...

Q:      Go ahead and answer.

A:      No, the ability to safeguard [DOE] comes with wherever [DOE] might be or what she wants to do.

---

[499]*Bila depo.* 104:24.

[500]*Hansen depo.* 194:25.

> Q:    But doesn't she have the right to not have to be escorted around by a uniformed peer student security officer? If one of them has to have a security officer, why not put it on Ige?
>
> A:    I did not consider that.[501]

Hansen seemed to forget that **Ige confessed DeMersseman's findings.** CSC performed zero risk assessment to determine whether allowing a confessed rapist to roam campus presented a risk, either to DOE or anyone else[502], and Hansen had no information to support a claim that a man who admits to raping a woman on two occasions can safely be allowed to go anyplace where his victim is not.[503] But Hansen allowed the perpetrator to roam about unrestricted, and told DOE that she is the one who should be followed around by a uniformed student security escort.

As to the tone of piety in Hansen's reminder to DOE that CSC banned Ige from DOE's work site, Hansen acknowledged that banning Ige from Brooks and only Brooks leaves open the constant potential for DOE to encounter Ige in the Physical Activity Center, Student Center, library and any other location on campus.[504] He agrees that he let Ige keep his privilege to go work out. He let Ige keep his privilege to go to the cafeteria. He let Ige keep his privilege to go to the computer lab, and go anywhere else he wanted. Ige had received the message that you can rape a woman and admit to it and you will not be barred from campus – he had nothing to fear, anywhere he went on campus. **DOE did not have access equal to that**.

Y.    DOE tries again

---

[501]**Hansen depo.** 190:12.

[502]**Hansen depo.** 54:13, 83:22, 153:09.

[503]**Hansen depo.** 153:15.

[504]**Hansen depo.** 191:18.

After she received Hansen's November 14, 2016 email, DOE wrote back to Hansen and

copied DeMersseman:

> In response to your email, your first email giving the Disciplinary Decision told me to
> feel free to contact you if I had any questions.  Based on this, I asked: "Based on this, I
> would like to know what options are available to me, such as completing the rest of
> my semester online or transferring."
>
> I was wondering what options were available to me, and asking if completing the rest
> of my semester online or transferring were options because I do not feel safe on
> campus.  However, I did not specifically request to have my classes online, and I told
> Dr. Bogner the same, because I have classes such as Courtroom survival which require
> my physical presence on campus, and I want to attend those classes.  As for the rest
> of the email, I will answer after consulting with my lawyer.
>
> Thank you.[505]

Hansen forwarded DOE's email to Taylor Sinclair, noting the undersigned's name as DOE's counsel.

Hansen is not sure how he knew which attorney would be working with DOE[506]; the undersigned's

first contact to CSC was in a letter dated one day later.  But DOE had been referred to the

undersigned through her Justice Studies advisor, Professor Lisette Leesch (Professor Bogner's

colleague)[507] – so perhaps there is some communication involving Professor Leesch regarding that

referral that Defendant has not produced.

He had no reason to question DOE's seriousness as a student; he also knew that Ige was an

un-serious student, and "has struggled to remain a student" even since Hansen's grace at DOE's

expense.[508]  But he did not reach out to Professor Bogner regarding DOE's remark about the need to

---

[505] *Depo. exhibit 91*.

[506] *Hansen depo.* 197:24.

[507] *DOE depo.* 174:13.

[508] *Hansen depo.* 200:01.

128

attend some classes in person.[509]  He acknowledged:

> Q:     This is a student who's saying, "I'm someone who wants to come to class; I'm not asking for you to pass me without doing the work," right?
>
> A:     No.
>
> Q:     She actually wants to be here on the campus and be part of this, right?
>
> A:     Yes.[510]

DOE copied DeMersseman on this email, but DeMersseman did not respond to DOE, even though she could tell DOE was frustrated.[511]  She might have checked with Hansen to make sure he was following up, but she doesn't recall ever initiating any type of conversation with Hansen about the fact that this sexual assault victim quite obviously feels that she is not being heard.[512]  There is no documentation to indicate that DeMersseman and Hansen had any contact about DOE's email.

Z.    DOE realizes the futility of her efforts

The date of Ige's second rape was September 19; it was now November 14.  DOE was wrung out, exhausted, and intermittently suicidal.  During that period, Hansen:

> *     between September 30 and October 24, relitigated DeMersseman's finding that Ige sexually assaulted DOE to satisfy himself that this was not serious;
>
> *     between October 11 and October 24, did not communicate or direct any communication with DOE to keep her informed of status, and piddled around in deciding a sanction without actually consulting with anyone who could bring useful information to bear on his decision (such as how exactly six sessions of all-purpose counseling could cure a rapist from being a rapist, or

---

[509]*Hansen depo.* 198:02.

[510]*Hansen depo.* 197:13.

[511]*DeMersseman depo.* 193:16.

[512]*DeMersseman depo.* 194:05.

why Ige hadn't already taken the mandatory classes on alcohol and consent);

\*     on October 24, knew damn well that DOE was seeing Robin Bila, considered whether there would be a conflict of interest in injecting Ige into the CSC Counseling Center;

\*     on October 25, failed to even acknowledge to DOE that he was forcing DOE to choose between risking encounters with Ige or else hide at home;

\*     on October 31, when DOE pushed back on his sanction, personally made arrangements to move DOE off campus instead of revisiting or reconsidering the freedom he had given Ige; and

\*     on November 14, effectively told DOE that he was not budging, and that she'd just have to find a way to get comfortable with the risk of seeing her rapist on campus.

These were the actions of a college vice-president who approved his Title IX coordinator's determination that Ige twice sexually assaulted DOE. He dismissed how it would impact DOE to constantly risk re-encountering Ige – and when DOE tried to tell him in her October 31 email, he went dark for two weeks, then delivered a lecture on why he was right and DOE should get comfortable with it. All of that came ***after*** the betrayals CSC committed by contracting its original safety plan, exposing DOE to Ige in the dorm, causing her to lose her work assignment and sending her conflicting and confusing information about where, if anywhere, Ige would be banned from.

DOE explains: how she felt at that point:

The disciplinary action they gave him. I was so disgusted. I was so sick to my stomach, because I thought as a rape victim, I would have help. I would have support from the college that I dedicated everything to. I was participating in anything I can. [I was the] vice president of the National Alliance on Mental Illness, working for the Big Event[513], the International Club, doing what I can, everything I dedicated to the school.

---

[513]"The Big Event is a student-based, community service day designed to say thank you to the community of Chadron." *See* https://www.csc.edu/thebigevent/index.csc

And when I needed them, they showed me that I couldn't trust them and they didn't care about me, which outraged even my advisor and my teacher Dr. Leesch.  Who, after she saw everything, she said the same thing. She gave me my current lawyer's information, Maren.  And she told me that Maren is well versed in cases like this and gave me her information.  And gave me an introduction to Maren.[514]

And I called Maren and explained the situation to Maren, because I needed help. I didn't have any family with me here. The people who I thought were my community, my family, turned their backs on me. No one would help me.  So even my advisor suggested that I needed to get outside help, someone who would help me and actually care about me and what's good for me.

So on November 15, 2016, the undersigned drafted a letter to CSC Health Services, requesting DOE's health and counseling records.  The letter was mailed from Scottsbluff; it seems unlikely that the letter was received before Hansen's reply to DOE's November 14, 2016 email.

Hansen's response to DOE's November 14 email came more quickly than his fourteen-days-delayed response to DOE's October 31 email.  Hansen sent his reply in a memorandum attached to an email on November 16, 2016, also copied to DeMersseman.  He wrote:

Your first option is to complete the semester via independent study, which the College has already approved.  When your courses require your physical presence on campus, you are welcome to be escorted by a campus security officer.  This option will allow you to finish your coursework and remain on track to graduate in December, 2016.

Your second option is to transfer to another institution.  Please understand that this will likely impact your graduation date, as you will not have finished your courses at Chadron State College and will likely need to complete another semester at the institution to which you transfer.  If you choose to transfer to another institution, we will do our best to ensure that it is a smooth transition for you.[515]

---

[514]Professor Leesch did not mention this in her deposition.

[515]*Deposition exhibit 92*.

131

Hansen acknowledges that he was not changing anything he had previously decided.[516]  He was not going to change Ige's restrictions or remove Ige from campus, no matter what DOE said.

DeMersseman, who was copied on Hansen's email, was asked in deposition why these "options" were put to DOE, rather than to Ige:

Q:      What about telling Mr. Ige that [taking classes online or transferring] are his options, since he's the one who was found to have committed a serious violation of board policy?

A:      I think either option could have been considered.

Q:      Either option of what?

A:      For her or for him.

Q:      So why didn't you advocate for having him be the one that has to have a change to his campus lifestyle?

A:      Because I didn't.  I can't tell you why I didn't.  I don't know why I didn't at the time.[517]

She said, "we made judgment calls based on the information we had at the time"[518] – and the information they had, as documented by DeMersseman herself in **Depo. exhibit 1**, was that Ige vaginally and anally raped DOE, on campus, on two occasions when she was working as a security officer.

DOE understood Hansen's November 16 email for exactly what it was.  She testified:

Q:      Did this look like a letter that says that they were willing to protect you?

---

[516]**Hansen depo.** 199:20.

[517]**DeMersseman depo.** 194:16.

[518]**DeMersseman depo.** 196:05.

> A:     Not at all.  All he's telling me is "we have an online option with you," even though I told him that I did not want to take online classes.[519]

Hansen wrote what he wrote – the equivalent of *I am not budging for you.*

> In DOE's deposition, the defense asked DOE:

> Q:     Do you know of any way the college could have protected you from the fear of seeing Mr. Ige, or the fact of seeing Mr. Ige, other than assuring that he was never on campus?

> A:     Right now, I'm not sure how to answer that question, because I trusted them before they lied to me. I trusted them again. And then they violated  my trust again, and ... [520]

The defense allowed DOE to take a break in her deposition at that point.  After the break, DOE explained further:

> Well, I think that the best way was to ban him off the campus. But I wrote to Jon Hansen after I saw the disciplinary decision.  And he basically disregarded my concerns, decided that they were not going to ban him. And kept on saying that I'm approved for independent study, and that I requested independent study even though I didn't.  Every effort I made to try to work with them was met with them lying to me, violating my trust, and then just basically telling me they're not going to do anything.

> They offered me independent study to take my courses online, which is -- after explaining to Anne DeMersseman, that as the victim, I don't want to be  penalized. They still went ahead and tried to give me independent study, even though I told them numerous times that I did not want independent study. I wanted to have the same right as other students.  I wanted to study in my classes, be in class, continue to answer questions, continue to ask questions.  And continue to basically live as normally as I could without having to feel like I'm the one who's being penalized even though I'm the one who was raped.[521]

When I e-mailed Jon Hansen about not being happy with the disciplinary decision, I

---

[519]***DOE depo.*** 233:09.

[520]***DOE depo.*** 178:24.

[521]***DOE depo.*** 180:04.

asked him about my options, because I was so frustrated, and it seemed like they weren't going to do anything. And he suggested independent study. And he told me I was approved for independent study even though I didn't request independent study. And I even explained that to Dr. Bogner whom they asked about independent study for. And I expressed my concerns to him about wanting to attend class and not wanting to do classes online. Especially since I had classes like [Courtroom Survival] that required me to be in there, because we did have mock trials. And I did not want to do independent study. I wanted to continue to go to my classes and graduate with amazing grades.

But the only option Hansen ever gave DOE was take online classes or have a uniformed security escort follow her around (which would not prevent further encounters with Ige). CSC failed to tell DOE when it reneged on its promise to move Ige out of Kent/High Rise/Andrews, and it sent Ige to counseling in the same two-person counseling center where DOE had been receiving counseling for a year, without asking DOE or even the counselors if this were a good idea. DOE's reservoir of trust in CSC had run dry.

AA.     Defendant's offers to "help" after DOE seeks counsel

So on November 18, 2016, the undersigned mailed a letter to Hansen and DeMersseman, asking that they preserve evidence, send records and cease direct contact with DOE. The official response came from Defendant's System Director of Title IX, Taylor Sinclair, who sent a letter to the undersigned on November 22.

Sinclair claimed that she wanted to assure that DOE "has proper access to educational opportunities" and claiming that if DOE has requests, "we can consider them and, to the extent reasonably possible, implement them before classes resume after the Thanksgiving break."[522] Sinclair sent a similar letter on November 30, and reiterated Hansen's position that CSC does not have to do

---

[522]*Letter from Taylor Sinclair to Maren Lynn Chaloupka* dated November 22, 2016.

134

any more than it did and that DOE is wrong, but that DOE should nonetheless authorize the undersigned to let CSC know if she would like a plain-clothes escort[523] to follow her around in the event she encounters Ige in the course of Ige's unrestricted travel around campus.[524]

Even this belated "offer" of a plain-clothes escort was still not a restriction on Ige – it was still a restriction on DOE, and still one that forced her to come to campus and risk encountering her rapist.  Charol Shakeshaft, DOE's expert witness, explains that

> I wouldn't be surprised that she wouldn't trust it.  She hadn't seen anything come forward that would indicate an openness to resolving the issues differently.  So I wouldn't expect her to trust it without some concrete offer, like, we've decided to ban Mr. Ige, or we will do this, I didn't see any of that.  I didn't see anything that would, for me, indicate that there was some serious kind of change in terms of the consequences to Mr. Ige.[525]

Whatever Sinclair was "offering" was still, in the end, the insistence that Ige, the rapist, should get to go to the gym without an escort, to the Student Center without an escort, to class without an escort and safe in the knowledge that even admitting to committing two rapes in the dorms will not get him banned from campus.

DOE's reaction was:

Q:   When Taylor Sinclair sends a letter to me saying, "okay, now, we're *really* ready to help," did you believe her?

A:   Absolutely not.  I had no reason to trust them.  I had no reason to believe

---

[523]That was the first time a plain-clothes escort was offered; still, there was no explanation of how any escort, uniformed or otherwise, could prevent further encounters with Ige, or how the presence of an escort could prevent a panic attack, or how DOE could trust in the availability of escorts when she needed them.

[524]*Letter from Taylor Sinclair to Maren Lynn Chaloupka* dated November 30, 2016.

[525]*Shakeshaft depo.* 60:15.

them. I trusted them and tried to work with them numerous times.  And each time it just sent me back mentally, because every time I believed and trusted in them, they let me down and it made me not want to trust anymore.  It made me feel like I had no one to turn to or no one to help me and that no one cared about me.  I felt like I'm the victim, but I'm the one who's being penalized.  What did I do wrong?  I was the one who was raped, and I still feel like I'm the one who's being penalized.[526]

Sinclair's "offers" came far too late, and after far too many disappointments and betrayals, for DOE to say, "sure, I'll trust you people again."

We ask this Court to consider the fact that Defendant has questioned repeatedly whether DOE was really raped.  Hansen and DeMersseman questioned it after DeMersseman found that she was.  In this litigation, Defendant refused to answer a Request for Admission on that point.  Hansen and DeMersseman both hinted in deposition that maybe it wasn't really a rape-rape, or something.  Defense counsel questioned DOE *extensively* on the details of both rapes, even though DeMersseman had found that Ige raped DOE in May and September, as if it was necessary to see if DOE could accurately describe how rape happens.[527]  Even Defendant's Motion and evidentiary submission are designed to slyly insinuate that this wasn't really rape.  **All of that should be kept in mind in gauging whether Sinclair's offers to "help" DOE, coming after Hansen had told DOE *I am not budging*, were made in good faith.**

DOE did graduate in December 2016.  Most CSC students need six years to graduate or even

---

[526]**DOE depo.** 234:24.

[527]The undersigned would not raise this point if this lawsuit were about a failure to find that the rapes happened – in such a situation, such questioning might well be appropriate.  But DeMersseman questioned DOE twice, read the reports of the police interviews of DOE, interviewed Ige, watched the videos, read the text messages and found that "sexual acts occurred in May and September which you did not consent to."

more; DOE completed her bachelor's degree in 3 ½ years, in spite of the trauma of her final year.

DOE's expert witness, Charol Shakeshaft, responds to any anticipated argument that this means that

being raped, and dismissed by CSC, was not a meaningful harm:

> Q: Relating to the fact that [DOE] kept her grades up, graduated ahead of schedule, did the work she needed to do in order to mitigate the harm of this situation as best she could, does that mean that there was no deprivation?
>
> A: No.  The research on trauma of rape survivors indicates that there's all sorts of coping mechanisms but that the trauma and the effects of trauma still play themselves out.
>
> Q: Can you say more about that?  Because it might be an easy argument to make that, "well, look, she kept her grades up, she graduated ahead of schedule so apparently no harm, no foul, no deprivation."  What's the response to that?
>
> A: What I would say is that, is that first of all, there was a harm because the experience of attending college isn't just that you keep your grades up.  It's that you can interact, that you can go to the library, that you can do things, that you feel safe, you feel comfortable, that you're not subjected to high levels of stress and trauma which later on can affect your health and well-being.  So that's certainly one measure of what happens in college is courses and grades, but that's not the whole experience of college.  And from my perspective, from May onward, Anna experienced heightened stress, fear, limited mobility, limited access to college resources, activities, entertainment, and reduced access to job possibilities.[528]

# ARGUMENT

## STANDARD OF REVIEW

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the

moving party establishes that there is no genuine issue of material fact to be resolved at trial and that

---

[528]*Shakeshaft depo.* 51:09.

the moving party is entitled to judgment as a matter of law.[529]   A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law."[530]   Materiality is determined by the substantive law that governs the case, and "only disputes over facts that might affect the outcome of the suit under governing law will properly preclude the entry of summary judgment."[531] "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."[532]

In moving for summary judgment against the party who will bear the burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim.[533]   "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.  It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must designate facts showing that there is a genuine issue for trial."[534]   The non-moving party, in order to defeat summary judgment, must then come

---

[529]*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

[530]*Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir.1995) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

[531]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[532]*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[533]*Celotex*, 477 U.S. at 322-23.

[534]*Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 111 (2d Cir.2001) (*quoting Celotex*, 477 U.S. at 324); *see also Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").

forward with evidence that would be sufficient to support a jury verdict in his or her favor.[535]   In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion.[536]   However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading,"[537] and "some metaphysical doubt as to the material facts" is insufficient.[538]

The pattern jury instructions for this Circuit provide that deliberate indifference is established where the defendant knows of a substantial risk that the plaintiff will suffer a deprivation of constitutional rights under certain circumstances, and where the defendant disregards that risk by refusing or failing to take reasonable measures to deal with the problem.  In the Title IX context, the United States Supreme Court has added that deliberate indifference is defined as "an official decision by the recipient [of federal funds] not to remedy the violation."[539]

## I.

### GENUINE ISSUES OF FACT EXIST AS TO WHETHER DEFENDANT'S ACTIONS EFFECTIVELY REMEDIED THE DISCRIMINATION AND RESTORED DOE'S EQUAL ACCESS TO EDUCATIONAL OPPORTUNITIES

---

[535]*Anderson*, 477 U.S. at 249 ("[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

[536]*Matsushita*, 475 U.S. at 587.

[537]FED. R. CIV. P. 56(e).

[538]*Matsushita*, 475 U.S. at 586; *see also Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (holding that a non-moving party's "mere speculation or conjecture as to the true nature of the facts" will not, by itself, defeat a motion for summary judgment).

[539]*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).

A.    It is not enough to pick remedies from OCR's list of remedies in unrelated cases: the interim measures and final remedies must be effective.

Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[540]   Recipients of federal funding may be liable for damages under Title IX for student-on-student sexual harassment.[541]   There is no dispute that this Defendant receives federal funding and may be held liable for Title IX student-on-student sexual harassment.

When a student sexually harasses another student, it creates a hostile environment.[542]   If the harassment interferes with or limits a student's ability to participate in or benefit from the school's program.[543] If a school knows or reasonably should know about student-on-student harassment that creates a hostile environment, Title IX requires the school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects. The university can generate disciplinary procedures to address complaints of sex discrimination, but all procedures must provide for prompt and equitable resolution of sexual violence complaints.

DOE does not allege that BOARD is liable for her rapes themselves; but BOARD may be held

---

[540]20 U.S.C. § 1681(a).

[541]*Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 653 (1999).

[542]*Soper v. Hoben*, 195 F.3d 845, 855 (6th Cir. 1999) (victim's allegations of rape, sexual abuse and harassment qualify as severe, pervasive, and objectively offensive sexual harassment); *Kelly*, 2003 WL 1563424, at *3 (plaintiff's allegations of rape constitute severe and objectively offensive sexual harassment).

[543]*Know your Rights: Title IX Prohibits Sexual Harassment and Sexual Violence Where You Go to School.* Office of Civil Rights, U.S. Office of Education

liable for deliberate indifference to known post-assault harassment "in a context subject to the school district's control," if the harassment was "so severe, pervasive, and objectively offensive that it can be said to deprive [plaintiff] of access to the educational opportunities or benefits provided by the school."[544]

Where the claim is premised upon the school's response to the report of the incident or incidents of sexual harassment, as little as a single act of severe sexual harassment can support a Title IX claim.[545]   In the context of Title IX, "there is no '*one free rape*' rule":  a victim does not have to be raped twice before the school is required to respond appropriately.[546]   A jury may conclude that harassment is severe, pervasive, and objectively offensive from evidence that a student who is known to have perpetrated a sexual assault upon another student was permitted to continue attending the same school as the victim.[547]   And, a reasonable jury may conclude that further encounters, of any sort, between a rape victim and her attacker could create an environment sufficiently hostile to deprive the victim of access to educational opportunities provided by a university."[548]

Just because a remedy selected by a school is among "the same types of remedies that [the

---

[544]***Davis***, 526 U.S. at 645, 650; ***Kelly v. Yale Univ***., 2003 WL 1563424, at *3 (D. Conn. 2003).

[545]***Vance v. Spencer Cty. Pub. Sch. Dist.***, 231 F.3d at 259 n.4; ***S.S. v. P.L. et al.***, 177 P.3d 724, 742-43 (Wash. App. 2008).

[546]***S.S. v. P.L. et al***, 177 P.3d 724, 741 (Wash. App. 2008).

[547]***Doe ex rel. Doe v. Derby Bd. of Educ.***, 451 F. Supp.2d 438, 444 (D. Conn. 2006).

[548]***Kelly, supra***, 2003 WL 1563424, at *3.

United States Department of Education/Office of Civil Rights would seek in its cases[549]" does not mean that the selected remedy is automatically appropriate for *every* case – or that such remedy was automatically appropriate for *this* case.  To the contrary, when the available facts show that the school's choice of remedy will not address the discrimination created by student-on-student sexual assault, and will not ensure a rape victim's equal access to educational opportunities, then the school cannot hide behind OCR's list of what might work in other cases whose facts are meaningfully dissimilar.

We would draw the Court's attention to **S.S. v. P.L.**,[550] a Title IX case brought by a student who worked as an assistant equipment manager for the football team.  She reported that a student-athlete, with whom she had previously had a consensual relationship, raped her in her dormitory room.  Like DOE herein (and many rape victims), the plaintiff of **S.S.** did not immediately report that rape.  She "just wanted to forget what happened," and she continued her work with the football team despite that she was occasionally exposed to contact with her assailant as a result.  She avoided social contact with the assailant and other football players for the rest of that school year.[551]

She first reported the rape over the summer, to an assistant coach.  The assistant coach passed along the report to the team's equipment manager, who asked the plaintiff if she would like to speak with the head football coach about the incident; she declined.  Eventually, the associate athletic director summoned the plaintiff to a meeting with other administrators.  The plaintiff reported that

---

[549]*See, e.g., Correspondence from Taylor Sinclair to Maren Lynn Chaloupka* dated November 30, 2016 at 2.

[550]*S.S. v. P.L. et al.*, 177 P.3d 724 (Wash. App. 2008).

[551]*Id.* at 729.

the assailant had "violated" her.  The administrators suggested that she transfer to a different job, and warned that members of the team might harass her.  Like DOE, the plaintiff did not want to leave her job.  The only other option presented to the plaintiff that day was counseling.

Thereafter, the Title IX compliance officer decided to conduct a mediation between the plaintiff and her alleged rapist.  No other options were presented to her for dealing with the situation, although the plaintiff had given detailed accounts of the rape.  At the mediation, the assailant – unlike Mr. Ige herein – denied the plaintiff's allegations.  The administrators refused to suspend the assailant, but decided that he would undergo counseling and would perform community service.[552] The plaintiff expressed her dissatisfaction, to no avail.  The only relief the university offered was for the plaintiff to transfer away from her job, which the plaintiff still did not want to do.[553]  When she learned that another student had made a similar rape allegation against her assailant, she filed suit.

After finding that the plaintiff had met the requirement of showing that she had suffered sexual harassment by her assailant, the Washington Court of Appeals turned to the question of whether university officials had actual knowledge of the discrimination.   It found that the administrators, including the Title IX coordinator, were "appropriate persons": "[e]ach holds an administrative position involving the exercise of significant discretion and each plainly had the authority to institute corrective measures."[554]  Each was in a position to exercise control over the perpetrator and the context in which the rape took place.  The court found that the plaintiff had met

---

[552]*Id.* at 730-31.

[553]*Id.*

[554]*Id.* at 738.

143

this requisite element of her Title IX claim.

The **S.S.** court then found that the plaintiff had presented "ample evidence to raise a jury question" on the issue of deliberate indifference. This included, relevant to DOE's case:

*      A lack of appropriate discipline of her assailant;

*      Minimizing the effects of the rape;

*      Treating the victim equally with the assailant in the mediation process;

*      Offering no alternative remedial measure except another mediation;

*      Not notifying the university's own police force of the report of a violent sex crime;

*      Repeatedly suggesting that the plaintiff leave her job with the football program while the assailant would remain on the team;

*      "Wearing [the plaintiff] down until she believed that further complaints would be futile"; and

*      Questioning the plaintiff's truthfulness when she expressed her dissatisfaction with the results of the mediation.

The **S.S.** court held that "each of those claims finds support in the federal case law as an indication of deliberate indifference. At a minimum, a jury question is presented."[555]

The university claimed that the plaintiff failed to offer proof that it caused her to suffer discrimination. The **S.S.** court held that

> these factors combine to limit a recipient's damages liability to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs. Only then can the recipient be said to 'expose' its students to harassment or 'cause' them to undergo it 'under' the recipient's

---

[555]***Id.*** at 740.

144

programs.[556]

By submitting evidence that "appropriate persons" had control over the assailant and the campus environment wherein the rape occurred, and that they had responded in a deliberately indifferent manner to actual knowledge of the rape, the plaintiff had submitted sufficient proof of causation to generate a jury question.

The **S.S.** court further agreed that the plaintiff had presented sufficient evidence that the discrimination to which she was subjected was severe, pervasive and objectively offensive.  The plaintiff had not sought damages for the rape itself; like DOE's case herein, the **S.S.** case presented the question of the school's responsibility for the "deleterious effects of the rape's aftermath that resulted from actions of the university."[557]  The plaintiff asserted that the university did not ameliorate the discrimination she suffered or seek to remedy its effects; instead, it "exacerbated the damage done by the discrimination and enhanced its discriminatory impact."[558]  The **S.S.** court agreed that a single act of rape was sufficient to support her claim for injury caused by actions of the university after she reported the rape.

The university then claimed that there was no evidence that the plaintiff suffered injury, as she remained enrolled in school and continued her work in the athletic department.  Analyzing this claim, the **S.S.** court observed that a total bar or exclusion from educational opportunities is not required, but rather the denial of "equal access to an institution's resources and opportunities."[559]  The

---

[556] *Id.* (*quoting* ***Davis v. Monroe County Bd. of Educ.***, 526 U.S. 629, 645 (1999)).

[557] *Id.* at 740.

[558] *Id.* at 740-41.

[559] *Id.* at 743 (*quoting* ***Davis***, 526 U.S. at 650).

145

plaintiff submitted evidence of her distress, anxiety and emotional hurt, as well as evidence that this interfered with her studies.  She provided evidence that "the enjoyment of her student employment opportunities was compromised by the actions of university officials."[560]  Her evidence showed that the university's handling of her rape report resulted in her being denied the full benefit of her educational experience, both in the classroom and in the athletic department; it was for a jury to determine whether those effects were real, negative and substantial.

Similarly, in **Doe v. Derby**[561], a 17-year-old male high school student sexually assaulted a 13-year-old female student, off of school grounds and during summer break.  It was undisputed that this was a single incident of sexual assault, and there was no evidence that the assailant ever harassed the girl thereafter.  The school suspended him from school for 10 days.  As the middle school and the high school held classes in the same building, the female student transferred to another school.

The **Derby** court found that the fact that the assailant was permitted to continue attending school in the same building as the victim after the assault, "leaving open the constant potential for interactions between them," mattered.  That evidence "could support a reasonable jury conclusion that these circumstances rose to the level of 'severe, pervasive and objectively offensive' discrimination."[562] The plaintiff had stated that she saw the assailant during the school year, and that the experience of seeing him was "very upsetting," and made the school year "very hard."[563]  Even absent actual post-assault harassment, the fact that the assailant and plaintiff merely attended school

---

[560]*Id.* at 745.

[561]***Doe v. Derby Bd. of Educ.***, 451 F. Supp.2d 438, 447 (D. Conn. 2006).

[562]*Id.*, 451 F. Supp.2d at 444.

[563]*Id.*.

146

together could be found to constitute pervasive, severe and objectively offensive harassment.

It is true that a school is not required to "engage in [a] particular disciplinary action"[564]; and it is also true that schools are deemed "deliberately indifferent to acts of student-on-student harassment "only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."[565]  But "[w]here a school district has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances."[566]

B.    CSC was deliberately indifferent in prioritizing Ige's access to educational opportunities over DOE's.

Title IX requires a school to take steps to ensure equal access to its education programs and activities and protect the complainant as necessary, including taking interim measures before the outcome of an investigation.[567]  "Equal access" means more than "we won't make the rape victim and rapist attend the same class."  It means taking into account how rape affects the survivor.

It is inaccurate, and demeaning, to suggest that as long as the rapist is not physically in the rape victim's space and threatening to rape her again, everything is okay.  Rape victims contend with physiological aftershocks even when the rapist is not physically present, especially when they know that the rapist could emerge at any time.  Robin Bila explained:

Q:    Do you agree that the potential for further encounters, if the victim is always

[564]*Davis*, 526 U.S. at 648.

[565]*Id.*

[566]*Vance v. Spencer Cnty. Pub. Sch. Dist.*, 231 F.3d 253, 260-261 (6th Cir. 2000).

[567]*Know your Rights: Title IX Prohibits Sexual Harassment and Sexual Violence Where You Go to School, Office of Civil Rights, U.S. Office of Education.*

147

having to be watchful for her perpetrator, can make things difficult for her?

A:     Yes.

Q:     That's part of rape trauma syndrome, isn't it?

A:     Yes.

Q:     I take it that [DOE] is not the only client that you've treated who's had rape trauma syndrome?

A:     Right.

Q:     Per your training and experience, how can it affect a rape victim to have further encounters with her assailant?

A:     It re-traumatizes them.

Q:     Say more.

A:     Anxiety.  It could cause flashbacks.  It could cause panic attacks, depression.

Q:     How does it affect their function then from there?

A:     That differs on each person.  Everybody has their own way of coping, but it can cause them to shut down or not be as effective at their job or in the classroom.

Q:     Can it be just always something that, always a feeling that's present, always wondering if he's going to be there?

A:     Yes.

Q:     Can that affect function –

A:     Absolutely.

Q:     – if part of your mind is always having to be turned on to watching for the attacker?

A:     I'm sure it does.

Q:     If a victim has sought accountability for her attacker and she still is at risk of encountering him, how can that affect her?

148

A:     In the same way, same way it would if she encountered him, it's the same thing.[568]

And one need not be a mental health professional to figure this out – just a decent human being.  DOE's Justice Studies professor Lisette Leesch testified:

Q:     How do you think it would affect a victim of rape to know that the college was allowing him to be almost completely unrestricted on campus?  And on this what I'm doing is I'm just asking you to put yourself in the shoes of a rape victim.

A:     To empathize with a student, I would imagine they would feel very badly.

Q:     And to know that the rapist is not going to be removed from classes, still be able to attend class in the same way that he did before he admitted to rape, how do you think the victim would feel about that?

A:     I think the victim would feel bad. I think they would not appreciate it. I don't think they'd like that.

Q:     How do you think the victim would feel upon knowing that the rapist was ordered to attend counseling at the same place where she attends counseling?

A:     I don't even know what to say to that one. I imagine the victim would feel -- I imagine they would feel that they were not very comfortable to go to the counselor's office.[569]

Presumably Leesch would not have told DOE to call the undersigned[570] if she thought that her employer was doing right by DOE under Title IX.

For the rape victim to know she will not see her rapist in the gym or the cafeteria or the computer lab or in the hall between classes helps restore her equal access to educational opportunities.

---

[568]*Bila depo.* 31:18.

[569]*Leesch depo.* 42:17.

[570]*DOE depo.* 174:13.

But, for the rape victim to know she could see her rapist anytime, anyplace except inside one dormitory does not restore her equal access to educational opportunities – it forces her to either avoid campus, or navigate campus in fear. **As between the rape victim and the rapist, the rapist has access to educational opportunities equal to other students – the rape victim does not**.

The issue of "as long as a school does *something*, that is enough" was addressed in the case of ***Vance v. Spencer Cty. Pub. Sch. Dist.***[571]   The plaintiff was a female student who made multiple reports that male students were bullying and sexually harassing her.  Throughout those reports, the harassment only increased.  When the plaintiff filed a formal complaint  under Title IX, the Title IX Coordinator allowed the plaintiff to complete her remaining few weeks of school at home, but did not address the specific harassment allegations before the new school year began.  Finally, after more harassment, the plaintiff withdrew and filed suit.

After the trial court upheld a jury verdict in favor of the plaintiff, the school district appealed, complaining that the trial court should have sustained its Rule 50 motions.  The pivotal issue identified by the United States Court of Appeals for the Sixth Circuit was whether the school had been deliberately indifferent in its response to the plaintiff's reports.  The school district claimed that "the intent standard governs Title IX student-on-student claims," meaning that "as long as a school district does something in response to harassment, it has satisfied the standard."[572]

But the Sixth Circuit disagreed with this interpretation:

If this court were to accept [the school district's] argument, a school district could satisfy its obligation where a student has been raped by merely investigating and

---

[571]***Vance v. Spencer Cnty. Pub. Sch. Dist.***, 231 F.3d 253, 260-261 (6th Cir. 2000).

[572]***Vance***, 231 F.3d at 260.

absolutely nothing more. Such minimalist response is not within the contemplation of a reasonable response. Although no particular response is required, and although the school district is not required to eradicate all sexual harassment, the district must respond and must do so reasonably in light of the known circumstances. Thus, where a school district has knowledge that its remedial action is inadequate and ineffective, it is required to take reasonable action in light of those circumstances to eliminate the behavior. Where a school has actual knowledge that its efforts to remediate are ineffective and it continues to use those same methods to no avail, such district has failed to act reasonably in light of the known circumstances.[573]

The response of the school had been to "talk to" the plaintiff's assailants; the school had also failed to investigate when a formal Title IX complaint was filed. The court found that the school's chosen remedy of "talking to" the offenders produced no results, yet the school continued to employ that ineffective method – which "reflect[ed] a deliberate indifference in light of the known circumstances."[574] "Although Title IX does not require certain specific responses," the *Vance* court held, "it does require a reasonable response, which [the district] failed to provide."[575]

*Vance* has application here, where DeMersseman, Hansen and Beu showed their deliberate indifference in their words, their failure to respect their Title IX training and the disrespect they showed DOE. As Defendant's relevant administrators, they went through the motions of Title IX compliance. But there is a meaningful "semi-colon-*but*" for each point of CSC's alleged compliance:

* CSC always had someone in the role of Title IX coordinator**; but** the staffing of that role changed on an annual basis, and the person holding that role was always performing Title IX duties on top of his or her full-time, dedicated job duties.

---

[573]*Id.* at 260-61, *citing* **Murrell v. School Dist. No. 1**, 186 F.3d 1238, 1243 (10th Cir. 1999); **Wills v. Brown Univ.**, 184 F.3d 20, 25 (1st Cir. 1999); **Doe v. School Admin. Dist. No. 19**, 66 F. Supp.2d 57, 60-64 (D. Me. 1999).

[574]**Vance**, 231 F.3d at 262.

[575]*Id.* at 263.

151

\*     CSC has, in the years 2014-2017, done "something" when its various Title IX coordinators find that sexual assault occurred**; *but*** it never banned the perpetrators from its campus (i.e., told them to finish their studies online), much less actually expelled any of the perpetrators who were found to have committed sexual assaults. It showed how seriously it takes sexual assault, and the message it sends to both perpetrators and victims, by allowing perpetrators to not only continue their studies at CSC, but to physically come to campus and be part of campus life, so that the victims must live in a state of hypervigilance knowing that the perpetrator could appear anywhere;

\*     CSC promptly opened a Title IX investigation upon report from the Chadron Police Department**; *but*** its own administrator, Pat Beu, didn't care enough about the seriousness of this report to just answer DeMersseman's question about an apparent prior no-contact order against Ige (which he may have never delivered to Ige at any rate) while the investigation was ongoing;

\*     CSC established a safety plan that would move Ige out of the Kent/High Rise/Andrews complex so DOE could keep her duty assignment without risk of triggering the panic attacks that would come in encountering Ige**; *but*** CSC then contracted that safety plan and did not care enough to tell DOE and left DOE to find out on her own by encountering Ige in the dorm;

\*     CSC gave DOE a new duty assignment for her work**; *but*** DOE did not want a new duty assignment, especially not so that Ige could remain free to move anywhere he wants around the campus. DOE enjoyed the setting of her original duty assignment and the opportunities that came with it to earn extra income over breaks;

\*     CSC put a no-contact order on Ige**; *but*** CSC also put a no-contact order on DOE, sending DOE the message that it regards her to be an equal participant in the rapes;

\*     CSC found that Ige had twice sexually assaulted DOE, and that DOE did not consent to sex with Ige either time**; *but*** its top administrators then talked themselves out of that finding. They did not amend or withdraw DeMersseman's finding, but – after DOE began pushing back against the restrictions CSC placed on her – simply convinced themselves that the rapes DeMersseman found to happen, which Ige admitted to, were not real or were not serious, or something.

\*     CSC followed the necessary procedures to obtain Ige's admission to the finding that he had twice sexually assaulted DOE, and his waiver of due process rights**; *but*** it then failed to inform DOE of that critical development (or communicate

152

with her at all) for two weeks thereafter, at a time when DeMersseman knew and had personally seen DOE to be in acute distress;

\* CSC took into consideration the fact that Ige apparently needed "supervision," as Sherri Simons indicated as her reason for not moving Ige into the Edna Wing dorm**; but** then formulated a sanction that "supervised" Ige for a whopping month after issuing its sanctions decision, and even that "supervision" consisted only of him spending an hour per week with a master's level counselor. It was not the "supervision" proportionate to DeMersseman's finding that Ige twice raped a campus security worker in CSC dormitories;

\* CSC told Ige that he was on "behavioral probation"**; but** no one was assigned to oversee this so-called probation, and it had no terms and conditions other than conditions to be completed within about a month of Hansen's sanctions letter. Given the seriousness of what DeMersseman found Ige to have done to DOE, it amounted to a "two free rapes" rule to tell Ige that he would face suspension and possible dismissal only if there were future "reports of similar behavior."

\* CSC approved DOE to finish her classes online**; but** DOE did not want online classes and, as Hansen had to repeatedly acknowledge, she did not request online classes. Hansen moved DOE into online classes without DOE's consent, beginning just hours after DOE emailed him to say that Hansen's decision to let Ige travel freely around campus was compromising her access to educational opportunities. DOE wanted to attend class, be part of campus life and finish her college career in freedom, not fear. DOE did not want to spend the rest of her semester in her apartment so that Ige could be allowed to travel about the campus unrestricted;

\* CSC encouraged DOE to attend counseling, and DeMersseman and Hansen had actual knowledge that DOE was a patient of the CSC Counseling Center (DeMersseman spoke directly with Bila)[576]**; but** in spite of that actual knowledge, CSC injected Ige into the safety of DOE's counseling environment, a small basement clinic with only two professionals, after showing a pattern of reckless disregard for the need to communicate with DOE regarding Ige;

\* CSC picked a sanction for Ige, *e.g.,* counseling, that is one of a type of remedies that OCR has sought in other cases**; but** it did so utterly recklessly. Hansen considered that it might create a conflict of interest to send the perpetrator to the same two-professional clinic as his victim, but made no inquiries of any

---

[576]*DeMersseman depo.* 172:10; *Bila depo.* 77:02.

mental health professionals or DOE to explore that consideration. Hansen knew the Counseling Center had no protocols or specialists trained in the treatment of sex offenders, and did not have any reason to think that a few sessions of counseling could change someone who twice raped a security worker into a non-rapist. Hansen knew he had no idea what the plan or scope for counseling Ige would be, and did not even communicate with the Counseling Center about making Ige its new patient before he issued his sanction.

\* CSC banned Ige from the new workplace it forced DOE into by agreeing to ban Ige from Brooks Hall*; but* it allowed Ige the run of the rest of the campus. In Hansen's October 25, 2016 correspondence to DOE, Hansen made absolutely no acknowledgment of how much banning Ige from only Brooks Hall would restrict DOE. Ige could go to the Student Center, the library, the gym, classroom buildings, the computer lab, any dorm except Brooks, football or basketball games and club meetings. He only had to leave if DOE saw him.

\* CSC offered DOE a security escort when DOE pointed this out*; but* DOE had made it clear, in her October 31, 2016 email, that the problem is the impact on her if she encounters Ige, which Hansen had no reason to believe would be ameliorated by the presence of a uniformed student security escort. A student security escort cannot prevent a crippling panic attack, and a student security escort cannot do anything to Ige. A student security escort can, however, make DOE feel visible, conspicuous and unable to move freely and normally around campus.

As in *Vance*, "such minimalist response is not within the contemplation of a reasonable response."[577]

Their deliberate indifference – their failure to care just a little bit – is further shown in their disrespect when DOE articulated legitimate concerns about her access to educational opportunities. On September 30, DOE told DeMersseman when she had encountered Ige in the dorm complex due to DeMersseman contracting the safety plan and not telling DOE. On October 31, DOE told Hansen and Beu that Hansen's sanction was compromising her access to educational activities while allowing her rapist to keep his full access. On November 14, DOE told Hansen and DeMersseman again that

---

[577]*See, e.g., Vance* at 260.

she did not want to take online classes, and she wanted her access to campus restored.

**But all that any of DOE's efforts ever accomplished was lectures by Hansen and DeMersseman about why DOE had to accept their decisions to let Ige have the run of the campus.**  When DOE confronted DeMersseman about encountering Ige when she thought she was going to be safe returning to work at Andrews, DeMersseman documented:

> Said she gave up her shift last night when she found out Anthony had only been banned from Andrews, not moved to a different complex.  I explained why we thought it was more effective to ban him from her building.[578]

When DOE emailed Hansen on October 31 to say she felt unsafe on campus after reading Hansen's October 25 sanction letter, Hansen moved her into online classes without her consent, then wrote back fourteen days later to tell her that she would have to accept restrictions because he wasn't changing anything for Ige, using a tone that he agrees sounds like he was criticizing DOE for speaking up.[579]  When DOE wrote back to Hansen again on November 14, Hansen's response was still to tell DOE that if she can't accept that she could encounter Ige anywhere on campus except inside Brooks Hall, then she can either finish her classes online or transfer.[580]  Even Taylor Sinclair's correspondence to the undersigned reiterated what Hansen had already said: *we are not budging for DOE.*

*What else did DOE need to say?  What "magic words," had she said them, would have caused Defendant to change its position?*  These are educated adult professionals, trained in Title IX concepts like "watch victim-blaming" and "for serious sexual misconduct, the primary purpose [of a sanction]

---

[578] *See, e.g., Depo. exhibit 24* at 3.

[579] *Depo. exhibit 5.*

[580] *Depo. exhibit 31/91.*

should not be developmental."[581]   They know a rape victim should not have to beg for the right to attend class without fear.  Beu knew DOE was already fragile before the rapes.[582]  DeMersseman and Hansen both knew DOE was already in counseling.[583]  But they didn't care about anything except their convenience, and the only magic words DOE could say that they would accept were "I give up – I'll go back to *enduring*."

C.    This is not a silly case about a "dissatisfied"[584] woman; it is about denying a rape victim equal access so she could attend school without fear.

This is not a case about a vaguely annoying guy pestering a coed for a date a time or two; it is about two violent rapes, perpetrated by a student who felt unafraid to force a campus security worker into vaginal and anal sex against her will, in a dormitory.  The first rape left the victim with a sexually transmitted infection and physical injuries that persist to this day.

This is not a case about a boyfriend and girlfriend who fight and get back together and fight and get back together.  It is about acquaintances who were not dating.  DOE had to ask for Ige's phone number after the second rape so that she could message him and tell him to leave her alone.

This is not a case about a respondent who denied the allegations and fought his way through due process.  It is about a perpetrator who accepted the findings that he committed rape and waived his due process rights.

This is not a case about a failure to find that sexual assault occurred; it is about an unqualified

---

[581]*Depo. exhibit 55*; *Hansen depo.* 50:25.

[582]*Depo. exhibit 58* at 1.

[583]*Depo. exhibit 1* at 3; *DeMersseman depo.* 172:10; *Bila depo.* 77:02; *Hansen depo.* 158:08.

[584]To use Defendant's verbiage at p. 32 of its Brief.

finding, after a complete investigation, that a CSC student raped another student twice.  It is about a finding that the college's vice-president accepted and approved.  And, it is a case about a vice-president and a Title IX administrator then talking themselves out of the finding of rape, beginning when the victim pushed back about encountering her rapist on campus again.

And it is not about "Plaintiff's dissatisfaction," as if she were sending back a steak that were too well-done.  For the defense to use that term suggests a complete failure of empathy, consistent with the failure of DeMersseman, Beu and Hansen to care even a little bit about what life must be like for Ige's rape victim to want to use the computer lab, but is hypervigilant for the potential that a grinning, taunting Ige might saunter into the lab to see if she'll notice him.  Or what it is like for Ige's rape victim to give up a work assignment she enjoyed, after an encounter with the man who forced her face-down onto his bed, anally raped her and gave her a disease.  Or what it is like for Ige's rape victim to try to descend into the basement for counseling with the professional partner of a counselor who is now professionally loyal to her rapist – and to conclude that she can't even see her counselor anymore.

This is not "dissatisfaction."  This is DOE asking for help, and asking for equal access – asking for what she migrated from Africa to the United States for.  For her institutions to not betray her.

The defense intones that its measures must have worked because DOE didn't see Ige very often, other than "only" once where DOE had trusted CSC would keep Ige out of, and "only" another time where the presence of Ige in a classroom building triggered a panic attack that forced DOE to leave class.  *But that's all – pretty good, right?*  Only if we assume that DOE had equal access to campus, which she did not.

Charol Shakeshaft, DOE's expert witness, explained that because Defendant chose to restrict

157

DOE rather than to restrict Ige, the absence of reports that Ige violated the no-contact order does not mean that no-contact order effectively remedied DOE's fear of encountering Ige:

> Q: The defense asked if there were any reports that Mr. Ige ever violated the no-contact order. If there are no violations of the no-contact order because the victim reduces her presence on campus out of fear, does that mean that there's no deprivation?
>
> A: No. What it means is what I said earlier: that everything about the sanctions and what happened after the rapes required the victim to reduce her world. Everything happened to the victim. Everything, every solution was for the victim to have less, less interaction, less opportunity, less contact with others, so it was all about changes in the victim's world, not changes in the offender's world. And so of course there was, you know, there was harm there to the victim. Her life wasn't returned to normality, her life wasn't made whole. It was kept diminished.[585]

Hansen personally engineered an outcome that would reduce the likelihood of Ige violating a no-contact order, but not by removing Ige from the campus. He did it by going to DOE's professor, and other administrators, behind DOE's back and falsely telling them that DOE had "requested" to finish her classes online. Professor Bogner's attendance records show that DOE's classroom attendance plummeted after the rape, and he testified that even when DOE did attend and sign in, she had to leave "abruptly"[586] when she was overcome by symptoms of panic.

The late[587] Robert Chaloupka would have said something like:

> *Lemme get this straight ... you shoo the rape victim off-campus, and then pat yourself on the back for how well your no-contact order worked? Are you kidding me?*

The right way to prevent a rape victim from encountering her rapist on campus is not to remove her

---

[585]*Shakeshaft depo.* 57:17.

[586]*Bogner depo.* 66:08.

[587]And really great.

from the campus.  It is to remove him.  Removing her to keep life normal for him is not equal access to educational opportunities.

Nor does it appear that Defendant considered that remedial measures should reach not only the complainant, but also the school community.  Beu told his assistants that the order banning Ige from Brooks "could end as early as next semester," after DOE graduates – without regarding to whether a man who has twice raped a campus security worker in the dormitories might pose a risk to anyone else.[588]  Asked why a man who admits committing a sexual assault in Andrews Hall should be allowed back into Andrews Hall as soon as the semester is over, DeMersseman answered that "if the individual is no longer there, it would be a consideration" – again referring to DOE's December 2016 graduation date.  Asked what risk assessment he performs to determined whether a rapist must be banned from one dorm but may safely be allowed to anyplace else on campus, Hansen had no answer except "my judgment."[589]

All of this direct and circumstantial evidence shows a college whose administrators know on a theoretical level that they have to comply with Title IX, but who do not really take sexual assault seriously.  The sanctions imposed on perpetrators restrict the victims, not the perpetrators, telling the victims to either:

* Restrict their presence on campus to the few areas that perpetrators are banned from; and/or

* Let a student security escort (who can't do anything) follow them around instead of moving freely and without fear; and/or

---

[588]*Depo. exhibit 39*.

[589]*Hansen depo.* 83:22.

159

> \*      Come to campus but live in a constant state of hypervigilance, panic attacks, and fear.

Victims are punished with no-contact orders when they did nothing wrong.  DeMersseman, Hansen and Simons speak of wanting the result that "protects both parties," even where one of those "parties" has been found to have forced a woman into sexual penetration against her will.  And when DOE pushed back against letting Ige have the run of the campus, Hansen's immediate response was to move DOE off-campus, putting her in online classes without her consent and falsely telling professors and administrators that this is what she wanted.

## CONCLUSION

DOE testified:

> Everything that I -- you know, I always believed that something like this -- like, I would never have been raped in the United States and have my rapist walk away, because I always believed that the institutions here were about justice and about protecting the victims and about helping the victims.[590]

That is what this case is about, and why we are here.  The facts show that Defendant's Motion should be denied.

---

[590]**DOE depo.** 30:03.

160

JANE DOE, Plaintiff,

By: ___/s/ *Maren Lynn Chaloupka*_____
    Maren Lynn Chaloupka – NSBA # 20864
Chaloupka Holyoke Snyder Chaloupka & Longoria,
P.C., L.L.O.
1714 2nd Avenue
P.O. Box 2424
Scottsbluff, NE  69363-2424
Telephone:  (308) 635-5000
Facsimile: (308) 635-8000
mlc@chhsclaw.net

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that a true and correct copy of the foregoing instrument has been sent via CM/ECF on this 23rd day of April 2019 to the following:

| | |
|---|---|
| George E. Martin, III | Thomas E. Johnson |
| Leigh Campbell Joyce | Johnson & Tabor |
| Baird Holm, LLP | 11932 Arbor Street, Suite 101 |
| 1700 Farnam Street, Suite 1500 | Omaha, NE  68144 |
| Omaha, NE  68102 | tjohnson@johnsontabor.com |
| gmartin@bairdholm.com | |
| lcampbell@bairdholm.com | |

      ___/s/ *Maren Lynn Chaloupka*_____